1  MARC J. WINTHROP -- State Bar No. 63218
   mwinthrop@winthropcouchot.com
2  GARRICK A. HOLLANDER -- State Bar No. 166316
   ghollander@winthropcouchot.com
3  JEANNIE KIM – State Bar No. 270713
   jkim@winthropcouchot.com
4  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
5  660 Newport Center Drive, Ste 400
   Newport Beach, CA 92660
6  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
7
   [Proposed] General Insolvency Counsel for
8  Debtor and Debtor-in-Possession

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**
                **SANTA ANA DIVISION**
12

13 | In re: | Case No. 8:11-bk-23362 SC |

14

15 ☐ ENERGY AND POWER
      SOLUTIONS, INC., a Delaware
16    corporation

   ☐ DAIRYGEN, LLC, a California limited
17    liability company

18 ☐ NEC - EPS HOLDING, LLC,
      a Delaware limited liability company

19 ☐ FRANKLIN ENERGY CENTER,
      LLC, a Delaware limited liability
20    company

21 ☐ LYNN ENERGY CENTER, LLC,
      a Delaware limited liability company
22

   ☐ COI ENERGY CENTER, LLC,
23    a Delaware limited liability company

24

25 ☒ ALL DEBTORS

26              Debtors and
                Debtors-in-Possession.
27

28

Jointly Administered with Case Nos.
8:11-bk-23364 SC; 8:11-bk-23365 SC;
8:11-bk-23369 SC; 8:11-bk-23370 SC;
8:11-bk-23372 SC

Chapter 11 Proceeding

**DECLARATION OF PETER LUDLUM IN
SUPPORT OF THE FOLLOWING
EMERGENCY MOTIONS:**

1.   **CASH COLLATERAL**
2.   **PAYROLL**
3.   **KEY EMPLOYEE RETENTION PLAN**
4.   **LIMIT NOTICE**

DATE:    September 29, 2011
TIME:    10:00 A.M.
PLACE:   Courtroom 5C
         411 W. 4th Street
         Santa Ana, CA 92701

1  I, Peter Ludlum, hereby declare as follows:

2  1. I am the Chief Financial Officer of Energy and Power Solutions, Inc., a Delaware

3 corporation ("EPS"), the debtor and debtor-in-possession in the above-entitled chapter 11 case by

4 virtue of its filing of chapter 11 on September 23, 2011 (the "Petition Date"), and am authorized to

5 give this declaration on its behalf. The facts stated herein are within my personal knowledge, and if

6 called upon to testify to such facts, I could and would testify competently thereto.

7  2. I also serve as the Secretary and Treasurer of DairyGen, LLC, a California limited

8 liability company, NEC - EPS Holding, LLC, a Delaware limited liability company, Lynn Energy

9 Center, LLC, a Delaware limited liability company, COI Energy Center, LLC, a Delaware limited

10 liability company, and Franklin Energy Center, LLC, a Delaware limited liability company

11 (collectively, "Related Debtors," or together with EPS, "Debtors")

12  3. In my capacity as Chief Financial Officer of EPS, I have also been responsible for

13 overseeing the financial operations of the Related Debtors. Consequently, I am involved in

14 supervising all aspects of all of the Related Debtors' financial affairs.

15  4. I have been engaged as Chief Financial Officer of EPS since April 1, 2008. In my role

16 as Chief Financial Officer, I have been responsible for overseeing the financial performance of the

17 Debtors. Consequently, I am involved in supervising all aspects of the Debtors' financial affairs.

18 My duties include, but are not limited to, the following:

19   a. supervising the individuals responsible for the maintenance and retention of the

20    Debtors' accounting records;

21   b. supervising the individuals responsible for the management of the daily operation of

22    the Debtors; and

23   c. overseeing the preparation of the Debtors' financial reporting, including, without

24    limitation, its balance sheets and income statements.

25  5. The Debtors' financial books and records are kept in a consistent and organized manner

26 in the ordinary course of the Debtors' businesses. As Chief Financial Officer of EPS, I am very

27 familiar with the Debtors' financial books and records, and have reviewed its financial reporting.

28 ///

**General Description of the Debtors**

6.  EPS is a Delaware corporation with its corporate office located in Costa Mesa, California. EPS, founded in 2002, provides energy efficiency services to manufacturing and other commercial organizations, and owns combined heat and power ("CHP") cogeneration assets at customer locations pursuant to long term energy service agreements. EPS is affiliated with five limited liability companies, or the Related Debtors. The schematic of EPS's corporate structure as included in each of the motions for authority to use cash collateral, pay payroll, pay key employee retention plan, and limit notice is true and correct.

7.  The following is a description of the three business segments in which EPS operates:

a.      xChangePoint®. xChangePoint® is a comprehensive software and consulting platform that tracks real-time usage of electricity, natural gas and water on an equipment, plant and enterprise-wide basis, providing a single portal through which to manage multi-facility energy usage and associated carbon emissions. EPS has two patent applications pending in the U.S. and one patent application pending in each of Brazil, Canada and the European Union. The patents focus on the proprietary method by which the xChangePoint® system compresses, collects and displays data as it is being processed.

b.      Energy Projects. EPS designs, engineers, develops and arranges financing for energy efficiency and clean energy generation projects. EPS identifies these projects through direct sales channels and xChangePoint®, which harvests information across multiple sites to identify savings opportunities at both the plant and enterprise levels.

EPS also delivers automated demand response through controls technology that is compatible with and incremental to xChangePoint®. Demand response has become increasingly important in many utility jurisdictions due to pressures on the grid system during peak demand periods.

c.      Asset Operations. EPS owns CHP projects located at customer sites. None of the sites is operating. When operating, the CHP projects sell energy to customers at prices lower than competing utility rates. EPS owns four CHP projects totaling 9.1 MW through its subsidiary special purpose entities.

**Events Precipitating the Chapter 11 Filing**

8.    In 2007, EPS's management raised $20 million in venture backed capital, primarily to support the development and commercialization of xChangePoint® and to acquire, operate and maintain cogeneration assets. In 2009, EPS raised another $30 million in venture equity.

9.    Notwithstanding the capital raised, EPS continued to sustain losses and consequently suffered from cash flow difficulties primarily from losses incurred as a result of continued significant capital expenditures for developing and commercializing EPS's most valuable asset and business segment – the xChangePoint® software. EPS's cash flows were further negatively impacted by the significant decreases in industrial electrical prices, which directly decreased EPS's revenue.

10.   In need of additional capital to fund the expansion and commercialization of xChangePoint®, EPS sought to raise equity funds through an initial public offering, and then through private placement. Unfortunately, EPS was unable to attract capital investment in light of the downturn in the economy. Accordingly, based on EPS's cash needs, EPS determined that the best, if not only, option to preserve the going concern value and to continue its operations is to consummate a sale of its business. To that end, in or about December 2010, EPS began extensively marketing its business for sale.

11.   Based on its efforts, EPS has identified a buyer for the purchase of its business. Due to EPS's financial condition, the sale transaction must be consummated in Chapter 11 through a Section 363 sale process. The transaction requires Bankruptcy Court approval. In order to consummate a sale and maximize value in this case, on September 23, 2011 (the "Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**The Debtors' Debt Structure**

12.   As of the Petition Date, EPS owed approximately $2.65 million to Silicon Valley Bank ("SVB"), and approximately $5.3 million to NGEN II, LP ("NGEN"). SVB asserts a senior secured claim against substantially all assets of EPS based on its filing of UCC-1s on December 24, 2009 and May 20, 2010. NGEN asserts a secured claim against substantially all assets of EPS based on its filing of a UCC-1 on September 30, 2010.

-4-

13. As of the Petition Date, the Related Debtors collectively owed approximately $5.0 million to TD Bank. TD Bank asserts a secured claim against substantially all assets of the Related Debtors, based on the filing of a UCC-1 on May 4, 2005 and an amendment and continuation statement filed on March 8, 2010.

**Need for Prompt Sale**

14. EPS is facing liquidity constraints and does not have the financial wherewithal to continue to operate its business throughout a prolonged chapter 11 process. The value of EPS's estate would be best preserved and maximized through a going concern sale of its business and assets used therein. Accordingly, EPS has engaged in an extensive marketing process for the going-concern sale of substantially all of EPS's businesses and assets (collectively, "Marketed Assets") in one or more sale transactions to be implemented pursuant to Section 363 of the Bankruptcy Code, subject to a competitive sale and bidding process.

15. I believe that unless a sale of the Marketed Assets is expeditiously consummated, there will be significant deterioration in the value of the business.

16. It is projected that EPS will run out of cash on December 15, 2011. If the sale process is not approved on a prompt basis, the ability of EPS to use its cash may be at risk.

**Debtor's Marketing Efforts**

17. EPS, in conjunction with an investment banking firm, Greentech Capital Advisors, marketed its assets for sale from December 2010 to June 17, 2011. From June 17, 2011 through August 30, 2011, EPS has marketed the assets included in the Asset Purchase Agreement exclusively to the Buyer and from August 31, 2011 to September 14, 2011 to multiple parties. Initially, EPS's investment bankers marketed the software and energy projects business as one asset and the cogeneration plants as another asset. Subsequently, the energy projects and software businesses were marketed separately.

18. The investment banking firm contacted 145 potential buyers. Based on the initial response received, the firm sent a summary "teaser" document and a non-disclosure agreement to 109 potential buyers and conducted follow-up calls with 63 of these firms. EPS obtained signed nondisclosure agreements from thirty-two (32) prospective buyers. Thereafter, EPS made

MAINDOCS-#166876-v3-EPS_PeterLudlumDecl_supportsFirstDayM'ns

1  presentations to seventeen (17) of these firms. Based on these efforts, EPS received letters of

2  interest from four (4) potential buyers, only one of which led to an offer as reflected herein.

3  **Proposed Sale**

4      19.   Based on its marketing efforts, EPS has received an offer from the Buyer to

5  purchase the Acquired Assets[1] for a gross price of Four Million Five Hundred Thousand Dollars

6  ($4,500,000.00), less the cure costs for contracts assumed by the Buyer, which the Debtor expects

7  to be fixed at $1,390,000.00, as set forth in the Purchase Agreement; this amount currently

8  represents the highest or otherwise best offer EPS has received. A true and correct copy of the

9  Purchase Agreement reflecting this offer is attached as Exhibit "2" hereto.

10      20.   The sale of the Acquired Assets ("Sale") is subject to the sale process and, if

11  applicable, the auction process to be proposed in EPS's Motion For Order: (1) Approving Bidding

12  Procedures, Break-Up Fee, And Expense Reimbursement In Connection With Proposed Sale Of

13  Substantially All Assets Of The Estate; (2) Approving The Form And Manner Of The Sale Notice;

14  (3) Scheduling An Auction And Sale Hearing; (4) Scheduling Certain Deadlines; And (5)

15  Approving Procedures For Determining Cure Costs and, ultimately, this Court's approval.

16      21.   I believe a going concern sale of the Acquired Assets will maximize the value of its

17  estate for the benefit of its creditors and other interested parties and is therefore preferable to any

18  effort to dispose of the Acquired Assets on a piecemeal basis through a liquidation.

19      22.   Pursuant to the terms of the Purchase Agreement, the proposed sale must close no

20  later than sixty (60) Business Days after execution of the Purchase Agreement, or December 7,

21  2011. Accordingly, a prompt sale is essential to a successful result in this case.

22  **Cash Collateral**

23      23.   EPS, SVB, and NGEN as collateral agent for certain bridge note holders[2]

24  ("Collateral Agent") have reached a stipulated agreement with respect to the Debtors' use of cash

---

[1] Capitalized terms not defined in this Motion shall have the same meaning as set forth in the Purchase Agreement or the Sale Order.

[2] On or about September 29, 2010, the Debtor entered into a Secured Convertible Note Purchase Agreement ("NPA") with various parties ("Bridge Note Holders") for the purposes of borrowing funds from the Bridge Note Holders.[2] As part of the borrowing, the Debtor also entered into a Security Agreement ("Bridge Note Holders' Security Agreement"). Pursuant to the Security Agreement, the Bridge Note Holders were granted a security interest and lien upon (the "Bridge Note Holders Pre-Petition Liens") all of the assets of the Debtor to the extent described in Exhibit A

-6-

MAINDOCS-#166876-v3-EPS_PeterLudlumDecl_supportsFirstDayMtns

Case 8:11-bk-23362-SC    Doc 17    Filed 09/27/11    Entered 09/27/11 16:38:44    Desc
Main Document    Page 7 of 60

1 │ collateral. Attached hereto as Exhibit "5" is a true and correct copy of the Stipulation for Debtor's

2 │ Use of Cash Collateral ("Stipulation"), which incorporates the Debtor's Budget attached hereto as

3 │ Exhibit "1."

4 │ 24. The Debtor's Budget projects the Debtor's cash needs through November 30, 2011.

5 │ I and EPS's management developed this projection based upon current operating data and

6 │ management's best estimate of future cash needs. The operating results detailed in the Budget

7 │ establish that EPS can maintain the going concern value of the assets to be sold. Accordingly,

8 │ SVB's and the Collateral Agent's asset pool will not be depleted through continued operations. To

9 │ the contrary, this asset pool will either remain stable or increase through post-petition operations.

10 │ 25. As illustrated in Exhibit "5," the cash collateral pool in which SVB and NGEN hold

11 │ an interest will not decline through the usage proposed by the Debtor. To the contrary, the overall

12 │ value of the estate will increase through this usage, leaving the SVB's and the Collateral Agent's

13 │ interests adequately protected.

14 │ 26. Unless EPS obtains immediate authorization to use cash collateral to pay all

15 │ ordinary and necessary obligations, the Debtors' operations will be adversely impacted. If use of

16 │ cash collateral is not granted immediately, operations will be interrupted, reducing the value of

17 │ the estate's assets, jeopardizing EPS's efforts to obtain Court-approval of the Purchase

18 │ Agreement, and impairing the rights of creditors. In contrast, if immediate relief is granted as

19 │ prayed in the Debtor's Emergency Motion to Approve Stipulation for Debtor's Use of Cash

20 │ Collateral, asset values will be preserved. Under these circumstances, granting relief on an

21 │ emergency basis is both necessary and appropriate.

22 │ **Payroll**

23 │ 27. EPS employs approximately thirty-five (35) persons at its office facility located at

24 │ 150 Paularino Avenue, Suite A-120, Costa Mesa, California 92626. The Related Debtors do not

25 │

26 │ of the Security Agreement (the "Bridge Note Holders' Pre-Petition Collateral"), subject only to the Bank's preexisting Collateral. Between September, 2010 and April 2011, the Debtor issued the Bridge Note Holders a series of

27 │ promissory notes ("Bridge Notes") which evidence the borrowing between the Debtor and Bridge Note Holders. As of the Petition Date, Debtor owed the Bridge Note Holders approximately $5,459,174.55, consisting of principal of

28 │ $5,138,290.83, accrued interest of $320,883.72 (the "Bridge Note Holders' Pre-Petition Obligations"), pursuant to (i) the NPA, (2) the Bridge Note Holders Security Agreement, and (3) the Bridge Notes (collectively, the "Bridge Note Holders Pre-Petition Loan Agreements").

-7-

MAINDOCS-#166876-v3-EPS_PeterLudlumDecl_supportsFirstDayMtns

1  employ any persons or entities.

2        28.    The next payroll is due and payable on October 6, 2011, for the pre-petition wage

3  related obligations and to honor employee related pre-petition benefits for employees whom EPS

4  still employs.  EPS seeks Court authority to pay approximately $7,500, which amount needs to be

5  processed on Tuesday, October 4, 2011, with the payroll vendor to effect the October 6, 2011 pay

6  date.  The payroll obligations include pre-petition payroll, wages, salaries, federal, state and local

7  payroll taxes, deductions and withholdings, payroll deductions relating to various benefits,

8  reimbursement of business expenses, 401(k) plan employer contributions, and miscellaneous

9  other claims asserted by current employees (including, without limitation, worker's

10  compensation, medical, dental, life insurance, and disability insurance).  These benefits include

11  vacation pay, sick leave, holiday pay, jury duty pay, and other pay leave.

12        29.    I believe payment of EPS's payroll obligations will not render the estate

13  administratively insolvent.  Attached hereto as Exhibit "4" is a true and correct copy of a list of

14  EPS's employees and the monthly payroll amount for each (which has been coded for privacy

15  purposes).

16        30.    **The pre-petition compensation amounts include compensation to insiders in**

17  **these cases, but <u>no</u> payments will be made to the insiders until such time as such insiders'**

18  **post-petition compensation is authorized to be paid pursuant to the U.S. Trustee Guidelines.**

19        31.    I am generally familiar with the employee census EPS maintains.  All of the

20  employees who will receive prepetition wage payments will fall below the $11,725 wage priority

21  limit provided for in Section 507 of the Bankruptcy Code.

22        32.    Additionally, EPS seeks authorization to retain its pre-petition payroll accounts for

23  a period of thirty (30) days; to direct the bank or other financial institution not otherwise to impair

24  EPS's ability to deposit funds into or to withdraw funds from its pre-petition payroll accounts; and

25  to authorize EPS to take all actions reasonable and necessary to comply with its obligations to its

26  existing payroll service.  EPS further seeks entry of an order (i) directing all banks to honor the

27  Debtor's pre-petition checks for payment of any of the foregoing, and (ii) prohibiting all banks

28

1  from placing any holds on, or attempting to reverse, any automatic transfers on account of the

2  foregoing.

3      33.    EPS desires to retain these accounts during the case for thirty (30) days after the

4  Petition Date because the payroll accounts serve a very limited purpose.  Because these are limited

5  purpose accounts, the retention of these accounts for this limited period of time will not have any

6  adverse impact upon the interests of creditors, since no pre-petition claims will be paid from these

7  accounts except to the extent authorized in this Motion, or otherwise, by this Court.

8      34.    EPS's business is dependent upon its labor.  If the employees are not paid, they will

9  cease working and seek employment elsewhere.  Any such disruption would have a devastating

10  effect upon the Debtor's business and consequential value to the creditors.  In contrast, if the

11  Debtor obtains the relief sought herein, its business operation will continue in the ordinary course,

12  customer needs will be met, and the overall value of the Debtor's business enterprise will be

13  preserved for creditors.

14      35.    I believe that employees will leave if they are not paid, which will cause immediate

15  and irreparable damage to EPS's business.  In contrast, if EPS can promptly obtain the relief

16  sought herein, its business value will be preserved for the benefit of all creditors.

17      **Retention Bonuses to Essential Employees**

18      36.    I believe that retention of certain essential employees ("Essential Employees") is

19  critical to preserve its customers and going concern value of its business.

20      37.    As a condition of the Purchase Agreement, the Buyer requires that EPS retain the

21  Essential Employees.  While EPS has over thirty (30) employees whose continued employment is

22  important to its success, I believe EPS's viability as a going concern would be severely

23  compromised if any of the Essential Employees left the Debtor's employ.

24      38.    I further believe the Essential Employees' have accumulated a wealth of experience

25  in the Debtors' businesses that not only would be highly difficult, if not impossible, for EPS to

26  replace, but also makes the Essential Employees highly marketable in the industry.

27      39.    I also believe that implementation of an employee incentive retention plan is

28  necessary because: (i) the Essential Employees' job security has been significantly compromised

1  due to EPS's financial condition and upcoming sale of assets, and despite this, the Essential

2  Employees have decided to remain with the Debtor until such time as they are terminated, and/or

3  (ii) the buyer of EPS's business seeks the retention of the Essential Employees.

4      40.    It is critical to provide the Essential Employees a positive incentive to remain with

5  EPS and assist in its sale efforts. I believe that payment of the bonuses described in Exhibit "3" to

6  the Essential Employees so long as such Essential Employees remain in the employ of EPS is

7  necessary and will entice the Essential Employees to remain with the Debtor through the hearing

8  on the sale of the assets. Where implementation of the employee incentive plan is in the best

9  interests of the estate, I respectfully request that this Court approve the plan.

10      **Limit Notice**

11      41.    The Debtor has more than 150 creditors in this case. It is my understanding that

12  some of the motions and applications that may be filed in the Debtor's case will involve matters

13  that ordinarily fall within the parameters of notices required to be given to all creditors and equity

14  security holders in the Debtor's case, but which will not affect directly, or impact the interests of, a

15  majority of creditors. Providing notice to all such parties would be overly burdensome and costly

16  to the estate.

17      42.    I believe that limiting notice to the U.S. Trustee, the secured and twenty (20) largest

18  unsecured creditors and to all parties who request special notice in the Debtors' Chapter 11 case(s)

19  would provide adequate and proper notice to affected creditors and to other interested parties.

20  Additionally, the Debtors will provide notice to any party whose interest is impacted directly by a

21  particular action or proceeding filed by the Debtors.

22      43.    I believe that adoption of this proposed notice procedure is necessary and

23  appropriate. Such notice procedure will relieve the Debtor of the significant administrative

24  burdens that would be associated with periodic "mass mailings," and would reduce substantially

25  ///

26  ///

27

28

MAINDOCS-#166876-v3-EPS_PeterLudlumDecl_supportsFirstDayMtns

1    the Debtor's postage and reproduction costs, thereby facilitating significantly the economical and

2    efficient administration of the Debtor's case.

3         I declare under penalty of perjury that the foregoing is true and correct.

4         Executed this 27th day of September 2011, at Costa Mesa, California.

5

6

7                                    Peter Ludlum

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

## WEEKLY CASH FORECAST
### FINAL BUDGET 9-27-11

**12 WEEK CASH FLOW**

| | 1 Week Ending 10/1 | 2 Week Ending 10/8 | 3 Week Ending 10/15 | 4 Week Ending 10/22 | 5 Week Ending 10/29 | 6 Week Ending 11/5 | 7 Week Ending 11/12 | 8 Week Ending 11/19 | 9 Week Ending 11/26 | 10 Week Ending 12/3 | 11 Week Ending 12/10 | 12 Week Ending 12/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | 1,241,884 | 1,193,980 | 939,575 | 730,859 | 517,832 | 498,368 | 276,974 | 325,242 | 489,207 | 468,202 | 121,757 | 155,097 |
| **Cash Receipts** | | | | | | | | | | | | |
| Collection on Receivables | 41,939 | 166,848 | 126,334 | 105,273 | 135,336 | 155,231 | 124,393 | 281,107 | 3,995 | 168,555 | 38,340 | 379,347 |
| Other Cash Receipts | 583 | 0 | 500 | 0 | 0 | 0 | 500 | 0 | 0 | 0 | 0 | 0 |
| Proceeds from Asset Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,500,000 | 0 | 0 | 0 | 0 |
| **Total Receipts** | 42,522 | 166,848 | 126,834 | 105,273 | 135,836 | 155,231 | 124,893 | 4,781,107 | 3,995 | 168,555 | 38,340 | 379,347 |
| **Disbursements** | | | | | | | | | | | | |
| Operating | | | | | | | | | | | | |
| Payroll | (7,000) | (125,000) | 0 | (125,000) | 0 | (125,000) | 0 | (125,000) | 0 | 0 | 0 | 0 |
| Payroll Fees | 0 | (500) | 0 | (500) | 0 | (500) | 0 | (500) | 0 | 0 | 0 | 0 |
| Commissions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Executive Salaries | 0 | 0 | (47,250) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-Executive Retention Plan | 0 | 0 | 0 | (31,500) | 0 | (31,500) | 0 | (31,500) | 0 | 0 | 0 | 0 |
| Rent | (12,948) | 0 | 0 | 0 | 0 | (12,948) | 0 | 0 | 0 | 0 | 0 | 0 |
| Prepetition Cure Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (747,668) | 0 | 0 | 0 | 0 |
| AP - New | 0 | (135,300) | (135,300) | (135,300) | (135,300) | (56,625) | (56,625) | (641,750) | 0 | 0 | 0 | 0 |
| Telecommunications | 0 | (10,000) | 0 | 0 | 0 | (10,000) | 0 | (30,000) | 0 | 0 | 0 | 0 |
| Cloud Computing | 0 | (10,500) | 0 | 0 | 0 | (10,500) | 0 | (31,500) | 0 | 0 | 0 | 0 |
| DSL Line Costs | 0 | 0 | (7,500) | 0 | 0 | 0 | 0 | (100,000) | 0 | 0 | 0 | 0 |
| Travel | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | 0 | 0 | 0 | 0 | 0 |
| State Taxes | 0 | (11,500) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Contract S/W Programmers | (6,000) | 0 | (500) | (6,000) | 0 | (500) | 0 | 0 | 0 | 0 | 0 | 0 |
| Freight & Postage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Insurances -Business | 0 | (25,777) | 0 | 0 | 0 | (25,777) | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurances -Med/Den | 0 | (40,000) | 0 | 0 | 0 | (40,000) | 0 | (174,375) | 0 | 0 | 0 | 0 |
| Sale Tax and Expense Proration | (43,750) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Fees | (729) | (10,000) | 0 | 0 | 0 | (10,000) | 0 | (2,661,970) | 0 | (10,000) | 0 | 0 |
| Loan Payments - SVB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (500,000) | 0 | 0 |
| Loan Payments - Bridge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Interest - SVB | 0 | (32,676) | 0 | 0 | 0 | (33,275) | 0 | (4,380) | 0 | 0 | 0 | 0 |
| Chapter 11 | 0 | 0 | (125,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| U.S. Trustee Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Committee Professional Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Debtor's Professional Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (75,000) | (20,000) | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Disbursements** | (90,426) | (421,253) | (335,550) | (318,300) | (155,300) | (376,625) | (76,625) | (4,617,142) | (25,000) | (515,000) | (5,000) | (5,000) |
| **Ending Cash** | 1,193,980 | 939,575 | 730,859 | 517,832 | 498,368 | 276,974 | 325,242 | 489,207 | 468,202 | 121,757 | 155,097 | 529,444 |

# WEEKLY CASH FORECAST

**FINAL BUDGET 9-27-11**

| | 12 WEEK CASH FLOW | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 Week Ending 10/1 | 2 Week Ending 10/8 | 3 Week Ending 10/15 | 4 Week Ending 10/22 | 5 Week Ending 10/29 | 6 Week Ending 11/5 | 7 Week Ending 11/12 | 8 Week Ending 11/19 | 9 Week Ending 11/26 | 10 Week Ending 12/3 | 11 Week Ending 12/10 | 12 Week Ending 12/17 |
| **Summary of Cash Collateral** | | | | | | | | | | | | |
| Cash | 1,193,980 | 939,575 | 730,859 | 517,832 | 498,368 | 276,974 | 325,242 | 489,207 | 468,202 | 121,757 | 155,097 | 529,444 |
| A/R | 1,202,516 | 1,035,668 | 909,334 | 804,061 | 668,726 | 1,321,612 | 1,197,219 | 916,112 | 912,117 | 743,562 | 705,222 | 325,875 |
| Total Cash Collateral | 2,396,496 | 1,975,243 | 1,640,193 | 1,321,893 | 1,167,093 | 1,598,586 | 1,522,461 | 1,405,319 | 1,380,319 | 865,319 | 860,319 | 855,319 |
| **Accrued Vendor Expense** | | | | | | | | | | | | |
| Prior Week's Balance | 0 | 88,200 | 170,340 | 252,480 | 262,140 | 271,800 | 376,242 | 480,683 | 0 | 0 | 0 | 0 |
| Accrued | 88,200 | 217,440 | 217,440 | 144,960 | 144,960 | 161,067 | 161,067 | 161,067 | 0 | 0 | 0 | 0 |
| Paid | 0 | (135,300) | (135,300) | (135,300) | (135,300) | (56,625) | (56,625) | (641,750) | 0 | 0 | 0 | 0 |
| Unpaid | 88,200 | 170,340 | 252,480 | 262,140 | 271,800 | 376,242 | 480,683 | 0 | 0 | 0 | 0 | 0 |

(1) Note: For the purposes of forecasting sales tax we conservatively assumed $43,750 and $174,375. It is expected to be significantly less.

# EXHIBIT "2"

*Execution Version*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of September 14, 2011, is hereby entered into by and between ISPE Services, LLC, a Delaware limited liability company, or any sister subsidiary under common control with ISPE Services, LLC as ISPE Services, LLC may designate (ISPE Services, LLC or such designee, the "Buyer"), and Energy and Power Solutions, Inc., a Delaware corporation (the "Seller").

## RECITALS:

**WHEREAS**, the Buyer desires to purchase certain assets of the Seller identified herein, and the Seller desires to sell, convey, assign, and transfer to the Buyer such assets pursuant to the terms and conditions of this Agreement, and

**WHEREAS**, it is intended that the Acquired Assets (defined below) will be sold and purchased pursuant to the terms of this Agreement in a sale authorized by the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court") under Section 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"); and

**WHEREAS**, it is intended that the Bankruptcy Court shall approve the assumption and assignment of certain Executory Contracts (defined below) under Section 365 of the Bankruptcy Code; and

**WHEREAS**, the Seller will file with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing a Chapter 11 bankruptcy case for the Seller (the "Bankruptcy Case").

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    **Defined Terms**. As used herein, the terms below shall have the following meanings:

"Acquired Assets" shall mean all right, title, and interest of the Seller in and to all assets related to the Business, including without limitation all right, title, and interest of the Seller in the assets described on Exhibit A hereto, but shall exclude all right, title, and interest of the Seller in

the Excluded Assets.  For the avoidance of doubt, the Acquired Assets shall include all right, title, and interest of the Seller in and to the Assumed Executory Contracts.

"Affiliate" shall have the meaning set forth in Section 101(2) of the Bankruptcy Code.

"Aggregate Cure Amount" shall have the meaning set forth in Section 2.5 of this Agreement.

"Allocation" shall have the meaning set forth in Section 2.8 of this Agreement.

"Alternative Transaction" means a sale, transfer, or other disposition of all or any substantial portion of the Acquired Assets or the Business to any person or entity (or persons or entities) other than the Buyer, in any transaction or series of transactions.

"Assumed Executory Contracts" shall mean the Executory Contracts set forth on Exhibit B hereto, provided that the Buyer may, in its sole discretion, at any time prior to closing, delete any Executory Contract from Exhibit B hereto, by written notice to the Seller, in which case such deleted Executory Contract shall not be an Assumed Executory Contract.

"Assumed Liabilities" shall mean only those liabilities expressly set forth on Exhibit C hereto.

"Bidding Procedures" shall mean the procedures for potential competitive bidding on the Acquired Assets in the form as set forth in Exhibit D hereto, together with any changes as to which the Buyer has agreed in writing in its sole discretion.

"Bidding Procedures Order" shall mean an order of the Bankruptcy Court, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel, approving the sale process described in the Sale Motion and the Bidding Procedures, including, without limitation, the Stalking Horse Provisions.

"Break-Up Fee" shall have the meaning set forth in Section 6.6(a) of this Agreement.

"Business" shall mean the Energy Projects business and the xChangePoint business of the Seller, as further described on Exhibit E hereto.

"Business Day" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Cash Collateral" shall mean any cash or cash equivalents of the Seller in which any person or entity may hold a Lien.

"Cash Collateral Order" shall mean an order authorizing the Seller's use of Cash Collateral in form and substance reasonably acceptable to the Buyer and as to the entry of which the Cash Collateral Parties have provided their consent.

2

"Cash Collateral Parties" shall mean any person or entity that holds a Lien on any Cash Collateral.

"Claims" shall mean any and all claims, demands, actions, credits, allowances, assertions, allegations, or other rights to payment or an equitable remedy that may or could have been made or asserted as of the date of this Agreement, or that may or could be made following the date of this Agreement, against the Seller or any of its subsidiaries and Affiliates, or against any of the Acquired Assets or the Business, for any Liabilities.

"Closing" shall have the meaning set forth in Section 3.1 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 3.1 of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" shall mean that certain Confidentiality Agreement entered into by and between the Seller and the Buyer, dated as of February 9, 2011.

"Cure Costs Determination" shall have the meaning set forth in Section 2.5 of this Agreement.

"Deposit" shall have the meaning set forth in Section 2.7 of this Agreement.

"Designated Key Employees" shall mean those Key Employees designated as "Designated Key Employees" on Exhibit H hereto.

"Encumbrances" shall mean any and all Liens, Claims, causes of action, choses in action, rights of recovery, rights of set-off, rights of recoupment, charges, conditional and installment sale agreements, options, rights of first offer or first refusal, restrictive covenants, activity and use limitations, easements, rights of way, deed restrictions, encumbrances and charges of any kind, and any similar legal or equitable rights, in each case relating to or connected with the Acquired Assets or the Business.

"Estimated Cure Costs" shall have the meaning set forth in Section 2.5 of this Agreement.

"Excluded Assets" shall mean only those assets expressly set forth on Exhibit F hereto.

"Executory Contracts" shall mean all contracts and leases in effect as of the date hereof to which the Seller is a party.

"Expense Reimbursement" shall have the meaning set forth in Section 6.6(a) of this Agreement.

"Interests" shall mean any "interest" of any person or entity in the Seller or any of its subsidiaries and Affiliates or in any of the Acquired Assets, as the term "interest" is used in Section 363(f) of the Bankruptcy Code.

3

"Key Contracts" shall mean those customer contracts and other agreements identified on Exhibit G hereto.

"Key Employees" shall mean those persons identified on Exhibit H hereto.

"Liens" shall mean any and all statutory and nonstatutory liens, security interests, pledges, charges, mortgages, hypothecations, collateral assignments, and other grants of security or similar rights in, over, or in respect of any assets or properties.

"Liabilities" shall mean any and all liabilities, debts, and obligations of the Seller whatsoever, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether conditional or unconditional, whether liquidated or unliquidated, whether legal or equitable or otherwise in nature, whether sounding in tort or in contract or otherwise, and whether due, past-due, or to become due, in each case including, without limitation, all liabilities, debts, and obligations related to employees, contracts, operations, Taxes, indebtedness, or regulatory compliance.

"Non-Designated Key Employees" shall mean Key Employees designated as "Non-Designated Key Employees" on Exhibit H hereto.

"Outside Date" shall mean the date that is sixty (60) Business Days following the date of this Agreement, or such later date as may be agreed by the Buyer in writing.

"Overbid Amount" shall have the meaning set forth in Section 6.5 of this Agreement.

"Permits" shall mean all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, or notifications to, any governmental authority, whether foreign, federal, state or local, necessary for the past or present conduct or operation of the Business.

"Permitted Encumbrances" shall mean only those Liens, Claims, Interests, and Encumbrances expressly set forth on Exhibit I hereto.

"Person" shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture or other entity of any kind whatsoever.

"Personnel" shall mean all directors, officers and employees of the Seller.

"Petition Date" shall have the meaning set forth in Section 6.4(a) of this Agreement.

"Pre-Closing Obligations" shall have the meaning set forth in Section 3.5 of this Agreement.

"Post-Closing Obligations" shall have the meaning set forth in Section 3.5 of this Agreement.

"Purchase Price" shall have the meaning set forth in Section 2.6 of this Agreement.

4

"Representative" shall mean any attorney, accountant, lender, agent, consultant or other representative.

"Sale Approval Order" shall mean an order of the Bankruptcy Court, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel, approving this Agreement and the transactions contemplated herein, including without limitation the sale of the Acquired Assets free and clear of all Liens, Claims, Interests, and Encumbrances and the assumption and assignment of all Assumed Executory Contracts.

"Sale Motion" shall mean a motion of the Seller, filed in the Bankruptcy Court, seeking approval of this Agreement and the transactions contemplated hereby, and entry of the Sale Approval Order, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel.

"Sales Procedures Motion" shall mean a motion of the Seller, filed in the Bankruptcy Court, seeking approval of the Bidding Procedures, the Stalking Horse Provisions, and entry of the Bidding Procedures Order, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel.

"Seller Claims" means any and all rights of the Seller to payment, whether affirmative or through set-off, credit, allowance, or recoupment, that arose prior to, and that exist as of, the Closing.

"Stalking Horse Provisions" shall mean, collectively, the Overbid Amount, the Break-Up Fee, and the Expense Reimbursement.

"Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any governmental entity or political subdivision thereof, including, but not limited to, income, excise, property, sales, use, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, ad valorem, stamp, value added or gains taxes, registration and documentation fees, custom duties, tariffs and similar charges, withholding, social security or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties or additions attributable thereto.

"Termination Threshold Cure Amount" shall mean One Million Dollars ($1,000,000.00).

"Transferred Books and Records" shall mean the books and records regarding the Business that are transferred from the Seller to the Buyer at the Closing, as the same may be maintained following the Closing in the ordinary course of the Business as operated by the Buyer following the Closing.

## ARTICLE II

## PURCHASE AND SALE AGREEMENT

2.1    **Transfer of Assets**.  Upon the terms and subject to the conditions and provisions contained herein, at the Closing, the Seller shall sell, convey, transfer, assign, and deliver to the Buyer, and the Buyer shall acquire and accept from the Seller, the Acquired Assets, free and clear of all Liens, Claims, Interests, and Encumbrances, including all Excluded Liabilities (subject only to Section 2.3 below).

2.2    **Excluded Assets.**  Notwithstanding anything to the contrary contained herein, the Acquired Assets shall not include, and the Seller shall retain all of its rights, title, and interest in and to, and shall not sell, convey, transfer, assign, and deliver to the Buyer, any of the Excluded Assets, provided, however, that the inclusion of any accounts receivable from a counterparty within the Excluded Assets shall in no way impair, diminish, or otherwise affect any other rights of the Buyer with respect to such counterparty or under any Assumed Executory Contract to which such counterparty is a party.

2.3    **Assumed Liabilities and Permitted Encumbrances**.  At the Closing, the Buyer shall assume and have sole responsibility for the Assumed Liabilities.  In addition, the Buyer shall take assignment of the Acquired Assets subject to, and only to, the Permitted Encumbrances.

2.4    **Excluded Liabilities**.  For the avoidance of doubt, notwithstanding any other terms, provisions and conditions of this Agreement, the Buyer shall not assume, or otherwise be responsible or liable for or obligated with respect to, any Liens, Claims, Interests, Encumbrances, or Liabilities of the Seller or related to the Acquired Assets or any other assets of the Seller, whether actual or contingent, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, or known or unknown, except for Assumed Liabilities and Permitted Encumbrances (such Liens, Claims, Interests, Encumbrances and Liabilities described in the foregoing sentence, as qualified by the following sentence, the "Excluded Liabilities").  Specifically, and without limiting the generality of the foregoing, the Buyer shall have no liability or obligation in respect of any accounts receivable that are included within the Excluded Assets, including, without limitation, any liability or obligation to assist the Seller with the collection of any such accounts receivable or to perform under any Assumed Executory Contract in order to enable the Seller or any successor, assign, agent, or representative of the Seller to collect any accounts receivable.

2.5    **Assumed Executory Contracts and Unexpired Leases**.

(a)    The Seller shall file with the Bankruptcy Court and serve on all non-debtor parties to all Assumed Executory Contracts, in accordance with the Bidding Procedures, a notice listing all Assumed Executory Contracts and the Seller's good-faith estimate of cure costs and adequate assurance of future performance, if any, required to be paid or provided in connection with assumption and assignment with respect to each such Assumed Executory Contract (such cure costs and costs of adequate assurance being referred to herein in the aggregate as the "Estimated Cure Costs").

6

(b)    In accordance with the Bidding Procedures, if any non-debtor party to an Assumed Executory Contract objects to the applicable portion of the Estimated Cure Costs, then either (i) such non-debtor party, the Seller, and the Buyer shall agree in writing on the proper amount of such costs, or (ii) in the absence of such agreement, the Bankruptcy Court shall determine the amount of such costs (a "Cure Costs Determination").

(c)    The aggregate amount of all cure costs and costs of adequate assurance of future performance, based on the Estimated Cure Costs and as modified through Cure Costs Determinations, if any, shall be referred to as the "Aggregate Cure Amount," and components of the Aggregate Cure Amount shall be referred to as "Allowed Cure Costs." The Buyer shall pay the Aggregate Cure Amount, provided that (i) any portion of the Aggregate Cure Amount paid by the Buyer (the "Buyer-Paid Cure Amount") may be deducted from the Purchase Price as set forth in Section 2.6 of this Agreement, (ii) the Buyer may, at any time and for any reason, or for no reason, in its sole discretion, elect not to take assignment of any Assumed Executory Contract, in which case such contract shall not be an Assumed Executory Contract and no portion of the Aggregate Cure Amount shall be payable in respect of such contract, and (iii) the Buyer may elect not to purchase any of the Acquired Assets, and may terminate this Agreement pursuant to Section 9.1(vi) of this Agreement, if the Aggregate Cure Amount exceeds the Termination Threshold Cure Amount.

2.6    **Purchase Price**. Upon the terms and subject to the conditions set forth herein, the Buyer shall pay to the Seller at the Closing, for the sale, transfer, assignment, conveyance and delivery of the Acquired Assets, cash in the amount of (x) Four Million Five Hundred Thousand Dollars ($4,500,000.00), less (y) any Buyer-Paid Cure Amount (such difference, the "Purchase Price"), and (z) plus or minus any net prorations known at the Closing to be due to the Buyer or the Seller, as the case may be, pursuant to Section 3.5.

2.7    **Deposit**. Buyer shall, as soon as practicable, but in any event on or before the date the Bankruptcy Court enters the Bidding Procedures Order, deposit, in an escrow account held in trust by a third-party escrow agent, a good-faith deposit in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "Deposit"). The Deposit shall be (a) paid to the Seller and applied against the Purchase Price at the Closing, or (b) if the Closing has not occurred, then (i) returned to the Buyer, if this Agreement has terminated (except for any termination by the Seller pursuant to Section 9.1(iv) of this Agreement), (ii) returned to the Buyer, if the Outside Date has occurred, and (iii) paid as any court of competent jurisdiction may direct, if neither of the preceding clauses (i) or (ii) applies or if there is any dispute between the Buyer and the Seller in respect of the Deposit. The Buyer and the Seller shall cooperate to provide the third-party escrow agent with instructions to implement the provisions of this Section 2.7.

2.8    **Allocation of the Purchase Price**. Within ninety (90) days after the Closing, the Buyer shall deliver to the Seller an allocation of the Purchase Price among the Acquired Assets (the "Allocation"). Such Allocation shall become part of this Agreement for all purposes. The Seller and the Buyer agree to report, pursuant to Section 1060 of the Code and the regulations promulgated thereunder, if and when required, the Allocation of the Purchase Price, as adjusted, in a manner entirely consistent with such Allocation in the preparation and filing of

7

all Tax Returns (including IRS form 8594). Neither the Seller nor the Buyer shall take any action that would call into question the bona fide nature of such Allocation; and neither party shall take any position for Tax purposes which is inconsistent with such Allocation, unless required to do so under applicable law. Notwithstanding the foregoing, the Allocation shall not be binding upon any person or entity that is not a party to this Agreement.

## ARTICLE III

## CLOSING

3.1    **Closing**. Provided that the conditions to closing set forth herein have been satisfied or, if waiveable, have been waived in accordance herewith, the closing of the transactions contemplated herein (the "Closing") shall be held via e-mail or such other place as agreed to between Buyer and Seller, within five (5) Business Days following the first date that all such conditions have been satisfied or, if waiveable, waived, on a Business Day mutually agreeable to the Buyer and the Seller, but in all events prior to the Outside Date. The date on which the Closing occurs in accordance with the previous sentence is referred to as the "Closing Date."

3.2    **Conveyances at Closing**. At the Closing, the Seller and the Buyer shall take the following actions:

(a)    the Buyer shall pay to the Seller, by wire transfer to an account designated by the Seller, the Purchase Price, less the Deposit and any net amount owing by the Seller pursuant to Section 3.5, in immediately available funds;

(b)    the Buyer and the Seller shall deliver to the escrow agent a written instruction, and otherwise cooperate in good faith, to effect a wire transfer of the Deposit to an account designated by the Seller;

(c)    the Seller shall deliver to the Buyer possession of all Acquired Assets;

(d)    the Seller shall execute all such instruments as the Buyer may reasonably require to effectuate the transfer, assignment, and conveyance of the Acquired Assets, including one or more bills of sale, contract assignments, intellectual property assignments, and other instruments of conveyance; and

(e)    the Buyer shall execute and deliver to the Seller an instrument of assumption of liabilities with respect to the Assumed Liabilities in the form attached hereto as Exhibit K.

3.3    **Additional Deliveries**. After the Closing Date, the Seller shall deliver to the Buyer such other instruments and documents, and shall take such other actions, as shall be reasonably requested by the Buyer to vest in the Buyer all of the Seller's right, title, and interest in and to the Acquired Assets and otherwise to effectuate the transactions described herein.

8

3.4    **Transaction Expenses**.  Except as expressly provided herein in respect of the Expense Reimbursement, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

3.5    **Prorations**.  To the extent that there are obligations in respect of the Acquired Assets that relate both to the period up to and including the Closing Date ("Pre-Closing Obligations") and to the period following the Closing Date ("Post-Closing Obligations"), the Buyer and the Seller shall allocate such obligations between themselves on a ratable basis that fairly reflects the portions of such obligations that are Pre-Closing Obligations and that shall be paid by the Seller, and the portions of such obligations that are Post-Closing Obligations and that shall be paid by the Buyer.  To the extent that any net amount is owing to the Buyer or the Seller, as the case may be under this Section 3.5 as of the Closing, the Purchase Price shall be decreased or increased, as the case may be, to the extent such prorations are identified as of the Closing, and to the extent such pro rations cannot or are not identified until after the Closing, then any net amount owing to the Seller or the Buyer shall be paid by the party owing such amount.  Any net amount owing to the Buyer under this Section 3.5, shall be an administrative expense of the Seller's bankruptcy estate under Section 503(b) and Section 507(a)(2) of the Bankruptcy Code.  For the avoidance of doubt, any prorations under this Section 3.5 that are known at Closing shall be embodied within, and shall not be in addition to, the amounts described in clause (z) of Section 2.6 of this Agreement.

3.6    **Other Closing Matters**.  Each of the parties shall use their reasonable efforts to take such other actions required hereby to be performed by it prior to or on the Closing Date.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller represents and warrants to the Buyer that the statements contained in this Article IV are correct and complete in all material respects as of the date of this Agreement.

4.1    **Organization of Seller**.  The Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2    **Authorization, Execution, and Delivery of Seller**.  Subject only to the entry of the Sale Approval Order, the Seller has all necessary corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  Subject only to the entry of the Sale Approval Order, this Agreement has been duly executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).  Subject only to the entry of the Sale Approval Order, each agreement, instrument, and document which has been or shall be entered into or executed and delivered by the Seller in

9

connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by the Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

4.3    **No Violation**. The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate any provision of the Articles or Certificate of Incorporation or Bylaws of the Seller or (b) subject only to the entry of the Sale Approval Order, conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to the Seller or by which the Acquired Assets or the Business are bound or affected.

4.4    **Governmental Consents and Approvals**. Except for the Sale Approval Order, no consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state, local or foreign governmental or regulatory authority is required to be made or obtained by the Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or thereby.

4.5    **Financial Statements**. The financial statements and other financial information provided by the Seller to the Buyer on or before the Closing Date (including without limitation the unaudited balance sheets of the Seller for the years ended December 31, 2008, December 31, 2009, and December 31, 2010, and for the quarters ended March 31, 2011 and June 30, 2011, and the related unaudited statements of operations, changes in stockholders' equity, and cash flows, as well as information regarding pipeline and backlog of customer contracts, projects, and revenues) (a) to the extent applicable to the Business, fairly present in all material respects the financial position of the Seller as of their respective dates, and (b) except for information therein regarding pipeline and backlog of customer contracts, projects, and revenues, each statement has been prepared in accordance with general accounting principles and rules.

4.6    **Acquired Assets**. The Seller has (or will have as of the Closing, subject only to the entry of the Sale Approval Order, pursuant to Section 363 of the Bankruptcy Code) good title to, or (if applicable) a valid leasehold interest in, each and all of the Acquired Assets, free and clear of all Liens, Claims, Interests, and Encumbrances. The Acquired Assets constitute all of the assets necessary for the Buyer to operate the Business in the manner that the Business has been conducted by the Seller prior to the date hereof. Other than the Acquired Assets, the Seller does not have any right, title, or interest in any assets used or useful in connection with the Business.

4.7    **Specific Representations and Warranties**. All of the specific statements with respect to the Acquired Assets, the Business, and the Seller contained on Exhibit J hereto

10

are correct and complete, and are incorporated in this Section 4.7 and in this Article IV by reference.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

The Buyer represents and warrants to the Seller that the statements contained in this Article V are correct and complete in all material respects as of the date of this Agreement.

5.1     **Organization of Buyer**.  The Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware.

5.2     **Authorization, Execution, and Delivery of Buyer**.  The Buyer has all necessary corporate or limited liability company power and authority, and has taken all corporate or limited liability company action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. This Agreement has been duly executed and delivered by the Buyer and is a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).  Each agreement or instrument which has been or shall be entered into or executed and delivered by the Buyer in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by the Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

5.3     **No Violation**.  The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate any provision of any organizational documents of the Buyer or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to the Buyer or by which the property or assets of the Buyer are bound or affected.

5.4     **Financial Capacity**.  The Buyer has sufficient financial resources to pay the Purchase Price when due and otherwise consummate the transaction described herein and perform the obligations arising under this Agreement.

5.5     **Adequate Assurances**.  To the Buyer's best knowledge, the Buyer is and will be capable of satisfying the conditions contained in Sections 365(b) and (f) of the Bankruptcy Code with respect to the Assumed Executory Contracts.

11

## ARTICLE VI

## ADDITIONAL COVENANTS

The Seller and the Buyer covenant and agree with each other that from the date hereof through the Closing:

6.1     **Maintenance of Acquired Assets Prior to Closing**.  The Seller, at its own expense, (a) shall maintain and operate the Acquired Assets and the Business in their current state of repair, excepting normal wear and tear, (b) shall not enter into any transactions or take any other actions outside the ordinary course of business of the Seller, consistent with past practices, in respect of or having any effect on the Acquired Assets or the Business, (c) shall maintain the employment of, and shall pay all wages, salaries, benefits, commissions, expenses, and other amounts in respect of, all employees, contractors, agents, and representatives related to the Acquired Assets and the Business, (d) shall pay all taxes, charges, and other amounts in respect of the Acquired Assets and the Business, (e) shall keep the Acquired Assets free of all Liens, Claims, Interests, and Encumbrances, other than Permitted Encumbrances, (f) shall pay all utilities all amounts that are due and owing or that may accrue up to the Closing, and shall provide all utilities any adequate assurance of payment as may be required by the Bankruptcy Code or the Bankruptcy Court, (g) shall service all customers and contracts related to the Acquired Assets and the Business, and shall perform all obligations thereto and thereunder, (h) shall maintain its existing accounting practices, and (i) shall maintain casualty and liability insurance covering the Acquired Assets and the Business in reasonable amounts and consistent with past practices and industry customs.  The Seller shall bear all risk of loss in respect of the Acquired Assets and the Business until the delivery of the Acquired Assets to the Buyer at the Closing, and, in the event that the Closing does not occur, the Buyer shall have no liability to the Seller in respect of the Acquired Assets or in relation to the Seller's taking, or having failed to take, any action required in this Section 6.1 or otherwise.

6.2     **Investigation by Buyer**.  The Seller shall allow the Buyer and its Representatives to inspect and make copies, at the Buyer's expense, of contracts, books and records, and all other documents and information reasonably requested by the Buyer and related to the Acquired Assets and the operation of the Business, up and until the Closing.  The Seller shall make available to the Buyer promptly upon reasonable request all additional documents and information with respect to the Acquired Assets and the operation of the Business.  The Buyer's rights to access, inspect and make copies as contained in this Section 6.2 will be governed by and subject to the Confidentiality Agreement.  Nothing in this Section 6.2 shall limit the Seller's obligations at closing under Section 3.2.

6.3     **Consents and Reasonable Efforts**.  Each of the parties hereto covenants and agrees, upon the terms and subject to the conditions contained herein, to pursue diligently and in good faith and use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby.

12

6.4    **Bankruptcy Actions**.

(a)    The Seller shall (i) commence the Bankruptcy Case as soon as reasonably practicable after executing this Agreement, and in any event no later than five (5) Business Days following the date of this Agreement (the commencement date being referred to as the "Petition Date"); (ii) as soon as reasonably practicable, and in any event within two (2) Business Days following the Petition Date, file with the Bankruptcy Court the Sale Procedures Motion; and (iii) as soon as reasonably practicable, and in any event in compliance with the Bidding Procedures Order, file with the Bankruptcy Court the Sale Motion and serve notice of the transactions contemplated hereby upon all parties entitled to notice, including, without limitation, all Persons known to possess or assert a Lien, Claim, Interest, or Encumbrance against the Acquired Assets or the Business, counterparties to all contracts or agreements with the Seller, all relevant government agencies, departments, authorities, and divisions thereof, and any other parties required to be served by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Bankruptcy Court, and upon any other parties requested to be served by the Buyer.  The Buyer acknowledges that the Acquired Assets may be subject to competitive bidding and that the Bidding Procedures may be supplemented by other customary procedures consistent with the terms of this Agreement, <u>provided</u> that the Bidding Procedures may not be amended, modified, or supplemented in any respect except as agreed to by the Buyer in writing in its sole discretion.

(b)    The Buyer shall provide such information and assistance as are reasonably requested by the Seller to assist the Seller in obtaining a finding by the Bankruptcy Court that the Buyer is deemed to have purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Assumed Executory Contracts as required by Section 365 of the Bankruptcy Code.

(c)    In the event the Sale Approval Order is appealed, the parties hereto shall cooperate in taking such steps to prosecute diligently such appeal and use their commercially reasonable efforts to defend such appeal, <u>provided</u> that nothing herein shall limit or impair the right of the Buyer to terminate this Agreement under Section 9.1 (iv), (x), or (xii) hereof.

6.5    **Overbid Protections**.  As set forth in the Bidding Procedures, any competing offer to purchase all or a portion of the Acquired Assets or Business will not be considered by the Seller as qualified unless, in the Seller's reasonable judgment, after consulting with the Seller's financial and legal advisors, such competing offer has been made on substantially the same terms and conditions as those set forth in this Agreement, and the competing purchase price equals or exceeds the aggregate of (i) the Purchase Price as set forth in Section 2.6(x) of this Agreement, (ii) the Break-Up Fee, (iii) the maximum amount of the Expense Reimbursement, plus (iv) $100,000 (such aggregate amount arrived at by adding the amounts in the foregoing clauses (i) through (iv) being referred to herein as the "Overbid Amount").

13

6.6    **Alternative Transaction.**

(a)    If the Seller enters into an agreement to consummate or consummates an Alternative Transaction, then the Seller shall pay the Buyer by wire transfer to an account designated by the Buyer, in immediately available funds, on the closing date of such Alternative Transaction: (i) an amount equal to Two Hundred Twenty Five Thousand Dollars ($225,000.00) (the "Break-Up Fee"), and (ii) all reasonable out-of-pocket expenses of the Buyer in connection with the transactions contemplated by this Agreement (including, without limitation, the fees and expenses of counsel) up to a maximum of Five Hundred Thousand Dollars ($500,000.00) (the "Expense Reimbursement").

(b)    The Break-Up Fee and Expense Reimbursement shall be paid from any proceeds of an Alternative Transaction otherwise payable to the Seller, provided that if such amounts are not paid from such proceeds, the Seller shall remain liable for such amounts. Except as otherwise provided in Section 9.2, in no event shall the Seller or any Affiliate have any liability with respect to the Buyer or any other person for an amount exceeding the Break-Up Fee and Expense Reimbursement in the event that this Agreement terminates pursuant to Section 9.1(ii).

(c)    The Break-Up Fee and Expense Reimbursement, to the extent the same become due and owing, shall be first-priority administrative expenses of the Seller's bankruptcy estate under Section 503(b) and Section 507(a)(2) of the Bankruptcy Code.

(d)    The obligation of the Seller to pay, and the payment by the Seller of, the Break-Up Fee and Expense Reimbursement shall in no way limit or otherwise affect the rights of the Buyer to a return of the Deposit, including without limitation the rights of the Buyer under Sections 2.7 and 9.2(iii) of this Agreement and under any applicable escrow agreement.

(e)    The Seller acknowledges and agrees that the Buyer would not have entered into this Agreement but for the provisions of this Section 6.6, and that the provisions of this Section 6.6 are integral to, and shall survive any termination of, this Agreement.

6.7    **No Shop Provision**.  The Seller shall not solicit, negotiate, or enter into any other offers to purchase all or any portion of the Acquired Assets or the Business except through the process set forth in the Bidding Procedures and as otherwise required by the Bankruptcy Code, provided, however, that the foregoing shall not prohibit the Seller or its advisors from taking any action in response to any unsolicited proposal that its board of directors concludes, after consultation with counsel, and through resolution in accordance with applicable corporate requirements, is necessary in the exercise of their fiduciary duties as directors.

6.8    **Avoidance Actions**.  The Seller shall not commence or pursue any action or claim under Chapter 5 of the Bankruptcy Code against the Buyer or against any vendor or customer of the Business.  This Section 6.8 shall survive the Closing and any termination of this Agreement following the Closing.

14

## ARTICLE VII

## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of the Seller to sell the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by the Seller in writing in accordance with Section 9.8:

7.1    **Entry of Orders**. Each of the Bidding Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall be final and non-appealable, and shall not have been stayed, withdrawn, or modified.

7.2    **Litigation**. There shall not be any judgment, decree, injunction, order or ruling in effect preventing the consummation of the transactions contemplated by this Agreement.

7.3    **Covenants and Representations**. The Buyer shall have performed in all material respects all agreements and covenants required hereby to be performed by the Buyer prior to or at the Closing Date, and the representations and warranties of the Buyer made in Article V shall be correct and complete in all material respects as of the Closing Date as if made on such date.

7.4    **Deliveries**.    On or prior to the Closing Date, the Buyer shall have delivered to the Seller the Purchase Price as required in Section 3.2(a).

## ARTICLE VIII

## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of the Buyer to purchase the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by the Buyer in writing in accordance with Section 9.8:

8.1    **Entry of Orders**. The Bidding Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall be final and non-appealable, and shall not have been stayed, appealed, withdrawn, or modified.

8.2    **Litigation**. There shall not be any judgment, decree, injunction, order or ruling in effect preventing the consummation of the transactions contemplated by this Agreement.

8.3    **Covenants and Representations**. The Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by the Seller prior to or at the Closing Date, and the representations and warranties of the Seller in Article IV

15

shall be correct and complete in all material respects as of the Closing Date as if made on such date.

8.4 **Required Approvals**. All customary regulatory approvals that may be required, if any, shall have been obtained, or any applicable waiting periods shall have expired without comment or response from the applicable regulatory entity or agency.

8.5 **No Material Adverse Change**. There shall not have been any material adverse change to the Business, to the Acquired Assets, or to the value thereof, or to the finances or operations of the Seller, other than the Seller's filing of its Bankruptcy Case, that (a) becomes known to the Buyer from the date of this Agreement through the Closing Date, (b) was not disclosed by the Seller, and (c) was not reasonably discoverable by the Buyer prior to the date of this Agreement.

8.6 **Key Employees**. All of the Designated Key Employees and at least eighty percent (80%) of the Non-Designated Key Employees: (a) shall continue to be employed by the Seller at the Closing; (b) shall not have given any notice or other indication that such employee is not willing or does not intend to be employed by the Buyer following the Closing; and (c) shall have accepted employment with the Buyer on terms and conditions satisfactory to the Buyer and executed and delivered to the Buyer the Buyer's standard forms of confidentiality and invention assignment agreement and associated schedules and statements without amendment or modification thereto in any substantive respect.

8.7 **Key Contracts**. No party to any Key Contract shall have objected to or otherwise opposed the assumption and assignment of its contract, shall have demanded any adequate assurance of future performance under its contract, or shall have objected to the Estimated Cure Costs for its contract, unless such objection or demand has been resolved to the reasonable satisfaction of the Buyer.

8.8 **Mechanics' Liens**. Notwithstanding Section 2.3 of this Agreement, the Seller shall have obtained releases of any Permitted Encumbrances described in paragraph 2 of Exhibit I hereto, unless, and solely to the extent that, the obligations secured by such Permitted Encumbrances are Assumed Liabilities.

8.9 **Instruments of Conveyance, Certificates**. The Seller shall have executed and delivered to the Buyer all of the documents provided for in Section 3.2 of this Agreement.

8.10 **Deliveries**. On or prior to the Closing Date, the Seller shall have delivered to the Buyer all of the following:

(i) a copy of the each of the Bidding Procedures Order and the Sale Approval Order as entered by the Bankruptcy Court, certified by the clerk of the Bankruptcy Court;

(ii) a certificate from the Seller, dated as of the Closing Date, stating that the conditions specified in Sections 8.1 through 8.9 have been satisfied; and

16

(iii)    such other documents or instruments as the Buyer or its counsel may reasonably request to effect the transactions contemplated hereby.

## ARTICLE IX

### MISCELLANEOUS

9.1    **Termination.**  This Agreement may be terminated prior to the Closing:

(i)    by mutual written consent executed by both the Buyer and the Seller at any time;

(ii)    by the Seller, upon the consummation of any Alternative Transaction as a result of any Auction (as defined in the Bidding Procedures), but only if the Seller performs its obligations under Sections 6.6 and 9.2(ii) and (iii) hereof prior to or simultaneously with such termination;

(iii)    by the Buyer, if the Seller is in breach of any of its material obligations hereunder, and, to the extent such breach is reasonably capable of cure within such period, such breach has not been cured by the Seller within five (5) Business Days after written notification by the Buyer;

(iv)    by the Seller, if the Buyer fails to satisfy any of its material obligations at the Closing;

(v)    by either the Buyer or the Seller, if all Cure Cost Determinations have not been made, or if the Aggregate Cure Amount has not been established within forty-five (45) Business Days following the Petition Date;

(vi)    by the Buyer, if the Aggregate Cure Amount exceeds the Termination Threshold Cure Amount;

(vii)    by the Buyer, if the Seller fails to comply with any of its obligations contained in Section 6.4 of this Agreement;

(viii)    by the Buyer, if the Cash Collateral Order is not entered by the Bankruptcy Court within five (5) Business Days following the Petition Date, or if any approval of the Seller's use of Cash Collateral is denied, or if any consent to the Seller's use of Cash Collateral by any Cash Collateral Parties is revoked, withdrawn, or terminated, or if the Cash Collateral Order or any other approval of the Seller's use of Cash Collateral is appealed, revoked, or withdrawn, or expires or terminates without renewal on terms reasonably satisfactory to the Buyer;

(ix)    by either the Buyer or the Seller, if (a) the Bidding Procedures Order has not been entered by the Bankruptcy Court, or if the Stalking Horse Provisions have not been approved by the Bankruptcy Court, in each case within twenty (20) Business Days following the Petition Date, (b) the Bidding Procedures Order has been appealed,

17

withdrawn, revoked, rescinded, or modified, or (c) the Bidding Procedures Order has not become a final, non-appealable order within fourteen (14) calendar days following the date on which it is entered;

       (x)     by either the Buyer or the Seller, if (a) the Sale Approval Order has not been entered by the Bankruptcy Court, or if the sale of the Acquired Assets to the Buyer has not been approved by the Bankruptcy Court, in each case within forty-five (45) Business Days following the Petition Date, (b) the Sale Approval Order has been appealed, withdrawn, revoked, rescinded, or modified, or (c) the Sale Approval Order has not become a final, non-appealable order within fourteen (14) calendar days following the date on which it is entered;

       (xi)    by the Buyer, if the Bankruptcy Case is converted from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code; or

       (xii)    by either the Buyer or the Seller, if the Closing has not occurred on or prior to the Outside Date, _provided_ that neither the Buyer nor the Seller may terminate pursuant to this clause (xi) if the failure of the Closing to occur on or prior to the Closing Date is primarily attributable to a breach by such party of its obligations hereunder.

       9.2     **In the Event of Termination; Remedies**.  In the event of termination of this Agreement pursuant to Section 9.1:

       (i)     except as otherwise set forth in this Section 9.2, all obligations of the parties hereto under this Agreement shall terminate and there shall be no liability of any party hereto to any other party and each party hereto shall bear its own expenses incurred in connection with the negotiation, preparation, execution and performance of this Agreement; _provided_ that the foregoing shall not relieve any party of liability for damages actually incurred by any other party as a result of any breach of this Agreement resulting from the willful misconduct or grossly negligent act or omission of the party permitting, causing or committing such breach;

       (ii)    in the case of a termination pursuant to Section 9.1(ii), the Buyer shall be entitled to the Break-Up Fee and the Expense Reimbursement on the terms and subject to the conditions of Section 6.6, notwithstanding such termination, and the provisions of Section 6.6 shall survive any termination of this Agreement; and

       (iii)   the Buyer and the Seller shall cause the Deposit to be released to the Buyer or the Seller, as the case may be, pursuant to the terms of Section 2.7, and the provisions of Section 2.7 shall survive any termination of this Agreement.

The provisions of this Section 9.2 shall survive any termination of this Agreement.  Nothing in this Section 9.2 shall require a termination of this Agreement by the Seller as a condition to the payment of the Break-Up Fee and Expense Reimbursement to the extent such amounts otherwise are or become owing under Section 6.6 of this Agreement.

18

9.3    **Seller's Liquidated Damages**.  Notwithstanding any other provision of this Agreement, in the event of any termination by the Seller under Section 9.1(iv), or in the event of any breach or default by the Buyer, whether or not this Agreement terminated, the sole remedy of the Seller shall be recourse to the Deposit.  The provisions of this Section 9.3 shall survive any termination of this Agreement.

9.4    **Assignment; Successors**.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of all other parties to this Agreement.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, legatees, successors and permitted assigns, and no other person shall have any right, benefit or obligation hereunder.  Notwithstanding the foregoing, ISPE Services, LLC may assign its rights and obligations under this Agreement to any wholly-owned direct or indirect subsidiary of ISPE Services, LLC by sending written notice to, but without the consent of, the Seller, provided that any such assignment shall not relieve ISPE Services, LLC of its obligation to pay the Purchase Price at the Closing, if required under the terms and subject to the conditions of this Agreement.  In the event of any such assignment by ISPE Services, LLC, all references to the Buyer herein shall be deemed references to the assignee, and the Seller shall cooperate to ensure that the Sale Approval Order and any other document or instrument reflecting the name of the Buyer is modified to reflect the name of the assignee.

9.5    **Access to Books and Records**.  From and after the Closing, and for so long as the Bankruptcy Case is pending or twelve (12) months after Closing, whichever is longer, the Buyer agrees to provide the Seller with reasonable access to the Transferred Books and Records (and allow the Seller to make extracts and copies of such Transferred Books and Records during such access) in connection with the Bankruptcy Case or any other proceeding or action related thereto, including any avoidance action (except for any avoidance actions described in the proviso to clause 8 of Exhibit F hereto) that may be brought by the Seller, in each case at the Seller's sole cost and expense.  Any such access shall be during regular business hours upon reasonable advance notice and in a manner that minimizes disruption to the business, operations and activities of the Buyer.  In connection with the Seller's access to the Transferred Books and Records, the Seller shall be accompanied at all times by a representative of the Buyer unless the Buyer otherwise agrees, shall not materially interfere with the use and operation of the offices and other facilities of the Buyer, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities.  Notwithstanding the foregoing, the Seller shall keep the Transferred Books and Records confidential, and may not use or disclose any Transferred Books and Records, or any information contained therein, following the Closing unless (a) such use or disclosure is permitted in writing by the Buyer or under the terms of the Confidentiality Agreement, or (b) such use or disclosure is necessary for the Seller's satisfaction of its obligations as a debtor under the Bankruptcy Code, in connection with any tax or regulatory filing or proceeding, or as a part of the Seller's winding up its affairs.

9.6    **Notices**.  All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by facsimile upon written confirmation (including the automatic confirmation that is received from

19

the recipient's fax machine or computer) of receipt by the recipient of such notice if such confirmation is received on a Business Day before 6:00 p.m. (ET), or otherwise on the next Business Day; the date after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case notice shall be:

If to the Seller, addressed to:            Energy and Power Solutions, Inc.
                                           150 Paularino Avenue, Suite A 120
                                           Costa Mesa, California 92626
                                           Attention: Jay Zoellner, President & CEO
                                           Facsimile:    (714) 957-0167

With a copy to:

            Attorney for the Seller:       Winthrop Couchot Professional Corporation
                                           660 Newport Center Dr., 4th Floor
                                           Newport Beach, CA 92660
                                           Attention: Marc Winthrop, Esq.
                                           Facsimile: (949) 720-4111

If to the Buyer, addressed to:             ISPE Services, LLC
                                           111 Speen Street, Suite 410
                                           Framingham, Massachusetts 01701
                                           Attention: General Counsel
                                           Facsimile: (508) 661-2203

With a copy to:

            Attorneys for the Buyer:       Wilmer Cutler Pickering Hale and Dorr LLP
                                           60 State Street
                                           Boston, Massachusetts 02109
                                           Attention: George W. Shuster, Jr., Esq.
                                           Facsimile: (617) 526-5000

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

        9.7    **Choice of Law**. This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the state of California. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 9.6. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of

20

the transactions contemplated hereby or thereby and any such dispute shall be deemed to have arisen in the state of California. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

9.8     **Entire Agreement; Amendments and Waivers**.  The Confidentiality Agreement shall be considered a part of this Agreement and shall be deemed integrated herewith. This Agreement, together with all Exhibits, Schedules, and Annexes attached or to be attached hereto and together with the Confidentiality Agreement (which Confidentiality Agreement shall survive the entry into this Agreement and any termination hereof), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties; provided that the forms of agreements attached hereto as Exhibits shall be superseded by the copies of such agreements executed by the parties thereto and shall be conclusive evidence of such parties' approval of any change or modification or waiver thereof or of this Agreement, as applicable. No amendment or modification of any term or provision hereof shall be binding unless executed in writing by or on behalf of the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

9.9     **Construction**.  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits, Schedules, and Annexes shall be to the specified Exhibits, Schedules, and Annexes attached hereto. All Exhibits, Schedules, and Annexes attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits, Schedules, and Annexes, except as otherwise provided therein. All references in this Agreement to "this Agreement" shall be deemed to include the Exhibits, Schedules, and Annexes attached hereto. The terms "hereby", "hereto", "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "including" when used herein shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

21

9.10    **Third Party Beneficiaries**.  No Person other than the parties hereto (and any permitted assignee under Section 9.4 hereof), shall have any rights or claims under this Agreement.

9.11    **Brokerage Obligations**. The Buyer and the Seller shall not be liable for any brokerage obligations incurred by the other, and in no event shall any broker engaged by the Seller have any recourse against the Buyer, the Acquired Assets, or the Business.

9.12    **No Waiver**.  The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform, nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

9.13    **Multiple Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.14    **Invalidity**.  In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument; provided, however, that Section 6.6 of this Agreement shall be deemed an integral part hereof and not severable from the other provisions of this Agreement.

9.15    **Publicity**.  The Seller shall not issue any press release or make any public statement regarding the transactions contemplated hereby, without the prior approval of the Buyer.

9.16    **Further Assurances**.  Without limiting any other rights or obligations of the parties contained in this Agreement, following the Closing, the Seller agrees to execute such documents, instruments or conveyances and take such actions as may be reasonably requested by the Buyer or the Buyer's counsel and otherwise reasonably cooperate with the Buyer, its Affiliates and their respective Representatives in connection with any action that may be necessary or advisable in connection with the transactions contemplated hereby.

9.17    **Cumulative Remedies**.  All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

9.18    **Warranties Exclusive**.  The representations and warranties contained herein are the only representations or warranties given by the Seller and all other express or implied warranties are disclaimed.  Without limiting the foregoing, the Buyer acknowledges that the Acquired Assets are conveyed "AS IS," WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed.

22

9.19 **Termination of Covenants, Representations, and Warranties at Closing**. The covenants to be performed hereunder by the Seller and the Buyer before the Closing, and the representations and warranties made by the Seller and the Buyer herein, shall terminate as of the Closing, subject only to those provisions of this Agreement that expressly survive the Closing or any termination of this Agreement. The Buyer shall have no right to seek indemnification from the Seller subsequent to the Closing based on a breach by the Seller of a representation or warranty made by the Seller herein, or based on a breach by the Seller of any covenant to be performed hereunder by the Seller before the Closing, except with respect to the Excluded Liabilities and except as set forth in Section 9.2(i). The Seller shall have no right to seek indemnification subsequent to the Closing based on a breach of a representation or warranty made by the Buyer herein, or based on a breach by the Buyer of any covenant to be performed hereunder by the Buyer before the Closing, except with respect to the Assumed Liabilities. For the avoidance of doubt, and notwithstanding the foregoing, covenants to be performed by the Seller and the Buyer on and following the Closing, or that expressly survive the closing pursuant to the terms of this Agreement, shall not terminate pursuant to this Section 9.19, and shall survive, and remain enforceable following, the Closing. This Section 9.19 shall survive following the Closing and notwithstanding any termination of this Agreement.

9.20 **Representation by Counsel; Mutual Negotiation**. Each party has been represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction and construction of the parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

9.21 **Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration and other such taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement shall be paid by the Buyer when due, and the Buyer shall, at its own expense, file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law.

[The next page is the execution page]

23

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

**SELLER**

**Energy and Power Solutions, Inc.**

By: _____
      Name: Peter Ludlum
      Title: CFO

**BUYER**

**ISPE Services, LLC**

By: _____
      Name: _____
      Title: _____

24

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

**SELLER**

**Energy and Power Solutions, Inc.**

By: _____

      Name: _____

      Title: _____

**BUYER**

**ISPE Services, LLC**

By: _____

      Name: _George P. Sakellaris_

      Title: _President_

24

## List of Exhibits

Exhibit A:    Acquired Assets

Exhibit B:    Assumed Executory Contracts

Exhibit C:    Assumed Liabilities

Exhibit D:    Bidding Procedures

Exhibit E:    Description of the Business

Exhibit F:    Excluded Assets

Exhibit G:    Key Contracts

Exhibit H:    Key Employees

Exhibit I:    Permitted Encumbrances

Exhibit J:    Specific Representations and Warranties

Exhibit K:    Instrument of Assumption of Liabilities

# EXHIBIT A

## Acquired Assets

The term "Acquired Assets" means, collectively, all of the following:

1.      All tangible assets, including, without limitation, (a) all fixtures, furniture, office supplies, and office equipment, (b) all computers, printers, servers, and other information technology equipment, (c) all machinery, tools and tooling, supplies, spare parts, packaging materials, and other operational and manufacturing equipment, (d) all fixtures, (e) all inventory, raw materials, and work-in-progress, (f) all motor vehicles, (g) all signage, advertising materials, marketing materials, literature and manuals, and samples, (g) all tangible books, records, files, ledgers, accounts, correspondence, and communications necessary or useful to operate the Business, and (h) all other tangible personal property.

2.      All intangible assets, including, without limitation, (a) all claims, prepayments, deposits (including security deposits and equipment deposits), refunds, causes of action, choses in action, rights of recovery, rights of setoff, rights of recoupment, and prepaid items, (b) all warranties and similar rights, (c) all certificates, licenses, permits, franchises, rights, approvals, clearances, orders, exemptions, registrations, authorizations, and similar rights issued by any governmental entity or agency, (d) all intangible books, records, files, accounts, ledgers, correspondence, and communications, (e) all rights under contracts, agreements, and instruments that are not Executory Contracts, including, without limitation, all rights under non-disclosure and confidentiality agreements that are not Executory Contracts and all rights under insurance contracts and to insurance proceeds for claims under such insurance contracts and to such insurance proceeds arising after the Closing Date to the extent that the insurance proceeds are related to other Acquired Assets, (f) all good will, and (g) all other intangible personal property.

3.      To the extent not included in the foregoing, all intellectual property and related rights, including, without limitation, (a) all patents, patent applications, patent disclosures and all related continuation, continuation-in-part, divisional, reissue, reexamination, utility model, certificate of invention and design patents, patent applications, registrations and applications for registrations, (b) all trademarks, service marks, trade dress, internet domain names, logos, trade names and corporate names and registrations and applications for registration thereof, (c) all copyrights, designs, data and database rights and registrations and applications for registration thereof, (d) all mask works and registrations and applications for registration thereof, (e) all computer software, data and documentation, (f) inventions, trade secrets and confidential business information, whether patentable or nonpatentable and whether or not reduced to practice, know-how, manufacturing and product processes and techniques, research and development information, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (g) other proprietary rights relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions), and (h) all copies and tangible embodiments of the foregoing and all good will associated with the foregoing, in each case whether the Seller's right, title, or interest therein is owned, licensed, or of any other nature or character.

4.      Without limiting the generality of the foregoing, all of the assets specifically listed in Annex A-1 hereto.

For the avoidance of doubt, notwithstanding the foregoing, (1) none of the Excluded Assets are included within the Acquired Assets, and (2) all of the Assumed Executory Contracts are Acquired Assets.

Annex A-1

## Specific Acquired Assets

1) Tangible - Inventory / Equipment for Projects / Tools located at:
    a)  150 Paularino Suites A120 and C110
    b)  Listing per accounting system:

Inventory Report                     07/26/2011

Warehouse:  1                     EPS Warehouse

| Item # | Description | Category | Qty |
|---|---|---|---|
| 00022 | UL489 MINIATURE CIRC(1492-SPU1B150) | MISC | 3.00 |
| 00024 | MODULE | MISC | 4.00 |
| 00026 | J4 END ANCHOR (REPL 1492-EA35) | MISC | 20.00 |
| 00028 | J4 END BARRIER | MISC | 12.00 |
| 00031 | FEED THROUGH SCREW TERM | MISC | 24.00 |
| 00032 | FEED THROUGH GRD BLK | MISC | 4.00 |
| 00034 | MCB/SUPPLEMENTARY P | MISC | 1.00 |
| 00041 | INPUT 8 CHANNEL | MISC | 4.00 |
| 00042 | RIGHT END CAP | MISC | 2.00 |
| 00044 | CMX L23E 16DI 16D ANG/GKK | MISC | 2.00 |
| 00045 | 750K/ETHERNET PROCESSOR | NETW | 2.00 |
| 00048 | DIN MOUNTING RAIL | MISC | 6.00 |
| 00068 | SINGLE SENSOR IO | METR | 8.00 |
| 00069 | 900MHZ WHIP ANTNN 1M RG174/SMA | METR | 16.00 |
| 00090 | 3" WHITE COVER | MISC | 36.00 |
| 00091 | 3 X 3 NARROW FINGER WHITE | MISC | 36.00 |
| 00103 | AB 15E POWER SUPPLY | POWR | 3.00 |
| 00105 | LOOP PWRD ISOLATOR 1 CH | MISC | 17.00 |
| 00106 | LOOP PWRD ISOLATOR 2 CH | MISC | 5.00 |
| 00107 | LOOP PWRD ISOLATOR 4 CH | MISC | 7.00 |
| 00110 | 900 MHZ WLESS OUTDOOR PTP ENET BRDG | MISC | 1.00 |
| 00115 | SOLOR PANEL KIT w/BATTERY BU | MISC | 1.00 |
| 00119 | SIE ECGB10 GROUNDBAR KIT #10-4 | MISC | 6.00 |
| 00121 | K FACTOR SCALER CONFG KIT FLO-TECH | MISC | 3.00 |
| 00122 | SIGNAL CONDITIONRS 4-20 LOOP ISOLTD | MISC | 1.00 |
| 00125 | HUMIDITY & TEMPERATURE METER | METR | 5.00 |
| 00126 | KEPWARE A-B OEM SITE LICENSE | SFTW | 6.00 |
| 00127 | ANTENEX DL BND CELLULAR/PCS ANT KIT | MISC | 2.00 |
| 00133 | VORTEX FLOW GAS MTR 316SS 24" STEM | METR | 15.00 |
| 00139 | FT218ISSSTE1DDB FOX THERML FLOW 18" | METR | 4.00 |
| 00140 | DYNASONIC ULTRASONIC FLOWMETER 11/2 | METR | 2.00 |
| 00153 | SPLIT-CORE CURRENT TRANSDUCER, HIGH | MISC | 1.00 |
| 00154 | REPEATER/POWER SUPPLY 2 CHANNELS | MISC | 2.00 |
| 00156 | PROX SWITCH, 18MM,10-30VDC,2WIRE,NO | MISC | 2.00 |
| 00158 | 115 VAC/7.5-13 VDC POWERED W/ ANALO | MISC | 1.00 |

| | | | |
|---|---|---|---|
| 00161 | MODIFIED SGL DOOR WALL MT ENC (DRAW | ITEQ | 22.00 |
| 00164 | FT2-I8ISSSTE1DDMBG3 INSERTION METER | LAB | 2.00 |
| 00165 | MINIATURE CB BREAKER | MISC | 5.00 |
| 00166 | 24VDC PWR SUPPLY | MISC | 6.00 |
| 00169 | PRESSURE TRANSDUCER | MISC | 1.00 |
| 00171 | PRESSURE TRANSDUCER | MISC | 1.00 |
| 00173 | MODBUS 8-Ch AI Module | MISC | 4.00 |
| 00174 | MODBUS 15-Ch DI/O Module | MISC | 10.00 |
| 00176 | ACROMAG:CH ANALOG INPUT ETHERNET IP | MISC | 2.00 |
| 00178 | RTD TEMP SENSOR w/ TRANSMITTER | MISC | 7.00 |
| 00179 | FT218ISSSTE1D0B0-FOX THRML NO DISP | METR | 3 00- |
| 00181 | J TYPE THERMOCOUPLE 6" LENGTH | MISC | 4.00 |
| 00182 | THERMOCOUPLE CONVERTER 4-20mA 32-12 | MISC | 2.00 |
| 00187 | DYNASONIC ULTRASONIC FLOWMETER 1" | METR | 6.00 |
| 00188 | ENERCEPT H8040 SERIES | MISC | 2.00 |
| 00192 | ENERCEPT H8040 SERIES | MISC | 1.00 |
| 00195 | USB to Isolated 2 Port 422/485 Conv | METR | 1.00 |
| 00196 | USB TO SERIAL 1 PORT, 2WIRE TB | METR | 2.00 |
| 00197 | Power-IO Interface Module | MISC | 14.00 |
| 00200 | AB Flex I/O Terminal Base Unit | MISC | 2.00 |
| 00201 | AB Flex I/O T/C RTD Input 8 Channel | MISC | 1.00 |
| 00202 | Rosemount RTD with 1" Thermal Well | MISC | 6.00 |
| 00203 | Rosemount Pressure Transmitter, 0-1 | MISC | 2.00 |
| 00204 | VFD PowerFlex 400 AB 23C-D045H103NN | MISC | 1.00 |
| 00207 | Din Mount Filter | MISC | 2.00 |
| 00208 | LEV 3801-DIN TVSS Single | MISC | 2.00 |
| 00209 | 20 AMP UL489 Mini Circuit Brake | MISC | 2.00 |
| 00210 | 5 AMP Mini Circuit Braker UL489 | MISC | 4.00 |
| 00213 | Hoff C-WHNL NON Locking Handle | MISC | 2.00 |
| 00214 | AB 1492-ACAB025EA69 Analog Cable W | MISC | 2.00 |
| 00215 | Assembly Cable | MISC | 2.00 |
| 00217 | Mobule with Multiple commons cable | MISC | 2.00 |
| 00218 | AB 1492-IFM20D-120A2 Module | MISC | 2.00 |
| 00219 | AB1769-1A16 Input MOD 16PT 120VAC | MISC | 2.00 |
| 00220 | AB179-OA16 Compact Logix 16 Point | MISC | 2.00 |
| 00221 | AB 1769-OF8C 8 Channel Log | MISC | 2.00 |
| 00222 | AB1769PA2 Ecpansion Power Supply | MISC | 2.00 |
| 00223 | AB 1783-US08T Stra Tix Unmanage | MISC | 2.00 |
| 00225 | AB-1492-J4 W Feed Through | MISC | 30.00 |
| 00226 | AB1492ACAB025D69 Asemble | MISC | 2.00 |
| 00227 | 3DB Fiberglass Omni Station Antenna | MISC | 1.00 |
| 00228 | HD Mounting Bracket for Antenna | MISC | 1.00 |
| 00229 | LMR195Cable RPSMA Plug toN-Male 3FT | MISC | 1.00 |
| 00300 | Vision Module Limited | MISC | 9.00 |
| 00301 | Swagelock Compression Fitting | MISC | 1.00 |
| 00302 | XPress Ethernet Bridge 900MHZ | MISC | 2.00 |
| 302 | Advantech Fanless Industrail PC | MISC | 7.00 |
| MDMKIT-A | AIRLINK MODEM KIT (AT&T) | KIT | 2.00 |

A-1-2

| Item # | Description | Category | Qty |
|---|---|---|---|
| MDMKIT-S | AIRLINK MODEM KIT (SPRINT) | KIT | 7.00 |
| 00108 | 11dBI HIGH GAIN 900MHZ ANTENNA | MISC | 6.00 |
| 00110 | 900 MHZ WLESS OUTDOOR PTP ENET BRDG | MISC | 2.00 |
| 00111 | CUSTOMIZED POLE MOUNT KIT | MISC | 4.00 |
| 00133 | VORTEX FLOW GAS MTR 316SS 24" STEM | METR | 2.00 |
| | | Warehouse Totals: | 472.00 |

| Warehouse: | LAB-A | LAB BLDG A | |
|---|---|---|---|
| **Item #** | **Description** | **Category** | **Qty** |
| 00007 | BELKIN USB TO 10/100BT ADAPTER | ITEQ | 1.00 |
| 00008 | APC 120V 8OUT RACKMOUNT 1U PDU | ITEQ | 1.00 |
| 00010 | GARMIN AC ADAPT C330 GPS | ITEQ | 1.00 |
| 00018 | HP DC7900 E8400 80GB | ITEQ | 1.00 |
| 00078 | TRIPP INTERNET 900CA UPS USB | ITEQ | 1.00 |
| 00096 | AIRLINK DC PWR CODE-XPLATFORM MODMS | ITEQ | 2.00 |
| 00143 | PLUG IN AC ADAPTER, 120 VAC TO 9VDC | ITEQ | 1.00 |
| 00146 | MOUNTING KIT - FIBERGLASS ANTENNA | ITEQ | 2.00 |
| | | Warehouse Totals: | 10.00 |

| Warehouse: | LAB-C | LAB BLDG C | |
|---|---|---|---|
| **Item #** | **Description** | **Category** | **Qty** |
| 00061 | CISCO 1811/K9  INTEGR SERV ROUTER | LAB | 1.00 |
| 00133 | VORTEX FLOW GAS MTR 316SS 24" STEM | METR | 1.00 |
| 00164 | FT2-I8ISSSTE1DDMBG3 INSERTION METER | LAB | 1.00 |
| | | Warehouse Totals: | 3.00 |

| Warehouse: | TOOLS | SMALL TOOLS | |
|---|---|---|---|
| **Item #** | **Description** | **Category** | **Qty** |
| 00113 | SERIAL EXPANSION UNIT | MISC | 1.00 |
| 00116 | DYNASONICS PC CABLE-ULTRALINK SFTWR | SFTW | 5.00 |
| 00121 | K FACTOR SCALER CONFG KIT FLO-TECH | MISC | 2.00 |
| 00141 | 24/28 VDC 30W POWER | POWR | 1.00 |
| | | Warehouse Totals: | 9.00 |
| | | Report Totals: | 494.00 |

2) Tangible - Fixed Assets located at:
   a) 150 Paularino Suites A120 and C110
   b) xChange Point equipment installed at Dean Foods sites
   c) xChange Point equipment installed at Land o Lakes sites
   d) xChange Point Software developed by EPS

A-1-3

e) Listing per accounting system as of 6/30/2011:

| | Date Acq | Description |
|---|---|---|
| Corp | 02/05/02 | LAPTOP COMPUTERS (3) |
| Corp | 12/02/02 | PHOTOTACHOMETER |
| Corp | 03/12/03 | HP Color Printer |
| Corp | 01/02/04 | Dell SERVER |
| Corp | 01/02/04 | DELL LAPTOP (Ting's) |
| Corp | 04/15/05 | DELL LAPTOP |
| Corp | 06/17/05 | Powerspec Desktop, Proview Monitor, Cannon |
| Corp | 06/17/05 | Powerspec Desktop |
| Corp | 06/17/05 | Powerspec Desktop & Proview Monitor |
| Corp | 06/17/05 | Powerspec Desktop, Proview Monitor, Cannon |
| Corp | 08/15/08 | ShorePhone Mailbox & Extension Licenses |
| Corp | 08/15/08 | ShorePhones (10) |
| Corp | 08/15/08 | Personal Call Manager (10) |
| Corp | 08/15/08 | Phone Network Install |
| Corp | 02/28/09 | Office Phones |
| Corp | 05/28/09 | ShorePhone IP 230 Silver Phones |
| Corp | 05/28/09 | ShorePhone IP 230 Silver Phones |
| Corp | 09/30/09 | Testing Equipment |
| Corp | 10/19/09 | Samsung LCD 46" TV LN46B610 #1 |
| Corp | 10/19/09 | Samsung LCD 46" TV LN46B610 #2 |
| Corp | 10/20/09 | Testing Equipment-Wireless Signal |
| Corp | 10/26/09 | Sharp Aquos D65UT 42" HDTV and Samsung DVD |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 11/05/09 | Hart Tooling |
| Corp | 01/30/10 | Samsung LCD TV 52 inch |
| Corp | 01/30/10 | Samsung LCD TV 52 inch |
| Corp | 02/25/10 | Samsung 52" 1080P HDT |
| Corp | 03/09/10 | Lantelligence Shorephone IP 230 Silver |
| Corp | 06/30/10 | Sales Tax |
| Corp | 01/27/11 | Automation tool kit |
| Corp | 02/10/11 | Shoretel phone |
| Corp | 03/31/11 | FT2 Hand Tool |
| Corp | 03/31/11 | FT2 Hand Tool |

A-1-4

| | | |
|---|---|---|
| Corp | 03/31/11 | FT2 Hand Tool |
| Corp | 03/31/11 | FT2 Hand Tool |
| Corp | 03/31/11 | FT2 Hand Tool |
| Corp | 01/01/06 | Dell Laptop |
| Corp | 03/24/06 | Dell Laptop (previously written off) |
| Corp | 06/08/06 | Dell Laptop |
| Corp | 01/03/08 | Dell Laptop |
| Corp | 01/03/08 | Dell Desktop |
| Corp | 01/03/08 | Dell Desktop |
| Corp | 01/13/08 | Dell Laptop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 01/16/08 | Dell Desktop |
| Corp | 02/01/08 | Sony Laptop |
| Corp | 02/12/08 | Dell Laptop |
| Corp | 02/19/08 | Dell Computer |
| Corp | 02/19/08 | Dell Server Rack |
| Corp | 02/19/08 | Dell Vostro 200 |
| Corp | 03/01/08 | Sony Laptop |
| Corp | 03/06/08 | HP Proliant DL380 G5 Server |
| Corp | 03/06/08 | HP Proliant DL360 G5 Server |
| Corp | 03/06/08 | HP Proliant DL360 G5 Server |
| Corp | 03/07/08 | Dell Laptop |
| Corp | 03/12/08 | Dell Laptop |
| Corp | 03/12/08 | Dell Laptop |
| Corp | 03/12/08 | Dell Laptop |
| Corp | 03/28/08 | HP ProCurve Switch 5304xl |
| Corp | 04/03/08 | HP Proliant DL360 G5 Server |
| Corp | 04/03/08 | HP Proliant DL360 G5 Server |
| Corp | 04/07/08 | Dell Laptop |
| Corp | 04/07/08 | Dell Laptop |
| Corp | 04/07/08 | Dell Laptop |
| Corp | 04/07/08 | Dell Laptop |
| Corp | 04/07/08 | Dell Laptop |
| Corp | 04/07/08 | Dell Laptop |
| Corp | 04/11/08 | APC Smart-UPS RT UPS 6000 |
| Corp | 04/14/08 | Costa Mesa Server |

A-1-5

| | | |
|---|---|---|
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 05/16/08 | Dell Laptop |
| Corp | 06/02/08 | HP Server ProLiant DL360 G5 Server & Care |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/16/08 | Dell Laptop |
| Corp | 06/18/08 | Dell Laptop |
| Corp | 07/22/08 | Dell Laptop |
| Corp | 07/22/08 | Dell Laptop |
| Corp | 07/22/08 | Dell Laptop |
| Corp | 07/22/08 | Dell Laptop |
| Corp | 07/22/08 | Dell Latitude D830 |
| Corp | 08/21/08 | Dell Vostro 200 |
| Corp | 08/21/08 | Dell Vostro 200 |
| Corp | 08/21/08 | Dell Vostro 200 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |
| Corp | 08/24/08 | Dell Latitude D830 |

A-1-6

| | | |
|---|---|---|
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/13/08 | Dell Latitude D830 |
| Corp | 11/17/08 | Dell Vostro 200 |
| Corp | 11/21/08 | HP Procurve Switch |
| Corp | 11/21/08 | HP Procurve Switch |
| Corp | 11/21/08 | HP Procurve Switch |
| Corp | 12/03/08 | APC Smart-UPS 2200 RM XL |
| Corp | 12/04/08 | Dell Vostro 200 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 12/26/08 | Dell Latitude E5500 |
| Corp | 01/01/09 | HP Scanjet 7800 Printer/Scanner |
| Corp | 01/01/09 | HP LaserJet M2727nf MFP Printer/Scanner |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |

A-1-7

| | | |
|---|---|---|
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | Dell Latitude E5500 |
| Corp | 02/28/09 | HP Compaq DC7900 Ultra Slim Destop |
| Corp | 02/28/09 | HP Compaq DC7900 Ultra Slim Destop |
| Corp | 02/28/09 | HP Compaq DC7900 Ultra Slim Destop |
| Corp | 02/28/09 | HP Compaq DC7900 Ultra Slim Destop |
| Corp | 02/28/09 | HP Compaq DC7900 Ultra Slim Destop |
| Corp | 04/01/09 | Dell Vostro 200 |
| Corp | 04/01/09 | Dell Vostro 200 |
| Corp | 04/01/09 | Dell Lattitude D830 (previously written off) |
| Corp | 04/01/09 | Dell Laptop (#8DQ9BF1) |
| Corp | 04/01/09 | Dell Computer |
| Corp | 05/01/09 | Dell Bags and Computers (TO BE ENTERED IN MAY) |
| Corp | 05/08/09 | CISCO Ethernet Router |
| Corp | 05/28/09 | HP Proliant DL380 G6 |
| Corp | 07/30/09 | HP Procurve Switch 2610-48 |
| Corp | 07/30/09 | HP Procurve Switch 2610-48 |
| Corp | 07/30/09 | HP Procurve Switch 2610-48 |
| Corp | 08/07/09 | HP Procurve Switch |
| Corp | 08/27/11 | HP Procurve Switch Hardware |
| Corp | 09/13/09 | Infocus IN35 XGA 2500 Lumre |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (2P1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (3Q1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (8P1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (BP1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (CP1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (HP1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (1Q1YPH1) |
| Corp | 10/31/09 | Dell Vostro 200 Desktop Computer (2Q2YPH1) |
| Corp | 11/01/09 | IT Networking Equipment (Dallas) |
| Corp | 11/11/09 | HP MDS9124 8-Port Fabric Switch |
| Corp | 11/11/09 | HP Cisco MDS9000 4GB FC SFP |

A-1-8

| | | |
|---|---|---|
| Corp | 11/19/09 | HP 42B PCIE 4GB FC 2PT Host Bus Adapter (1 of 2) |
| Corp | 11/19/09 | HP 42B PCIE 4GB FC 2PT Host Bus Adapter (2 of 2) |
| Corp | 11/19/09 | HP MSL4048 1840 LT04 FC Library |
| Corp | 11/22/09 | HPE 9x5xNBD MSL 4048 |
| Corp | 11/30/09 | HP Data Protector Starter Pack Win |
| Corp | 11/30/09 | HP DP On-Line B/U for Win |
| Corp | 12/14/09 | Latitude E34300-Fast Track |
| Corp | 12/16/09 | HP Laserjet M727PPM Printer |
| Corp | 01/05/10 | Dell Latitiude Laptop |
| Corp | 01/22/10 | Dell Latitude Laptopp |
| Corp | 01/22/10 | Dell Latitude Laptopp |
| Corp | 01/27/10 | Dell Latitude Laptop |
| Corp | 01/30/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 01/31/10 | Samsung 23 inch Monitor |
| Corp | 02/12/10 | Latitude E4300 Laptop |
| Corp | 02/15/10 | Latitude E4300 Laptop |
| Corp | 02/18/10 | Saturday Latitude E4300 Laptop |
| Corp | 02/18/10 | Saturday Latitude E4300 Laptop |
| Corp | 03/01/10 | CDW Corp IT Server |
| Corp | 03/01/10 | CDW IT Corp Server |
| Corp | 03/01/10 | Dell Latitude E4300 Fast Track |
| Corp | 03/01/10 | Dell Latitude E4300 Fast Trak |
| Corp | 03/12/10 | Canon DR-2580C Scanner |
| Corp | 04/01/10 | Onset Computer |
| Corp | 05/17/10 | CDW CM# SRG5674 |
| Corp | 05/18/10 | HP Dual Port |
| Corp | 08/10/10 | HP 8GB Memory |
| Corp | 08/10/10 | HP 8GB Memory |
| Corp | 12/01/10 | Idera Hardware xCP |
| Corp | 02/28/11 | HP Hardware |
| Corp | 02/28/11 | HP Hardware |

A-1-9

| | | |
|---|---|---|
| Corp | 03/10/08 | Neat Suite License |
| Corp | 04/01/08 | Symantec Backup for Windows Servers |
| Corp | 04/01/08 | Symantec Backup for MS Exchange Server |
| Corp | 04/01/08 | HP Pro Curve Manager Plus Licenses |
| Corp | 04/07/08 | AutoCAD LT 2008 |
| Corp | 04/07/08 | AutoCAD LT 2008 |
| Corp | 04/10/08 | MS Office Enterprise 2007 Licenses |
| Corp | 04/10/08 | MS Dynamics CRM-Licenses & Software Assurance |
| Corp | 04/18/08 | Blackberry Enterprise Server Licenses |
| Corp | 05/01/08 | Adobe Creative Suite 3 |
| Corp | 05/01/08 | MS Dynamics CRM Pro Server License & |
| Corp | 05/01/08 | MS Dynamics CRM - Licenses & Software |
| Corp | 06/02/08 | MS Office SharePoint Server |
| Corp | 06/02/08 | MS Office Sharepoint Licenses |
| Corp | 06/23/08 | AutoCAD LT 2008 |
| Corp | 06/23/08 | AutoCAD LT 2008 |
| Corp | 07/29/08 | Quickbooks Licenses |
| Corp | 10/28/08 | Team Viewer |
| Corp | 01/01/09 | Blackberry Software |
| Corp | 01/01/09 | Salesforce Software |
| Corp | 01/31/09 | Insignia-MicrosoftOffice Sharepoint |
| Corp | 02/28/09 | SQL Licenses (5) |
| Corp | 02/28/09 | KepServerEX |
| Corp | 02/28/09 | Dexter-Chaney Spectrum Software (thru |
| Corp | 03/31/09 | Dexter-Chaney Spectrum Software (March |
| Corp | 04/30/09 | Dexter-Chaney Spectrum Software (April |
| Corp | 04/30/09 | Insignia-MicrosoftOffice Sharepoint |
| Corp | 05/01/09 | VMWare |
| Corp | 06/12/09 | Cisco Smartnet 24X7X4 |
| Corp | 06/20/00 | Black Berry Ent/Pro Calc 10 |
| Corp | 07/11/09 | RNW Be AGT Ent |
| Corp | 07/23/09 | CISCO 1841 Adv Security Feat Pack |
| Corp | 08/06/09 | Inductive Automation Software |
| Corp | 08/14/09 | ADP HRB HRIS Software |
| Corp | 08/31/09 | VMWare VSphere |
| Corp | 08/31/09 | Telerik |
| Corp | 09/14/09 | epsway.com Website |
| Corp | 09/14/09 | Adobe Creative Suite Software |
| Corp | 09/17/09 | Russell Brown Softwareoftware |
| Corp | 09/25/09 | ManagerPlus Asset Maintenance Software |
| Corp | 10/01/09 | Salesforce Software |
| Corp | 10/01/09 | Cisco Smartnet Software |

A-1-10

| | | |
|---|---|---|
| Corp | 10/05/09 | Autodesk Autocad 2010 Software |
| Corp | 10/08/09 | epsway.com Website Upgrade |
| Corp | 11/01/09 | AdobeFlex builder 3 professional software |
| Corp | 11/03/09 | Automation Tookit AB 93982QTKIT15B (3)ware |
| Corp | 12/10/09 | AVL Robohelp Off8 Win L1 |
| Corp | 12/31/09 | Policy & Procedure Manager Software |
| Corp | 01/08/10 | OneSource Toolkit Software |
| Corp | 01/14/10 | AVL Acrobat |
| Corp | 02/28/10 | Direct Marketing Association |
| Corp | 02/28/10 | Microsoft-MSDN Program Engineer DVD |
| Corp | 02/28/10 | Adobe Suite Mastergram Engineer DVD |
| Corp | 02/28/10 | Adobe Suite Master |
| Corp | 04/10/10 | Symantec Upgrade |
| Corp | 04/30/10 | Michelle Pierce |
| Corp | 05/06/10 | Greyware |
| Corp | 05/19/10 | VMWARE Support |
| Corp | 05/30/10 | Quotewerks |
| Corp | 06/30/10 | Sales Tax |
| Corp | 09/02/10 | Avangate |
| Corp | 09/30/10 | SalesForce implentation |
| Corp | 09/30/10 | Win embedded 2009 eMB ESD |
| Corp | 09/30/10 | Web Design-xCP |
| Corp | 09/30/10 | VMWare VSphere |
| Corp | 10/13/10 | Idera Hardware |
| Corp | 10/13/10 | Red Gate |
| Crop | 04/01/11 | Int'l Media Mgmt-Carbon Tracking Software |
| Corp | 02/05/02 | Office chairs (6) |
| Corp | 04/30/02 | File cabinets (6) |
| Corp | 04/30/02 | Desks (6) |
| Corp | 05/06/02 | 4 Drawer lateral file |
| Corp | 05/09/02 | Conference table |
| Corp | 03/28/03 | Furniture and fixtures |
| Corp | 10/24/03 | Furniture and fixtures |
| Corp | 03/28/03 | Cubicles (2) |
| Corp | 03/05/07 | Office furniture |
| Corp | 05/14/07 | Chairs - Executive (7) & Lobby (5) |
| Corp | 10/22/07 | Herman Viller Action Office |
| Corp | 11/26/07 | Office furniture |
| Corp | 12/04/07 | Office furniture |
| Corp | 12/18/07 | West Coast Office furniture |
| Corp | 02/06/08 | West Coast Office Furniture |
| Corp | 02/14/08 | East Coast Office Furniture |
| Corp | 02/22/08 | East Coast Office Furniture |

A-1-11

| | | |
|---|---|---|
| Corp | 04/28/08 | West Coast Office Furniture |
| Corp | 06/09/08 | West Coast Office Cubicles |
| Corp | 01/01/09 | CM Cubicles |
| Corp | 10/23/09 | Mahogany "L" Shaped Desks |
| Corp | 10/26/09 | EPS Corp Tradeshow Booth |
| Corp | 10/26/09 | EPS Corp Tradeshow Booth |
| Corp | 10/21/10 | EPS Corp Tradeshow Booth |
| Corp | 04/30/11 | |
| Corp | 12/10/07 | Office Addition |
| Corp | 03/11/08 | West Coast Office Remodel - Winter 08 |
| Corp | 04/01/08 | East Coast Office IT Improvements |
| Corp | 05/21/08 | West Coast Office Remodel - Spring 08 |
| Corp | 06/26/08 | Exchange Point LabRemodel - Spring 08 |
| Corp | 07/16/08 | June/July 08 CM Remodel |
| Corp | 08/18/08 | CM Office Improvements |
| Corp | 09/02/08 | Security Cameras |
| Corp | 01/01/09 | CM Office:  Fiber Cable & Panels |
| Corp | 01/01/09 | CM office: B-140 HR office improvements |
| Corp | 01/01/09 | CT Ofc improvements-server enclosure and wall |
| Corp | 01/01/09 | CM Office: B-140 Infrastructure/Improvements |
| Corp | 02/28/09 | CM Office: B-140 Infrastructure/Improvements |
| Corp | 04/30/09 | CM Office Improvements |
| Corp | 08/13/09 | CM Office: ADT Security System |
| Corp | 09/01/09 | CM office: Bldg C improvements |
| Corp | 05/12/08 | Fluke-345  15BK2 |
| Corp | 06/11/08 | Fluke-725-US 6KD42 |
| Corp | 07/02/08 | Flow Meter Test Equip |
| Corp | 08/19/08 | Fluke-354 Clamp on Power Meter Kit |
| Corp | 08/19/08 | Fluke-725 US Multifunction Calibrator |
| Corp | 04/20/09 | Green Box Drawing |
| Corp | 08/31/09 | Green/Blue Box Racks for Lab |
| Corp | 06/30/10 | Sales Tax |
| Corp | 12/31/08 | V-Gard White w/ Rachet |
| Corp | 04/03/08 | HP Proliant DL380G5 |
| Corp | 06/10/08 | HP Proliant DL360 G5 Server & Care Pack |
| Corp | 06/10/08 | HP Proliant DL360 G5 Server & Care Pack |
| Corp | 06/10/08 | HP Proliant DL360 G5 Server & Care Pack |
| Corp | 06/11/08 | HP Proliant DL380 G5 Server & Care Pack |
| Corp | 07/24/08 | HP Proliant DL360 G5 Server & Care Pack |
| Corp | 07/24/08 | HP Proliant DL360 G5 Server & Care Pack |
| Corp | 07/24/08 | HP Proliant DL380 G5 Server & Care Pack |
| Corp | 07/24/08 | HP Proliant DL380 G5 Server & Care Pack |
| Corp | 07/24/08 | HP Proliant DL380 G5 Server & Care Pack |

A-1-12

| | | |
|---|---|---|
| Corp | 05/12/09 | CISCO Ethernet Router |
| Corp | 06/11/09 | CISCO Ethernet Router |
| Corp | 07/23/09 | HP DL360 G6 L5520 EFF Server |
| Corp | 08/16/09 | HP DL360 G6 L5520 EFF Server |
| Corp | 08/27/09 | GP 300GB 3G  SAS 10K Hard Drive |
| Corp | 08/27/09 | GP 300GB 3G  SAS 10K Hard Drive |
| Corp | 08/27/09 | HP 300GB 3G Plug SAS 10K DP SFF HD |
| Corp | 08/27/09 | HP 300GB 3G Plug SAS 10K DP SFF HD |
| Corp | 08/27/09 | HP 300GB 3G Plug SAS 10K DP SFF HD |
| Corp | 08/27/09 | HP 300GB 3G Plug SAS 10K DP SFF HD |
| Corp | 08/27/09 | HP 300GB 3G Plug SAS 10K DP SFF HD |
| Corp | 08/27/09 | HP 300GB 3G Plug SAS 10K DP SFF HD |
| Corp | 11/01/09 | HP StorageWorks 4/16 San Switch |
| Corp | 01/12/10 | HP 1/8 G2 & MSL LT04 Encryption kit |
| Corp | 02/28/10 | xCP Dept Network Setup |
| Corp | 06/30/10 | Sales Tax |
| XCP | 06/01/09 | XChangePoint Software |
| XCP | 03/01/09 | XChange Point Software |
| XCP | 04/18/10 | xCP Software Upgrade 5.5 |
| XCP | 05/17/10 | xCP Software Upgrade 5.6 |
| XCP | 05/31/10 | XChangepoint Software |
| XCP | 06/30/10 | xCP Software Upgrade 5.6 adj |
| XCP | 08/31/10 | xCP Software Upgrade 5.7 |
| XCP | 08/31/10 | xCP Software Upgrade 5.8 |
| XCP | 10/31/10 | xCP Software Upgrade 5.8 |
| XCP | 10/31/10 | xCP Software Upgrade 5.9 |
| XCP | 11/30/10 | xCP Software Upgrade 5.9 |
| XCP | 04/30/11 | xCP Software 5.9 Add'l |
| XCP | 06/01/09 | XCP-SVC-Dean Milk-BPCA |
| XCP | 06/01/09 | XCP-SVC-Dean-IceCrm-BPCA |
| XCP | 06/01/09 | XCP-SVC-Dean-Alta DD-COI |
| XCP | 06/01/09 | XCP-SVC-Dean-Brkly-HWCAI |
| XCP | 09/01/09 | XCP-Fortworth-TX |
| XCP | 11/01/09 | XCP-SVC-Pet Dairy-SPSC |
| XCP | 11/01/09 | XCP-SVC-Lee Dairy-OCFL |
| XCP | 11/01/09 | XCP-SVC-TG Lee Dairy-ORFL |
| XCP | 11/01/09 | SCP-SVC-Mayfield IC-BIAL |
| XCP | 11/01/09 | XCP-SCV-Meadow Gld-ENCO |
| XCP | 11/01/09 | XCP-SCV-Meadow Gld-HOHI |
| XCP | 11/01/09 | XCP-SVC-Country Frsh-GRMI |
| XCP | 11/01/09 | XPC-SVC-Land-O-Sun-TOOH |
| XCP | 11/01/09 | XCP-SVC-LibertyDairy-EVMI |
| XCP | 11/01/09 | XCP-SVC-Price Cream-EPTX |

A-1-13

| | | |
|---|---|---|
| XCP | 11/01/09 | XCP-SVC-Robinson-DECO |
| XCP | 11/01/09 | XPC-SVC-Grandy's-LUTX |
| XCP | 11/01/09 | XCP-SVC-Barber Dairy-BIAL |
| XCP | 11/01/09 | XCP-SVC-Dairy Fresh-WSNC |
| XCP | 11/01/09 | XCP-SVC-Foremost Dai-SHLA |
| XCP | 12/01/09 | XCP-SVC-Oak Farms-HOTX |
| XCP | 12/01/09 | XCP-SVC-Oak Farms-SATX |
| XCP | 12/01/09 | XCP-SVC-Garlck Farms-FRMA |
| XCP | 12/01/09 | XCP-SVC-Garlck Farms-LYMA |
| XCP | 12/01/09 | XCP-SVC-Garlck Farms-RENY |
| XCP | 12/01/09 | XCP-SVC-Garelick Frm-BUNJ |
| XCP | 12/01/09 | XCP-SVC-Garelick Frm-RENY |
| XCP | 12/01/09 | XCP-SVCSchepps-DATX |
| XCP | 12/01/09 | XCP-SVC-Country Frsh-LIMI |
| XCP | 12/01/09 | XCP-SVC-Chemung-HAIL |
| XCP | 12/01/09 | XCP-SVC-Dean Foods-HUIL |
| XCP | 12/01/09 | XCP-SVC-Dean Foods-WATX |
| XCP | 12/01/09 | XCP-SVC-Southwest IC-MKTX |
| XCP | 12/01/09 | XCP-SVC-Broughton-MAGA |
| XCP | 12/01/09 | XCPSVC-CountryDelite-NATN |
| XCP | 12/01/09 | XCP-SVC-Creamland-ALNM |
| XCP | 12/01/09 | XCP-SVC-Meadow Gold-SLUT |
| XCP | 12/01/09 | XCP-SVC-Model Dairy-RENV |
| XCP | 12/01/09 | XCP-SVC-Swiss Dairy-RICA |
| XCP | 12/01/09 | XCP-SVC-Tulare Cult-TUCA |
| XCP | 12/01/09 | SCP-SVC-Reiter Dairy-SPOH |
| XCP | 12/01/09 | XCP-SVC-MeadowGold-ORUT |
| XCP | 12/01/09 | XCP-SVC-Morningstar-SSTX |
| XCP | 01/01/10 | XCP-SVC-Dean Foods-BEIL |
| XCP | 01/01/10 | XCP-SVC-Lehigh-LAPA |
| XCP | 01/01/10 | XCP-SVC-Shenandoah-SPVA |
| XCP | 01/01/10 | XCP-SVC-Dean Foods-SPVA |
| XCP | 01/01/10 | XCP-SVC-MayfieldDairy-ATTN |
| XCP | 01/01/10 | XCP-SVC-Land O Sun-FLSC |
| XCP | 01/01/10 | XCP-SVC-Whitewave-MCPA |
| XCP | 01/01/10 | XCP-SVC-McArthur Dairy-MIFL |
| XCP | 02/01/10 | XCP-SVC-PINE ISLAND-PIMN |
| XCP | 02/01/10 | XCP-SVC-MelroseDairy-MEMN |
| XCP | 03/01/10 | XCP-SVC-Richmond Feed |
| XCP | 03/01/10 | XCP-SVC Macon Feed |
| XCP | 03/01/10 | XCP-SVC Denmark Dairy |
| XCP | 05/28/10 | XCP-SVC-Spencer-LOL |
| XCP | 06/30/10 | XCP-SVC-GarelickFrm-BUNJ addtl |

A-1-14

| XCP | 06/30/10 | XCP-SVC-ModelDairy-RENV |
| XCP | 06/30/10 | XCP-SVC-TulareCult-TUCA |
| XCP | 06/30/10 | XCP-SVC-PineIsland-PIMN LOL |
| XCP | 06/30/10 | XCP-SVC Macon Feed |
| XCP | 06/30/10 | XCP-SVC-Richmond-RIIN |
| XCP | 06/30/10 | XCP-SVC-MelrosDairy-MEMN |
| XCP | 06/30/10 | XCP-SVC-Denmark-DEWI |
| XCP | 06/30/10 | XCP-SVC-Spencer-SPWI |
| XCP | 07/31/10 | XCP-SVC-Kent-KEOH |
| XCP | 07/31/10 | 11-7-CAP-Kiel |
| XCP | 07/31/10 | UltraDairy-DENY |
| XCP | 09/30/10 | UltraDairy-DENY |
| XCP | 09/30/10 | Macon-MAMS |
| XCP | 09/30/10 | Denmark-DEWI |
| XCP | 09/30/10 | Spencer-SPWI |
| XCP | 09/30/10 | Kiel-KIWI |
| XCP | 09/30/10 | XCP-SVC-Dean Milk-BPCA |
| XCP | 11/01/10 | Carlisle-CAPA |
| XCP | 12/01/10 | LOL Rivergate Purina |
| XCP | 01/31/11 | LOL ST. Joseph Purina |
| XCP | 03/31/11 | Carlisle-CAPA reverse depreciation |
| XCP | 03/31/11 | Carlisle-CAPA (1) |
| XCP | 03/31/11 | Carlisle-CAPA (2) |

3) Tangible - Books, records, files, ledgers, accounts, correspondence related to the Business located at:
   a) 150 Paularino Suites A120 and C110
   b) At offsite storage (Magellan)

4) Tangible – Office Supplies located at:
   a) 150 Paularino Suites A120 and C110

5) Intangible – Licenses – xChange Point:

   a. Commerical Software Ongoing maintenance  (optional annual renewal)

   | i. | MSDN Professional | |
   |----|-------------------|--|
   | ii. | VMWare | |
   | iii. | GotoMeeting | |
   | iv. | GotoWebinar | |
   | v. | Salesforce.com | |

A-1-15

| vi.   | Red-Gate SQL Backup (6 Additional Licenses) | |
|-------|---------------------------------------------|--|
| vii.  | Red-Gate SQL Monitor (1 Additional License) | |
| iii.  | Quest TOAD Data Modeler | |
| ix.   | Idera Defrag Manager | |
| x.    | Red-Gate SQL Toolbelt | |
| xi.   | Idera SQL Toolbox | |

b. Commerical Software Purchased
  i. MDaemon - http://www.altn.com/Products/MDaemon-Email-Server-Windows/
  ii. Adobe Robohelp 9.0
  iii. Adobe Master Collection CS4
  iv. SnagIt
  v. AdvancedInstaller
  vi. WinZip
  vii. ClientAce Toolkit by Kepware
  viii. WinRar
  ix. Nero
  x. LightScribe
  xi. Camtasia Studio
  xii. TextPad (http://www.textpad.com/)
  xiii. TeamViewer.
  xiv. Microsoft Visual Studio 2008 / 2010 Professional
  xv. Microsoft SQL Server 2005 / 2008
  xvi. Adobe Flex Builder 3.5
  xvii. Telerik Web UI ASP.Net AJAX (Web UI libraries)
  xviii. Telerik Test Studio (for test case automation)
  xix. FusionChart Flex (Rich Charting components)
  xx. Red-Gate ANTS Performance Profiler .Net
  xxi. IETester (http://www.debugbar.com/)

c. Commerical software (Free)
  i. Idera SQL Permissions
  ii. Idera SQL Job Manager
  iii. Red-Gate SQL Search
  iv. SQL Sentry – Plan Explorer
  v. Quest PowerGui
  vi. HDD Hex Editor Neo (http://www.hhdsoftware.com/free-hex-editor)
  vii. PDFill (http://www.pdfill.com/pdf_tools_free.html)
  viii. Google Chrome (http://www.google.com/chrome)
  ix. Fiddler2 (http://www.fiddler2.com/fiddler2/)

A-1-16

    d.   Opensource
       i.   TortoiseSVN (http://tortoisesvn.net/)
      ii.   GhostScript (http://pages.cs.wisc.edu/~ghost/)
     iii.   7Zip  (http://www.7-zip.org/)
     iv.   Firebug (http://getfirebug.com/)
      v.   Firebox (http://www.mozilla.com/en-US/firefox/new/)
     vi.   Notepad++ (http://notepad-plus-plus.org/)
    vii.   XML Notepad 2007 (http://xmlnotepad.codeplex.com/)
   viii.   http://www.famfamfam.com/lab/icons/silk/
     ix.   Trac (http://trac.edgewall.org/)
      x.   SVN (http://subversion.apache.org/)

    e.   All other licenses required for operation of the xChange Point businesses

6) Office:
   a)   Office 2007 Suites
   b)   Office 2003 Applications
   c)   Office 2003 Suites
   d)   Office 2007 Applications
   e)   Office 2007 Suites
   f)   Office XP Suites
   g)   Win 7 - KMS
   h)   Win 7 - MAK
   i)   Windows Server 2003
   j)   Windows Server 2003 R2, x64 Ed.
   k)   Windows Server 2008 Std/Ent KMS B
   l)   Windows Vista - KMS
   m)   Windows Vista - MAK
   n)   Windows XP Prof, x64 Ed.
   o)   Windows XP Professional
   p)   Dexter Chaney Spectrum
   q)   Asset Keeper
   r)   Thin Mind
   s)   Salesforce (Cost included in XCP list)
   t)   Allen Bradley complete software suite – 10 licenses (renewed annually)
   u)   GE Tech support contract  - access to all GE software (renewed annually)
   v)   Opto22 control software
   w)   AutoCAD
   x)   All Product Keys associated with the foregoing

A-1-17

7) Intangible – Trademarks
b) Trademark: XCHANGE POINT
   i) Serial No.: 77/476,063
   ii) Filing Date: May 15, 2008
   iii) Class: 9, 35 & 42
  c) Trademark: EPS
   i) Serial No.: 77/476,083
   ii) Filing Date: May 15, 2008
   iii) Class: 9 and 42
  d) Trademark: EPS (Stylized and/or with design)
   i) Serial No.: 77/476,084
   ii) Filing Date: May 15, 2008
   iii) Class: 9 and 42
  e) Trademark: THE EPSWAY
   i) Serial No.: 77/476,094
   ii) Filing Date: May 15, 2008
   iii) Class: 9 and 42
  f) Trademark:    REPS (Stylized and/or with design)
   i) Serial No.: 77/476,093
   ii) Filing Date: May 15, 2008
   iii) Registration No.: 3981854
   iv) Registration Date: June 21, 2011
   v) Class: 9, 35 & 42
  g) Mark: EPS POWERSAVER
   i) Serial No.: 77/767,630
   ii) Filed: June 24, 2009
   iii) Class: 42
  h) Mark: REBATE XCHANGE
   i) Serial No.: 78/362,622
   ii) Filling Date: February 4, 2004

8) Intangibles – Patents
  a) Publication #: US 2009/0281677
   i)    Pub Date:Nov. 12, 2009
   ii)   Status:-Pending
  b) Publication #: US 2010/0145629
   i)    Pub Date:Jul. 10, 2010
   ii)   Status:-Pending

A-1-18