1  MARC J. WINTHROP – State Bar No. 63218
   mwinthrop@winthropcouchot.com
2  GARRICK A. HOLLANDER – State Bar No. 166316
   ghollander@winthropcouchot.com
3  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
4  660 Newport Center Drive, Suite 400
   Newport Beach, CA 92660
5  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
6
7  [Proposed] General Insolvency Counsel for
   Debtors and Debtors-in-Possession

8           **UNITED STATES BANKRUPTCY COURT**

9           **CENTRAL DISTRICT OF CALIFORNIA**

10                    **SANTA ANA DIVISION**

11  In re:                                    Case No. 8:11-bk-23362 SC

12  ☒   ENERGY AND POWER SOLUTIONS,          Jointly Administered with Case Nos.
        INC., a Delaware corporation          8:11-bk-23364 SC; 8:11-bk-23365 SC;
13  ☐   DAIRYGEN, LLC, a California limited   8:11-bk-23369 SC; 8:11-bk-23370 SC;
        liability company                     8:11-bk-23372 SC
14  ☐   NEC - EPS HOLDING, LLC, a
        Delaware limited liability company    Chapter 11 Proceedings
15  ☐   LYNN ENERGY CENTER, LLC, a
        Delaware limited liability company
16  ☐   COI ENERGY CENTER, LLC, a            **DEBTOR'S MOTION FOR ORDER:**
        Delaware limited liability company    **(1) APPROVING BIDDING PROCEDURES,**
17  ☐   FRANKLIN ENERGY CENTER, LLC          **BREAK-UP FEE, AND EXPENSE**
        a Delaware limited liability company  **REIMBURSEMENT IN CONNECTION**
18                                            **WITH PROPOSED SALE OF**
                                              **SUBSTANTIALLY ALL ASSETS OF THE**
19                                            **ESTATE; (2) APPROVING THE FORM AND**
                                              **MANNER OF THE SALE NOTICE;**
20  ☐   All Debtors                           **(3) SCHEDULING AN AUCTION AND SALE**
                                              **HEARING; (4) SCHEDULING CERTAIN**
21                                            **DEADLINES; AND (5) APPROVING**
            Debtors and                       **PROCEDURES FOR DETERMINING CURE**
22          Debtors-in-Possession.            **COSTS; MEMORANDUM OF POINTS AND**
                                              **AUTHORITIES; AND DECLARATION OF**
23                                            **PETER LUDLUM IN SUPPORT THEREOF**
                                              [Local Bankruptcy Rule 6004-1(b)]
24                                            Date:        October 6, 2011
                                              Time:        10:00 A.M.
25                                            Courtroom:  5C
26
27
28

1    **TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES**

2    **BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE;**

3    **CREDITORS; AND PARTIES-IN-INTEREST:**

4        **PLEASE TAKE NOTICE** that on October 6, 2011, at 10:00 a.m. prevailing Pacific time,

5    in Courtroom 5C located at 411 West Fourth Street, Santa Ana, California 92701, Energy and

6    Power Solutions, Inc., a Delaware corporation, one of the jointly-administered debtors and

7    debtors-in-possession herein ("EPS"), will and hereby does move s ("Motion"), pursuant to

8    Rule 6004-1 of the Local Bankruptcy Rules, for an order: (1) approving bidding procedures, a

9    break-up fee, and an expense reimbursement in connection with proposed sale of substantially all

10    assets of EPS's estate; (2) approving the form and manner of the sale notice; (3) scheduling an

11    auction and sale hearing; (4) scheduling certain deadlines; and (5) approving procedures for

12    determining cure costs.

13        In order to maximize value in this case, EPS seeks promptly to sell substantially all assets

14    of its estate, and on that basis, seeks authority to schedule the hearing on the sale, and approval of

15    bidding procedures, a break-up fee, an expense reimbursement, the form and manner of notice of

16    sale, and procedures for determining cure costs and assumption and assignment of executory

17    contracts in advance of serving the sale motion to ensure a fair and efficient sale process and, if

18    applicable, auction.

19        This Motion is based upon the Memorandum of Points and Authorities set forth herein, the

20    Declaration of Peter Ludlum ("Ludlum Declaration") in support thereof, all pleadings, papers and

21    records on file with the Court, and such other evidence, oral or documentary, as may be presented

22    to the Court at the time of the hearing on the within Motion.

23        **IF YOU DO NOT OPPOSE THE RELIEF REQUESTED BY THE MOTION, YOU**

24    **NEED TAKE NO FURTHER ACTION.  HOWEVER, IF YOU OBJECT TO THE**

25    **MOTION, PURSUANT TO LOCAL BANKRUPTCY RULE 6004-1(b), OBJECTIONS AND**

26    **ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES AND**

27    **DECLARATIONS MUST BE FILED WITH THE COURT ON OR BEFORE ONE (1) DAY**

28    **PRIOR TO THE HEARING ON THE MOTION.  YOU MUST FILE YOUR OBJECTION**

MAINDOCS-#165366-v9-EPS_OverbidMotion.DOC

1   **WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, LOCATED AT**

2   **411 W. FOURTH STREET, SUITE 2074, SANTA ANA, CALIFORNIA 92701-4593.**

3   **PAPERS FILED IN OPPOSITION TO THE MOTION MUST BE SERVED VIA FAX OR**

4   **EMAIL UPON EPS'S COUNSEL AT THE MAILING ADDRESS INDICATED IN THE**

5   **UPPER LEFT CORNER OF THIS NOTICE, THE OFFICE OF THE UNITED STATES**

6   **TRUSTEE LOCATED AT 411 WEST FOURTH STREET, SUITE 9041, SANTA ANA,**

7   **CALIFORNIA 92701, AND ON COUNSEL FOR ISPE SERVICES, LLC, GEORGE W.**

8   **SHUSTER, JR., ESQ., WILMERHALE, 60 STATE STREET, BOSTON, MA 02109,**

9   **FACSIMILE: (617) 526-5000, EMAIL: GEORGE.SHUSTER@WILMERHALE.COM.  A**

10  **JUDGE'S COPY OF THE OPPOSITION MUST BE ALSO SERVED ON THE JUDGE IN**

11  **CHAMBERS IN ACCORDANCE WITH LOCAL BANKRUPTCY RULE 5005-2(d).  ANY**

12  **FAILURE TO TIMELY FILE AND SERVE OBJECTIONS MAY RESULT IN ANY SUCH**

13  **OBJECTIONS BEING WAIVED.**

14          WHEREFORE, EPS prays that the Court enter an order (i) approving the proposed

15  Bidding Procedures, Break-Up Fee and Expense Reimbursement (each as defined in the

16  Memorandum of Points and Authorities attached hereto); (ii) approving the form and manner of

17  notice of sale as reflected in the sale notice ("Sale Notice") attached as Exhibit "1;"

18  (iii) scheduling a hearing in no less than forty-five (45) days on the sale of substantially all of

19  EPS's assets; (iv) scheduling certain deadlines; and (v) approving procedures for the fixing of

20  cure

21  costs and assumption and assignment of executory contracts, and such additional relief as the

22  Court deems just and proper.

23  DATED:  September 27, 2011          **WINTHROP COUCHOT**
                                        **PROFESSIONAL CORPORATION**
24

25
                                        By:___/s/ Marc J. Winthrop_____
26                                          Marc J. Winthrop
                                            Garrick A. Hollander
27                                      [Proposed] General Insolvency Counsel for the
                                        Debtors and Debtors-in-Possession
28

MAINDOCS-#165366-v9-EPS_OverbidMotion.DOC

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

As set forth below, EPS believes that it is in the best interests of the estate to promptly conduct a sale of substantially all assets of its estate. To that end, and in order to ensure a fair, timely and efficient sale process, EPS seeks immediate Court approval of the Bidding Procedures, Break-Up Fee, and Expense Reimbursement described herein, and the scheduling of a hearing on the sale of the assets.

### II.

### STATEMENT OF FACTS

**A.    General Background of Debtor.**

EPS is a Delaware corporation that is affiliated with five limited liability companies. The following is a schematic of EPS's corporate structure:



---

[1]    DairyGen, LLC owns no assets and has no operations.
[2]    NEC - EPS Holding, LLC is a holding company with no assets other than the equity in its subsidiaries.
[3]    Lynn Energy Center, LLC owns as its only asset a cogeneration plant located on the property of Garelick Farms in Lynn, Massachusetts, which has been shut down and is not currently operating.
[4]    COI Energy Center, LLC owns as its only asset a cogeneration plant located on the property of White Wave Foods in the City of Industry, California, which has been shut down and is not currently operating.
[5]    Franklin Energy Center, LLC owns as its only asset a cogeneration plant located on the property of Garelick Farms in Franklin, Massachusetts, which has been shut down and is not currently operating.
Note:  none of these subsidiaries have any employees.

MAINDOCS-#165366-v9-EPS_OverbidMotion

1    EPS, founded in 2002, provides energy efficiency services to manufacturing and other

2    commercial organizations, and owns combined heat and power ("CHP") cogeneration assets at

3    customer locations pursuant to long term energy service agreements.  The following is a

4    description of the three business segments in which EPS operates:

5          1.    xChangePoint®.  xChangePoint® is a comprehensive software and

6    consulting platform that tracks real-time usage of electricity, natural gas and water on an

7    equipment, plant and enterprise-wide basis, providing a single portal through which to

8    manage multi-facility energy usage and associated carbon emissions.  EPS has two patent

9    applications pending in the U.S. and one patent application pending in each of Brazil,

10    Canada and the European Union. The patents focus on the proprietary method by which the

11    xChangePoint® system compresses, collects and displays data as it is being processed.

12          2.    Energy Projects.  EPS designs, engineers, develops and arranges financing

13    for energy efficiency and clean energy generation projects.  EPS identifies these projects

14    through direct sales channels and xChangePoint®, which harvests information across

15    multiple sites to identify savings opportunities at both the plant and enterprise level.

16          EPS also delivers automated demand response through controls technology that is

17    compatible with and incremental to xChangePoint®.  Demand response has become

18    increasingly important in many utility jurisdictions due to pressures on the grid system

19    during peak demand periods.

20          3.    Asset Operations.  EPS owns CHP projects located at customer sites.  None

21    of the sites is operating.  When operating, the CHP projects sell energy to customers at

22    prices lower than competing utility rates.  EPS owns four CHP projects totaling 9.1 MW

23    through its subsidiary special purpose entities.

24    EPS employs approximately thirty-five (35) persons at its office facility located at 150 Paularino

25    Avenue, Suite A-120, Costa Mesa, California 92626.

26    **B.    EPS's Secured Debt Structure.**

27          As of the Petition Date, EPS owed approximately $2.65 million to Silicon Valley Bank

28    ("SVB"), and approximately $5.3 million to NGEN II, LP ("NGEN").  SVB asserts a senior

1  secured claim against substantially all assets of EPS based on its filing of UCC-1s on

2  December 24, 2009 and May 20, 2010.  NGEN asserts a secured claim against substantially all

3  assets of EPS based on its filing of a UCC-1 on September 30, 2010.

4          As of the Petition Date, NEC - EPS Holding, LLC, Lynn Energy Center, LLC, COI Energy

5  Center, LLC, and Franklin Energy Center, LLC collectively owed approximately $5.0 million to

6  TD Bank.  TD Bank asserts a secured claim against substantially all assets of DairyGen, LLC;

7  NEC - EPS Holding, LLC; Lynn Energy Center, LLC; COI Energy Center, LLC; and Franklin

8  Energy Center, LLC, based on the filing of a UCC-1 on May 4, 2005 and an amendment and

9  continuation statement filed on March 8, 2010.

10         **C.    Need for Prompt Sale.**

11         EPS is facing liquidity constraints and does not have the financial wherewithal to continue

12  to operate its business throughout a prolonged chapter 11 process.  EPS has determined that the

13  value of its estate would be preserved and maximized through a going concern sale of its business

14  and assets used therein.  Accordingly, EPS engaged in an extensive marketing process for the

15  going-concern sale of substantially all of EPS's businesses and assets (collectively, "Marketed

16  Assets") in one or more sale transactions to be implemented pursuant to Section 363 of title 11

17  (the "Bankruptcy Code"), subject to a competitive sale and bidding process.  EPS believes that,

18  unless a sale of the Marketed Assets is expeditiously consummated, there will be significant

19  deterioration in the value of the business.  Indeed, EPS cannot endure an attenuated stay in

20  chapter 11 without significant risk to EPS's survival.  In fact, it is projected that EPS runs out of

21  cash on December 15, 2011.  In addition, as set forth in its separate motion with respect to use of

22  cash collateral, the Debtor has the consent of all creditors holding a lien on or security interest in

23  its cash to the use of cash collateral in accordance with the budget attached to such cash collateral

24  motion, which budget is geared toward, and which consent is conditioned upon, promptly pursuing

25  and reaching a closing date of the proposed sale.  If the sale process is not approved on a prompt

26  basis, the ability of EPS to use its cash may be at risk.

27         Moreover, pursuant to the terms of the Asset Purchase Agreement ("Purchase Agreement")

28  entered into with ISPE Services, LLC, a Delaware limited liability company ("Buyer"), the

1    proposed sale must close no later than 60 business days after execution of the Purchase

2    Agreement, or December 7, 2011.  Accordingly, a prompt sale is essential to a successful result in

3    this case.

4    **D.    Debtor's Marketing Efforts.**

5            EPS, in conjunction with an investment banking firm, Greentech Capital Advisors,

6    marketed its assets for sale from December 2010 to June 17, 2011.  From June 17, 2011 through

7    August 30, 2011, EPS has marketed the assets included in the Asset Purchase Agreement

8    exclusively to the Buyer and from August 31, 2011 to September 14, 2011 to multiple parties.

9    Initially, EPS's investment bankers marketed the software and energy projects business jointly as

10   one asset and the cogeneration plants as another asset.  Subsequently, the energy projects and

11   software businesses were marketed separately.

12           The investment banking firm contacted 145 potential buyers.  Based on the initial response

13   received, the firm sent a summary "teaser" document and a non-disclosure agreement to

14   109 potential buyers and conducted follow-up calls with 63 of these firms.  EPS obtained signed

15   nondisclosure agreements from thirty-two (32) prospective buyers.  Thereafter, EPS made

16   presentations to seventeen (17) of these firms.  Based on these efforts, EPS received letters of

17   interest from four (4) potential buyers, only one of which led to an offer as reflected herein.

18   **E.    Proposed Sale.**

19           Based on its marketing efforts, EPS has received an offer from the Buyer to purchase the

20   Acquired Assets[1] for a gross price of Four Million Five Hundred Thousand Dollars

21   ($4,500,000.00), less the cure costs for contracts assumed by the Buyer, which the Debtor expects

22   to be fixed at $1,390,000.00, as set forth in the Purchase Agreement; this amount currently

23   represents the highest or otherwise best offer EPS has received.  A true and correct copy of the

24   Purchase Agreement reflecting this offer is attached as Exhibit "2" to the Ludlum Declaration and

25   incorporated herein by this reference.  The sale of the Acquired Assets ("Sale") is subject to the

26   sale process and, if applicable, the auction process proposed herein and, ultimately, this Court's

27

28
---
[1] Capitalized terms not defined in this Motion shall have the same meaning as set forth in the Purchase Agreement or the Sale Order.

-7-

1  approval. EPS believes a going concern sale of the Acquired Assets will maximize the value of

2  its estate for the benefit of its creditors and other interested parties and is therefore preferable to

3  any effort to dispose of the Acquired Assets on a piecemeal basis through a liquidation.

4  **III.**

5  **PROPOSED BIDDING PROCEDURES, NOTICE OF SALE,**

6  **BREAK-UP FEE, AND EXPENSE REIMBURSEMENT**

7      In order to create a fair, orderly and competitive process for the bidding of the Acquired

8  Assets, EPS proposes and the Buyer requests that the Court establish and approve the bidding

9  procedures set forth in Exhibit D to the Purchase Agreement ("Bidding Procedures"), the Break-

10  Up Fee (as defined below), the Expense Reimbursement (as defined below), and form of notice of

11  sale in substantially the form attached hereto as Exhibit "1" ("Sale Notice") and incorporated

12  herein by this reference. The Bidding Procedures are summarized as follows[1]:

13      A.    <u>Acquired Assets to Be Sold</u>. The Acquired Assets are as defined in the Purchase
14                  Agreement and generally constitute all of EPS's operating assets related to the
15                  Business as described in the Purchase Agreement and related exhibits, schedules, and annexes.

16      B.    <u>Notice of Sale</u>. As sufficient notice of the Sale, the Bidding Procedures and
17                  Bidding Procedures Order, the time and place of the Auction (as defined below), the time and place of the Sale Hearing (as defined below), the objection deadline
18                  for the Sale Hearing, the potential assumption and assignment of executory contract(s) or unexpired lease(s) and any cure costs, and the objection deadline with
19                  respect thereto, within two (2) Business Days of the entry of the Bidding
20                  Procedures Order, or as soon as reasonably practicable thereafter, EPS will provide, to all persons and entities required by the Purchase Agreement, the Bankruptcy
21                  Code, and the Bankruptcy Rules, the Notice of (A) Bid Deadline, Auction and Sale Hearing in Connection with the Sale of Substantially All of the Debtor's Acquired
22                  Assets and (B) the Debtor's Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection with the Proposed Sale in a form
23                  substantially similar to the form attached as Exhibit "2".

24      C.    <u>Participation Requirements</u>: Any person or entity other than the Buyer ("<u>Bidder</u>")
25                  that desires to submit a higher or otherwise better offer ("Competing Bid") must do so in writing, provided that such Competing Bid satisfies all of the requirements for
26                  Qualified Competing Bids (as set forth below) and is received by EPS, SVB, NGEN ("Collateral Agent"), and the Committee of General Unsecured Creditors
27                  ("Committee") (collectively, the "Notice Parties") at their following respective

28  ---

[1] To the extent of any inconsistency between the following summary and Exhibit D to the Purchase Agreement, Exhibit D to Purchase Agreement shall control.

-8-

addresses by the date set in the order granting this Motion For Order: (1) Approving Bidding Procedures, Break-Up Fee, And Expense Reimbursement In Connection With Proposed Sale Of Substantially All Assets Of The Estate; (2) Approving The Form And Manner Of The Sale Notice; (3) Scheduling An Auction And Sale Hearing; (4) Scheduling Certain Deadlines; And (5) Approving Procedures For Determining Cure Costs ("Bidding Procedures Order"), not later than 1:30 p.m. prevailing Pacific time ("Bid Deadline") (unless EPS, the Buyer, SVB, the Collateral Agent, and the Committee agree to an extension): (i) EPS, Attn: Peter Ludlum, Chief Financial Officer, 150 Paularino Avenue, Suite A 120, Costa Mesa, California 92626; (ii) Debtor's counsel: Winthrop Couchot Professional Corporation, Attn: Garrick A. Hollander, Esq., 660 Newport Center Drive, Fourth Floor, Newport Beach, California 92660, email: ghollander@winthropcouchot.com; (iii) counsel to the Committee, if any; (iv) counsel for SVB: Levy, Small & Lallas, Attn: Leo D. Plotkin, Esq., 815 Moraga Drive, Los Angeles, CA 90047, email: lplotkin@lsl-la.com; and (v) counsel for the Collateral Agent: Murray & Murray, a Professional Corporation, Attn: Stephen T. O'Neill, Esq., 19400 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014-2548, email soneill@murraylaw.com.  Upon receipt, EPS shall promptly, and in no event later than one (1) Business Day following receipt, provide copies of all Competing Bids to the Buyer.

D.    Qualified Competing Bid.    To be considered a qualified Competing Bid ("Qualified Competing Bid"), each Competing Bid must be received by the Bid Deadline and must comply with all of the following requirements:

(a)    it is in writing and is irrevocable through the closing of the sale of the Acquired Assets;

(b)    it includes a duly authorized and executed asset purchase agreement substantially in the form of the Purchase Agreement together with all exhibits thereto, as well as copies of such materials marked to show any amendments and modifications to the Purchase Agreement ("Marked Agreement") and a marked copy of the proposed order to approve the Sale by the Bankruptcy Court;

(c)    it provides for a purchase price for the Acquired Assets, expressed in U.S. Dollars, of not less than (i) Five Million Three Hundred Twenty-Five Thousand Dollars ($5,325,000) minus (ii) any of the portion of the Aggregate Cure Amount that the Buyer will deduct from its Purchase Price and that Bidder will not deduct from its purchase price (such difference, the "Minimum Purchase Price")[1];

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow EPS, in consultation with SVB, the Collateral Agent, and the Committee, to make a reasonable determination as to the

---

[1] EPS estimates that the Aggregate Cure Amount to be deducted from the Buyer's bid is approximately One Million Two Hundred Seventy Thousand Dollars ($1,390,000), the details of which will be disclosed in the Sale Motion.

Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement;

(e)   it is not conditioned on any contingencies, such as, without limitation: (i) the outcome of unperformed due diligence by the Bidder and/or (ii) obtaining financing;

(f)   it includes an acknowledgement and representation that the Bidder will assume EPS's obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Bidder wishes to assume), contains full details of the Bidder's proposal for the treatment of related cure costs, and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(g)   it includes an acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all required diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement; and (iv) is not entitled to any expense reimbursement of break-up fee in connection with its bid;

(h)   it includes evidence, in form and substance reasonably satisfactory to EPS, of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Marked Agreement; and

(i)   it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by EPS), certified check or such other form of immediately available funds acceptable to EPS, payable to the order of EPS (or such other party as EPS may determine) in an amount equal to Two Hundred Fifty Thousand Dollars $250,000).

A person meeting the requirements set forth in this paragraph shall be considered a "Qualified Competing Bidder."

E.   <u>Auction</u>. If EPS receives one or more Qualified Competing Bids in addition to the Purchase Agreement, EPS will conduct an auction ("Auction") of the Acquired Assets to select the highest or otherwise best bid for the Acquired Assets ("Successful Bid"). The Auction, which shall be transcribed, shall be held at 10:00 a.m. (prevailing Pacific time) on the date set in the Bidding Procedures Order, at the law offices of Winthrop Couchot Professional Corporation, located at 660 Newport Center Drive, Suite 400, Newport Beach, California 92660, or such other

location as shall be timely communicated to all entities entitled to attend the Auction.

If no Qualified Competing Bids are received, EPS and the Buyer intend to seek immediate Court approval of the Purchase Agreement and assumption and assignment of the Assumed Executory Contracts without conducting an Auction.

F.    <u>Auction Rules</u>. EPS may conduct the Auction in any manner and upon any terms and conditions satisfactory to the Court, permitted by the Purchase Agreement, and consistent with the Bidding Procedures that will achieve the maximum value for the Acquired Assets. Such terms and conditions may include, by way of example, one or more rounds of sealed or open bids from the Buyer and any Qualified Competing Bidder. The initial bid at the Auction shall be the highest or otherwise best bid, as determined by EPS in its reasonable discretion, as among the Buyer's bid and any Qualified Competing Bids, and such initial bid shall be announced to the Buyer and any other Qualified Competing Bidder at least one (1) Business Day prior to the commencement of the Auction. Any subsequent bidding for the Acquired Assets at the Auction shall be in increments of at least One Hundred Thousand Dollars ($100,000.00) or such other amount as set by the Court. In each bidding round at the Auction, and in any other bidding process, the Buyer's bid shall be deemed to consist of, and be valued at, the sum of (a) the Purchase Price as set forth in Section 2.6(x) of the Purchase Agreement, or any such greater purchase price as the Buyer may offer in writing, plus (b) the Break-Up Fee amount, plus (c) the maximum Expense Reimbursement amount.

At the conclusion of the Auction, EPS, in consultation with SVB, the Collateral Agent, and the Committee, shall submit the Successful Bid (as defined below) to the Court at the Sale Hearing (as defined below), for entry of a Sale Approval Order. Any Bid that fails to comply with the Bidding Procedures or any other procedures established at the Auction may be refused.

G.    <u>Sale Hearing</u>. A hearing to approve the sale of the Acquired Assets to the Buyer or other Successful Bidder will be held on the date set in the Bidding Procedures Order in Courtroom 5C of the United States Bankruptcy Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, California ("Sale Hearing"). Any party who has filed an objection to the Sale or to the assumption and assignment of any Assumed Executory Contract or the cure payments identified thereto or who has submitted a higher offer is expected to be present at the Sale Hearing, failing which the objection will be overruled or the higher offer stricken.

H.    <u>Selection of Successful Bid</u>. Prior to the conclusion of the Auction, EPS, in consultation with its advisors, SVB, the Collateral Agent, and the Committee, will (a) review and evaluate the Buyer's bid and each Qualified Competing Bid, (b) identify the highest or otherwise best offer for the Acquired Assets received at the Auction (such bid, the "Successful Bid" and the Bidder making such bid, "Successful Bidder") and (c) communicate to the Buyer and the Qualified Competing Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by EPS, after consultation with SVB, the Collateral Agent, and the Committee, shall be final, subject to approval by the Bankruptcy Court.

EPS will sell the Acquired Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing. For the avoidance of doubt, EPS shall not consider or support any bid (whether or not such bid is a Qualified Competing Bid) for any of the Acquired Assets received after the close of the Auction.

I.    Failure to Close. If, following the entry of the Sale Approval Order, the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of the Successful Bidder, the highest or otherwise best bid ("Back-Up Bid") will be deemed the new Successful Bid, and EPS will be authorized, but not required, to consummate the Sale with the Bidder who submitted the Back-Up Bid without further order of the Court. In such case, the defaulting Successful Bidder's good faith deposit shall be forfeited to EPS and EPS shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder to the extent permissible under the applicable purchase agreement and applicable law. Notwithstanding the foregoing, the Buyer shall not be obligated to consummate the Sale if it is not the Successful Bidder, and its bid shall not be considered a Back-Up Bid, unless it otherwise consents in writing.

J.    Expenses. Any Bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the Purchase Agreement, provided, however, that the Buyer, but no other Bidders, shall be entitled to its Break-Up Fee and Expense Reimbursement as set forth in the Purchase Agreement should it not be the Successful Bidder.

K.    Assumption and Assignment of Executory Contracts. EPS will serve a notice in form and substance satisfactory to the Buyer ("Assumption and Assignment Notice") on all non-debtor parties to all Assumed Executory Contracts (each, a "Contract Counter-Party" and collectively, the "Contract Counter-Parties") no later than the date set in the Bidding Procedures Order.

The Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Contract Counter-Party, (ii) identification of the Assumed Executory Contract, and (iii) the amount, if any, determined by EPS to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code or to provide any adequate assurance of future performance required under Section 365(b)(1)(C) of the Bankruptcy Code ("Cure Amount").

Any objection by a Contract Counter-Party must be filed with the Court and served upon the Notice Parties by the date set in the Bidding Procedures Order ("Assumption and Assignment Objection Deadline"). Any objection by a Contract Counter-Party must specify the grounds for such objection, including stating the Contract Counter-Party's alleged Cure Amount (including, on a transaction by transaction basis, calculations and details of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the Contract Counter-Party disagrees with the proposed Cure Amount and any other defaults or termination events that the Contract Counter-Party alleges must be cured to effect assumption and assignment of the Assumed Executory Contract.

Unless a Contract Counter-Party or any other entity properly and timely files an objection to the Assumption and Assignment Notice by the Assumption and Assignment Objection Deadline, EPS may assume and assign the Assumed Executory Contracts in accordance with the provisions of the Purchase Agreement and the Sale Motion, subject to the occurrence of the Closing, without further order or notice of hearing. If an objection is filed and served by the Assumption and Assignment Objection Deadline, and the objection cannot be resolved consensually, then the objection shall be heard at the Sale Hearing.

L.    Break-Up Fee and Expense Reimbursement. EPS shall pay to the Buyer a break-up fee equal to Two Hundred Twenty-Five Thousand Dollars ($225,000) ("Break-Up Fee") and an Expense Reimbursement (as defined in the Purchase Agreement and to the extent provided in the Purchase Agreement). The Break-Up Fee and the Expense Reimbursement shall be payable on the terms and subject to the conditions set forth in the Purchase Agreement and shall, if payable, constitute administrative expenses of EPS's bankruptcy estate pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

EPS's management believes that establishing uniform procedures for bidding on the Acquired Assets will allow EPS and the Court to promptly review, analyze and compare all bids, if any, received to determine which bid, if any, is in the best interest of EPS. Additionally, the proposed Bidding Procedures are fair and equitable.

**IV.**

**GOOD CAUSE EXISTS TO APPROVE THE BIDDING PROCEDURES**

As set forth in the Ludlum Declaration, EPS believes that the procedures set forth above are reasonable. In the context of bankruptcy, sales such as the proposed transaction become even more challenging, due in part to a debtor's duty to maximize the value of estate assets and the obligation to encourage competitive bidding in order to achieve the highest and best price. It is clear that few potential buyers of the Acquired Assets would be willing to enter into a purchase agreement in the context of a bankruptcy proceeding without some assurance that the bidding process will be fair and equitable and will treat all parties equally.

In this instance, EPS believes that the proposed Bidding Procedures are fair and equitable, and treat all parties equally. Based upon the foregoing, EPS respectfully requests that the Court approve the Bidding Procedures outlined above.

-13-

MAINDOCS-#165366-v9-EPS_OverbidMotion

V.

**THE PROPOSED BREAK-UP FEE AND EXPENSE**

**REIMBURSEMENT SHOULD BE APPROVED**

In scrutinizing break-up fees or topping fees, bankruptcy courts typically employ a dynamic case-by-case approach developed for analyzing break-up fees whereby a court " . . . must take into consideration what is in the best interests of the estate." See In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); see also In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (standard for approval of break-up fees is whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike."); In re Hupp Indus., Inc., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992) (the proposed break-up fee must be carefully scrutinized to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected); Mark F. Hebbeln, The Economic Case For Judicial Deference To Break-Up Fee Agreements In Bankruptcy, 13 Bankr. Dev. J. 475, 502-505 (1997) (unless the court determines that a break-up fee arrangement is tainted with self-dealing, fraud, or bad faith, courts should accord "substantial deference" to the fiduciary duty of the debtor's board members who approved the terms of the break-up fee).

Break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule. See In re Integrated Res., Inc., 147 B.R. 650 (Bankr. S.D.N.Y. 1992) citing Cottle v. Storer Commc'ns, Inc., 849 F.2d 570 (11th Cir. 1988) ($29 million termination fee protected by business judgment rule); CRTF Corp. v. Federated Dep't Stores, 683 F.Supp. 422 (S.D.N.Y. 1988) (break-up fees not illegal when they enhance rather than hamper bidding). While few courts have addressed the validity of break-up fees in bankruptcy, the court in the Integrated Resources case, found that courts addressing this issue have routinely asked the following questions:

First, is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation such that the business judgment rule should not be applied? A court will uphold a decision by the board of directors if the decision was safeguarded by the scrutiny of disinterested directors or other means. Integrated Resources, Inc., 147 B.R. at 657.

1    Second, does the fee materially hamper bidding?  In assessing the incentive or effect of a

2    break-up fee, the court should determine whether the amount of the break-up fee is so

3    substantial that it has a "chilling" effect.  Id., at 660.

4        Third, is the amount of the fee unreasonable relative to the proposed purchase price?  A

5    break-up fee should constitute a fair and reasonable percentage of the proposed purchase price,

6    and should be reasonably related to the risk, effort and expenses of the prospective purchaser.

7    Id., at 662 (the court heard expert testimony that "the average break-up fee in the industry is 3.3

8    percent [of the purchase price]").

9        As set forth in the Ludlum Declaration, no "self-dealing" or manipulation exists with

10   respect to the Buyer, EPS or their professionals.  The sales transaction with the Buyer was and

11   has been, at arm's length, by definition of the disinterestedness of the professionals retained in

12   this case.  Accordingly, given the circumstances of this case, EPS believes that the proposed

13   Break-Up Fee and Expense Reimbursement are fair and reasonable.  EPS believes that the

14   amount of the break-up fee is reasonable as a reflection of the risk, effort and expense

15   anticipated to be incurred by the Buyer in conducting due diligence.  Given the nature of the

16   proposed Break-Up Fee (a percentage of consideration paid), there will not be a "windfall" to

17   the Buyer.  The proposed Break-Up Fee equates to approximately five percent (5%) of the

18   Purchase Price is well within the typical range of appropriate break-up fees.  Additionally, EPS

19   believes that the proposed Break-Up Fee:  (1) will encourage the making of a meaningful offer

20   at a point where EPS needs to sell its Acquired Assets; (2)  may discourage a bidding strategy

21   designed to hold back competitive bids until late in the process; (3) will aid EPS in negotiating

22   an initial bid that may be the highest bid; (4) may establish a high floor in the bidding process;

23   and (5) will enhance the bidding process by creating momentum towards the consummation of a

24   sale.

25       Based upon the foregoing, EPS respectfully requests that the Court approve the Break-

26   Up Fee and Expense Reimbursement as set forth above.

27   / / /

28   / / /

MAINDOCS-#165366-v9-EPS_OverbidMotion

1

**VI.**

2

**NOTICE**

3      Notice of this Motion will be provided to (i) all entities reasonably known to have

4  expressed an interest in a transaction with respect to the Acquired Assets during the nine (9)

5  months preceding the filing of the Motion, (ii) all entities reasonably known to have asserted any

6  Claim, Lien, Encumbrance or Interest in the Acquired Assets, (iii) all Contract Counter-Parties,

7  (iv) the attorneys general for all states in which Acquired Assets owned by the Debtor are located,

8  all federal and state taxing authorities, the United States Internal Revenue Service, and the United

9  States Department of Labor and applicable similar state labor or employment agencies, (v) all

10  parties entitled to notice pursuant to Local Bankruptcy Rule 2002-2, (vi) all known creditors of the

11  Debtor and the debtors in the Debtor's jointly administered chapter 11 cases, (vii) counsel for the

12  Committee, (viii) counsel for SVB and NGEN, and (ix) the additional persons agreed between the

13  Debtor and the Buyer to be served in accordance with the terms of the Purchase Agreement.

14

**VII.**

15

**CONCLUSION**

16      For the foregoing reasons, EPS respectfully requests that the Court grant the instant

17  Motion.

18  DATED:  September 27, 2011        **WINTHROP COUCHOT**

19                              **PROFESSIONAL CORPORATION**

20

21                            By: _____

22                                  Marc J. Winthrop
                                  Garrick A. Hollander

23                                  [Proposed] General Insolvency Counsel for the
                                  Debtors and Debtors-in-Possession

24

25

26

27

28

## DECLARATION OF PETER LUDLUM

I, Peter Ludlum, declare and state as follows:

1.    The matters stated herein are true and correct and within my personal knowledge. If called as a witness, I could and would competently testify thereto. I am the Chief Financial Officer of Energy and Power Solutions, Inc., a Delaware corporation, one of the jointly administered debtors and debtors-in-possession herein ("Debtor").[1]

2.    This Declaration is provided in support of the Debtor's Motion for Order (1) Approving Bidding Procedures, Break-Up Fee, and Expense Reimbursement in Connection with Proposed Sale of Substantially All Assets of the Estate; (2) Approving the Form and Manner of the Sale Notice; (3) Scheduling an Auction and Sale Hearing; (4) Scheduling Certain Deadlines; and (5) Approving Procedures for Determining Cure Costs ("Motion"). I have reviewed the Motion and, to the best of my knowledge, the factual representations contained therein are materially true and correct.

3.    As set forth below, I believe that it is in the best interests of the estate to promptly conduct a sale of substantially all assets of the estate. To that end, and in order to ensure a fair, timely and efficient sale process, the Debtor seeks immediate Court approval of the Bidding Procedures, Break-Up Fee and Expense Reimbursement described in the Motion, and a shortening of time for a hearing on the sale of the Acquired Assets.

4.    The Debtor is facing liquidity constraints and does not have the financial wherewithal to continue to operate its business throughout an attenuated chapter 11 process. The Debtor has determined that the value of its estate would be preserved and maximized through a going concern sale of its business and assets used therein. Accordingly, the Debtor engaged in an extensive marketing process for the going-concern sale of substantially all of the Debtor's businesses and assets ("Marketed Assets") in one or more sale transactions to be implemented pursuant to Section 363 of the Bankruptcy Code, subject to a competitive sale process and, if applicable, auction. I believe that, unless a sale of the Marketed Assets is expeditiously consummated, there will be significant deterioration in the value of the business.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning set forth in the Motion.

MAINDOCS-#165366-v9-EPS_OverbidMotion

1     5.     The Debtor cannot endure a prolonged stay in chapter 11 without significant risk

2   to the Debtor's survival.  It is projected that the Debtor will run out of cash on December 15,

3   2011.  Accordingly, a prompt sale is essential to a successful result in this case.

4     6.   EPS, in conjunction with an investment banking firm, has been marketing its assets for

5   sale from December 2010 to June 17, 2011.  From June 17, 2011 through August 30, 2011, EPS

6   has marketed the assets included in the Asset Purchase Agreement exclusively to the Buyer and

7   from August 31, 2011 to September 14, 2011 to multiple parties.  Initially, EPS's investment

8   bankers marketed the software and energy projects business jointly as one asset and the

9   cogeneration plants as another asset.  Subsequently, the energy projects and software businesses

10  were marketed separately.

11    7.   The investment banking firm contacted 145 potential buyers.  Based on the initial

12  response received, the firm sent a summary "teaser" document and a non-disclosure agreement to

13  109 potential buyers and conducted follow-up calls with 63 of these firms.  EPS obtained signed

14  nondisclosure agreements from thirty-two (32) prospective buyers.  Thereafter, EPS made

15  presentations to seventeen (17) of these firms.  Based on these efforts, EPS received letters of

16  interest from four potential buyers, only one of which led to an offer as reflected herein.

17    8.   Based on its marketing efforts, EPS has received an offer from the Buyer to purchase

18  the Acquired Assets[1] for a gross price of Four Million Five Hundred Thousand Dollars

19  ($4,500,000.00), less the cure costs for contracts assumed by the Buyer, which the Buyer expects

20  to be fixed at $1,390,000, as set forth in the Purchase Agreement; this amount currently represents

21  the highest or otherwise best offer EPS has received.  A true and correct copy of the Purchase

22  Agreement reflecting this offer is attached hereto as Exhibit "2" and incorporated herein by this

23  reference.  The sale of the Acquired Assets ("Sale") is subject to the sale process and, if

24  applicable, the auction process proposed herein and, ultimately, this Court's approval.  EPS

25  believes a going concern sale of the Acquired Assets will maximize the value of its estate for the

26  benefit of its creditors and other interested parties and is therefore preferable to any effort to

27  dispose of the Acquired Assets on a piecemeal basis through a liquidation.

28

---

[1] Capitalized terms not defined in this Declaration shall have the same meaning as set forth in the Purchase Agreement.

MAINDOCS-#165366-v9-EPS_OverbidMotion

9.      The Debtor's management believes that establishing uniform procedures for bidding on the Acquired Assets will allow the Debtor to promptly review, analyze and compare all bids received to determine which bid is in the best interests of the Debtor and the Debtor's creditors. Accordingly, the Debtor believes that the proposed overbid procedures are fair and equitable.

10.     No "self-dealing" or manipulation exists with respect to the Buyer, the Debtor or its professionals. The Debtor has been marketing the Debtor's Acquired Assets through third-party investment banking professionals from December 2010 to June 17, 2011 and since June 17, 2011 through August 30, 2011 to multiple parties. The sales transaction with the Buyer was and has been, at arm's length, by definition of the disinterestedness of the professionals retained in this case. Accordingly, given the circumstances of this case, I believe that the proposed Break-Up Fee and Expense Reimbursement are fair and reasonable. I believe that the amount of the Break-Up Fee is reasonable as a reflection of the risk, effort and expense anticipated to be incurred by the Buyer in conducting due diligence. Given the nature of the proposed Break-Up Fee (a percentage of consideration paid), there will not be a "windfall" to the Buyer. The proposed Break-Up Fee equates to approximately five percent (5%) of the Purchase Price is within the typical range of appropriate break-up fees. Additionally, I believe that the proposed Break-Up Fee: (1) will encourage the making of a meaningful offer at a point where the Debtor needs to sell its Acquired Assets; (2) may discourage a bidding strategy designed to hold back competitive bids until late in the process; (3) will aid the Debtor in negotiating an initial bid that may be the highest bid; (4) may establish a high floor in the bidding process; and (5) will enhance the bidding process by creating momentum towards the consummation of a sale.

11.     In order to preserve the value of the Acquired Assets, the Debtor seeks to promptly close the sale of the Acquired Assets. I believe that the Debtor's viability is at stake if a sale is not consummated by December 7, 2011. Accordingly, the Debtor asserts that in order to preserve the going concern value of the Acquired Assets, it is in the best interests of the Debtor's estate to conclude the sale as expeditiously as possible, taking into consideration the

-19-

MAINDOCS-#165366-v9-EPS_OverbidMotion

1  legitimate rights of creditors and parties interested in bidding to obtain adequate notice of the

2  Sale Hearing.

3       I declare that the foregoing is true and correct under the penalty of perjury.

4       Executed this 27th day of September 2011, in Costa Mesa, California.

5

6                           Peter Ludlum

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#165366-v9-EPS_OverbidMotion.DOC

# EXHIBIT "1"

MARC J. WINTHROP – State Bar No. 63218
mwinthrop@winthropcouchot.com
GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@winthropcouchot.com
JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

[Proposed] General Insolvency Counsel for
Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Case No. 8:11-bk-23362 SC |
| ☒  ENERGY AND POWER SOLUTIONS, INC., a Delaware corporation | Jointly Administered with Case Nos. 8:11-bk-23364 SC; 8:11-bk-23365 SC; 8:11-bk-23369 SC; 8:11-bk-23370 SC; 8:11-bk-23372 SC |
| ☐  DAIRYGEN, LLC, a California limited liability company | |
| ☐  NEC - EPS HOLDING, LLC , a Delaware limited liability company | Chapter 11 Proceedings |
| ☐  LYNN ENERGY CENTER, LLC, a Delaware limited liability company | DATE:    _____, 2011 TIME:    ____ |
| ☐  COI ENERGY CENTER, LLC, a California limited liability company | PLACE:    Courtroom 5C 411 West Fourth Street Santa Ana, CA 92701 |
| ☐  FRANKLIN ENERGY CENTER, LLC, a Delaware limited liability company | |
| Debtors and Debtors-in-Possession. | |

**NOTICE OF (A) BID DEADLINE, AUCTION, AND SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) THE DEBTOR'S INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE PROPOSED SALE AND STATEMENT OF LIMITED CURE COSTS ASSOCIATED THEREWITH**

NOTICE IS HEREBY GIVEN, as follows:

1.    Energy and Power Solutions, Inc., a Delaware corporation, debtor and debtor-in-possession ("Debtor" or "EPS") seeks to sell substantially all of the Debtor's assets ("as defined in the Purchase Agreement[1], the Acquired Assets") to ISPE Services, LLC, a Delaware limited liability company, or its designee ("Stalking Horse Purchaser").

---

[1] Capitalized terms not defined herein shall have the same meaning as set forth in the Bidding Procedures and/or Bidding Procedures Order. For clarity, the "Purchase Agreement" is that certain Asset Purchase Agreement dated as of September 14, 2011, by and between the Debtor

2.      On September 27, 2011, the Debtor filed a motion ("Bidding Procedures Motion")[2] pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code ("Bankruptcy Code") and rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") seeking an order: (1) approving bidding procedures, a break-up fee, and an expense reimbursement in connection with proposed sale of substantially all assets of EPS's estate; (2) approving the form and manner of the sale notice; (3) scheduling an auction and sale hearing; (4) scheduling certain deadlines; and (5) approving procedures for determining cure costs.

3.      On _____, the United States Bankruptcy Court ("Court") entered an order ("Bidding Procedures Order") approving, among other things, the Bidding Procedures, and setting key dates and times relating to the sale of the Acquired Assets.  As set forth in the Bidding Procedures, the sale of the Acquired Assets is subject to competing offers from any prospective qualified bidder.  ***All interested potential bidders should carefully read the Bidding Procedures***.

4.      On _____, the Debtor filed a motion ("Sale Motion") seeking an order (1) approving the sale of substantially all of the Debtor's assets free and clear of liens, claims, and interests pursuant to section 363 of the Bankruptcy Code, (2) authorizing the assumption and assignment of certain executory contracts, and (3) authorizing the rejection of the Debtor's interests, if any, in certain executory contracts.  The sale of the Acquired Assets shall be free and clear of all Liens, Claims, Interests, and Encumbrances (as those terms are defined in the Purchase Agreement).

5.      All interested parties are invited to make offers to purchase the Acquired Assets in accordance with the terms of the Bidding Procedures and Bidding Procedures Order, available upon written request from counsel to the Debtor, Winthrop Couchot Professional Corporation, Attn: Garrick A. Hollander, Esq., 660 Newport Center Drive, Suite 400, Newport Beach, CA  92660; e-mail: ghollander@winthropcouchot.com or which may be downloaded from the following website: www.winthropcouchot.com.

6.      The deadline to submit bids for the Acquired Assets ("Bid Deadline") is _____ **at 12:00 noon prevailing Pacific time**.  Pursuant to the Bidding Procedures Order, the Debtor will conduct an auction ("Auction") for the sale of the Acquired Assets on _____ **at 10:00 a.m. prevailing Pacific time**.  Only (a) parties and their advisors that have submitted a bid that meets the qualification standards for a Qualified Competing Bid set forth in the Bidding Procedures Order by the Bid Deadline, (b) counsel to the Official Committee of Unsecured Creditors, and (c) other parties specified in the Bidding Procedures Order will be permitted to attend, participate in, and/or make any statements on the record at the Auction.  The Auction will be conducted at the law offices of Winthrop Couchot Professional Corporation, located at 660 Newport Center Drive, Suite 400, Newport Beach, California 92660.  The Debtor reserves the right to change the date or the place of the Auction, and will notify Qualified Bidders if it does so.

7.      The Bidding Procedures Order further provides that a Sale Hearing will be held to confirm the results of the Auction, approve the sale of the Acquired Assets to the successful bidder at the Auction ("Successful Bidder"), and approve the relief requested in the Sale Motion, on _____ **at _____ a.m., prevailing Pacific time** before the Honorable _____, United States Bankruptcy Judge, in Courtroom _____ of the United States Bankruptcy Court for the Central District of California, Santa Ana Division, 411 West Fourth Street, Santa Ana, CA 92701 or at such time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

8.      Pursuant to the Sale Motion and section 365 of the Bankruptcy Code, the Debtor requests authority to assume and assign the Assumed Executory Contracts to the Successful Bidder, and that upon such assumption and assignment the Debtor shall be relieved of any liability under the Assumed Executory Contracts arising after the Closing.  Attached hereto as **Exhibit 1** is a schedule of the Assumed Executory Contracts that may be assumed and assigned under the Purchase Agreement, together with the proposed Cure Amount relating to each Assumed Executory Contract.

9.      Any counterparty to an Assumed Executory Contract that wishes to obtain adequate assurance information regarding Qualified Bidders that will or may participate at the Auction must notify the Debtor in writing, c/o Winthrop Couchot Professional Corporation, Attn: Garrick A. Hollander, Esq., 660 Newport Center Drive, Suite 400, Newport Beach, CA  92660; e-mail: ghollander@winthropcouchot.com, on or before _____ ("Request for Adequate Assurance").  The Request for Adequate Assurance must include an email and/or address to which a response to such information request can be sent.

---

and ISPE Services, LLC, as the same may be amended from time to time, a copy of which Purchase Agreement has been filed with and is available from the Court or may be obtained from counsel to the Debtor through the contact information set forth in footnote 2 below.
[2] A copy of the Sale Motion, the Purchase Agreement, the Bidding Procedures and/or the Bidding Procedures Order may be obtained by written request made to counsel for the Debtor, Winthrop Couchot Professional Corporation, Attn: Garrick A. Hollander, Esq., 660 Newport Center Drive, Suite 400, Newport Beach, CA  92660; e-mail: ghollander@winthropcouchot.com or may be downloaded from the following website:  www.winthropcouchot.com.

MAINDOCS-#165884-v3-EPS_BiddingProceduresNotice.DOC

10.     Any non-debtor party to an Assumed Executory Contract that objects to adequate assurance of future performance and wishes to obtain adequate assurance information regarding the Qualified Bidders that will or may participate at the Auction must notify the Debtor in writing, on or before _____ of such request and must file an objection on or before such date.

11.     The only cure costs or other amounts due or payable in connection with, or to be paid upon the assumption or assignment of, any Assumed Executory Contracts (the "Cure Amounts") are set forth on **Exhibit 1** hereto.  If a non-debtor party to an Assumed Executory Contract or any other person or entity does not (i) properly object to the applicable Cure Amounts, as set forth on **Exhibit 1** attached hereto, and/or submit a request for adequate assurance on or before _____; (ii) set forth a specific default in any Assumed Executory Contract; and (iii) claim a specific monetary amount that differs from the amount set forth on **Exhibit 1** attached hereto, this Court shall enter an order deeming the amount set forth in **Exhibit 1** to be the only actual cure cost and cost of adequate assurance of future performance payable under 11 U.S.C. § 365 and forever barring such counterparty or other person or entity from objecting to the cure cost and from asserting any additional cure or other amounts against the Debtor, its estate, the Buyer, and any other Qualified Bidders or Successful Bidder with respect to its Assumed Executory Contract or with respect to any other Assumed Executory Contracts.

12.     In addition to those contracts listed in **Exhibit 1** attached hereto, most of which have already expired or been terminated, any contract not assumed and assigned pursuant to the Sale Motion will be rejected by the Sale Motion.

13.     At the Sale Hearing, the Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of this chapter 11 case.

14.     Objections, if any, to the Sale Motion, including any objections to the proposed assumption and assignment of the Assumed Executory Contracts (including objections relating to Cure Amounts and/or adequate assurances of future performance by any of the bidders) shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Central District of California, shall set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtor's estate or properties, the basis for the objection and the specific grounds therefor, and shall be served upon the following **so that they are actually received by no later than** _____ **at 12:00 p.m. prevailing Pacific time** ("Objection Deadline"):

    a.     counsel for the Debtor, Winthrop Couchot Professional Corporation, Attn: Garrick A. Hollander, Esq., 660 Newport Center Drive, Suite 400, Newport Beach, CA  92660; e-mail: ghollander@winthropcouchot.com;

    b.     the United States Trustee for the Central District of California, Santa Ana Division, 411 West Fourth Street, Room 9041, Santa Ana, CA 92701;

    c.     counsel for the Creditors' Committee, if any;

    d.     counsel for Silicon Valley Bank, Levy, Small & Lallas, Attn:  Leo Plotkin, Esq., 815 Moraga Drive, Los Angeles, California 90049; e-mail:  lplotkin@lsl-la.com;

    e.     counsel for NGEN II LP (as collateral agent for Bridge Note Holders as defined in the Motion), Murray & Murray, a professional corporation, Attn:  Stephen O'Neill, Esq., 19400 Stevens Creek Boulevard, Suite 200, Cupertino, California 95014-2548; e-mail:  soneill@murraylaw.com;

    f.     counsel for the Stalking Horse Purchaser (ISPE Services, LLC), WilmerHale, Attn:  George W. Shuster, Esq., 600 State Street, Boston, Massachusetts 02109; e-mail: george.shuster@wilmerhale.com; and

    g.     any other parties who have timely filed requests for notice under Bankruptcy Rule 2002 or who are entitled to notice under any case management procedures order, if any, entered in this chapter 11 case prior to the mailing deadline.

15.     Failure of any person or entity to file an objection on or before the Objection Deadline shall be deemed to constitute consent to the sale of the Acquired Assets to the Buyer or any other Successful Bidder and the other relief requested in the Sale Motion, on the terms set forth in the Purchase Agreement,  and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Purchase Agreement, the Auction, the sale of the Acquired Assets, or the Debtor's consummation and performance of the terms of the Purchase Agreement or any other purchase agreement entered into with the Successful Bidder (including, without limitation, the sale of the Acquired Assets and Assumed Executory Contracts free and clear of all liens, claims, interests and encumbrances (including, without limitation, all Liens, Claims, Interests and Encumbrances, as those terms are defined in the Purchase Agreement) other than Permitted Encumbrances), if authorized by the Court.

16.     Failure of the non-debtor parties to the Assumed Executory Contracts to object to the assumption and assignment of the applicable Assumed Executory Contracts, including any objections to their proposed Cure Amounts or adequate assurance of future performance by the Successful Bidder prior to the Objection Deadline shall constitute deemed

acceptance of the relief requested in the Sale Motion and the Purchase Agreement with respect to such Assumed Executory Contracts, including, without limitation, the assumption of the Assumed Executory Contracts by the Debtor, the assignment of the Assumed Executory Contracts to the Buyer or any other Successful Bidder, the payment of only the applicable Cure Amount, if any, for such Assumed Executory Contract as set forth in **Exhibit 1** hereto, and the waiver of any adequate assurance of future performance in respect of such Assumed Executory Contract.

17.    Notice of the Auction and Sale Hearing is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict, and the Debtor encourages parties in interest to review such documents, and also the Purchase Agreement, in their entirety.

DATED:  _____, 2011

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**


By:____/s/ Garrick A. Hollander_____
        Marc J. Winthrop
        Garrick A. Hollander
        Jeannie Kim
[Proposed] General Insolvency Counsel for Debtor and
Debtor-in-Possession

# EXHIBIT "2"

*Execution Version*

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of September 14, 2011, is hereby entered into by and between ISPE Services, LLC, a Delaware limited liability company, or any sister subsidiary under common control with ISPE Services, LLC as ISPE Services, LLC may designate (ISPE Services, LLC or such designee, the "Buyer"), and Energy and Power Solutions, Inc., a Delaware corporation (the "Seller").

## R E C I T A L S:

**WHEREAS**, the Buyer desires to purchase certain assets of the Seller identified herein, and the Seller desires to sell, convey, assign, and transfer to the Buyer such assets pursuant to the terms and conditions of this Agreement, and

**WHEREAS**, it is intended that the Acquired Assets (defined below) will be sold and purchased pursuant to the terms of this Agreement in a sale authorized by the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court") under Section 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"); and

**WHEREAS**, it is intended that the Bankruptcy Court shall approve the assumption and assignment of certain Executory Contracts (defined below) under Section 365 of the Bankruptcy Code; and

**WHEREAS**, the Seller will file with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing a Chapter 11 bankruptcy case for the Seller (the "Bankruptcy Case").

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    **Defined Terms**.  As used herein, the terms below shall have the following meanings:

"Acquired Assets" shall mean all right, title, and interest of the Seller in and to all assets related to the Business, including without limitation all right, title, and interest of the Seller in the assets described on Exhibit A hereto, but shall exclude all right, title, and interest of the Seller in

the Excluded Assets.  For the avoidance of doubt, the Acquired Assets shall include all right, title, and interest of the Seller in and to the Assumed Executory Contracts.

"Affiliate" shall have the meaning set forth in Section 101(2) of the Bankruptcy Code.

"Aggregate Cure Amount" shall have the meaning set forth in Section 2.5 of this Agreement.

"Allocation" shall have the meaning set forth in Section 2.8 of this Agreement.

"Alternative Transaction" means a sale, transfer, or other disposition of all or any substantial portion of the Acquired Assets or the Business to any person or entity (or persons or entities) other than the Buyer, in any transaction or series of transactions.

"Assumed Executory Contracts" shall mean the Executory Contracts set forth on Exhibit B hereto, provided that the Buyer may, in its sole discretion, at any time prior to closing, delete any Executory Contract from Exhibit B hereto, by written notice to the Seller, in which case such deleted Executory Contract shall not be an Assumed Executory Contract.

"Assumed Liabilities" shall mean only those liabilities expressly set forth on Exhibit C hereto.

"Bidding Procedures" shall mean the procedures for potential competitive bidding on the Acquired Assets in the form as set forth in Exhibit D hereto, together with any changes as to which the Buyer has agreed in writing in its sole discretion.

"Bidding Procedures Order" shall mean an order of the Bankruptcy Court, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel, approving the sale process described in the Sale Motion and the Bidding Procedures, including, without limitation, the Stalking Horse Provisions.

"Break-Up Fee" shall have the meaning set forth in Section 6.6(a) of this Agreement.

"Business" shall mean the Energy Projects business and the xChangePoint business of the Seller, as further described on Exhibit E hereto.

"Business Day" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Cash Collateral" shall mean any cash or cash equivalents of the Seller in which any person or entity may hold a Lien.

"Cash Collateral Order" shall mean an order authorizing the Seller's use of Cash Collateral in form and substance reasonably acceptable to the Buyer and as to the entry of which the Cash Collateral Parties have provided their consent.

2

"Cash Collateral Parties" shall mean any person or entity that holds a Lien on any Cash Collateral.

"Claims" shall mean any and all claims, demands, actions, credits, allowances, assertions, allegations, or other rights to payment or an equitable remedy that may or could have been made or asserted as of the date of this Agreement, or that may or could be made following the date of this Agreement, against the Seller or any of its subsidiaries and Affiliates, or against any of the Acquired Assets or the Business, for any Liabilities.

"Closing" shall have the meaning set forth in Section 3.1 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 3.1 of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" shall mean that certain Confidentiality Agreement entered into by and between the Seller and the Buyer, dated as of February 9, 2011.

"Cure Costs Determination" shall have the meaning set forth in Section 2.5 of this Agreement.

"Deposit" shall have the meaning set forth in Section 2.7 of this Agreement.

"Designated Key Employees" shall mean those Key Employees designated as "Designated Key Employees" on Exhibit H hereto.

"Encumbrances" shall mean any and all Liens, Claims, causes of action, choses in action, rights of recovery, rights of set-off, rights of recoupment, charges, conditional and installment sale agreements, options, rights of first offer or first refusal, restrictive covenants, activity and use limitations, easements, rights of way, deed restrictions, encumbrances and charges of any kind, and any similar legal or equitable rights, in each case relating to or connected with the Acquired Assets or the Business.

"Estimated Cure Costs" shall have the meaning set forth in Section 2.5 of this Agreement.

"Excluded Assets" shall mean only those assets expressly set forth on Exhibit F hereto.

"Executory Contracts" shall mean all contracts and leases in effect as of the date hereof to which the Seller is a party.

"Expense Reimbursement" shall have the meaning set forth in Section 6.6(a) of this Agreement.

"Interests" shall mean any "interest" of any person or entity in the Seller or any of its subsidiaries and Affiliates or in any of the Acquired Assets, as the term "interest" is used in Section 363(f) of the Bankruptcy Code.

3

"Key Contracts" shall mean those customer contracts and other agreements identified on Exhibit G hereto.

"Key Employees" shall mean those persons identified on Exhibit H hereto.

"Liens" shall mean any and all statutory and nonstatutory liens, security interests, pledges, charges, mortgages, hypothecations, collateral assignments, and other grants of security or similar rights in, over, or in respect of any assets or properties.

"Liabilities" shall mean any and all liabilities, debts, and obligations of the Seller whatsoever, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether conditional or unconditional, whether liquidated or unliquidated, whether legal or equitable or otherwise in nature, whether sounding in tort or in contract or otherwise, and whether due, past-due, or to become due, in each case including, without limitation, all liabilities, debts, and obligations related to employees, contracts, operations, Taxes, indebtedness, or regulatory compliance.

"Non-Designated Key Employees" shall mean Key Employees designated as "Non-Designated Key Employees" on Exhibit H hereto.

"Outside Date" shall mean the date that is sixty (60) Business Days following the date of this Agreement, or such later date as may be agreed by the Buyer in writing.

"Overbid Amount" shall have the meaning set forth in Section 6.5 of this Agreement.

"Permits" shall mean all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, or notifications to, any governmental authority, whether foreign, federal, state or local, necessary for the past or present conduct or operation of the Business.

"Permitted Encumbrances" shall mean only those Liens, Claims, Interests, and Encumbrances expressly set forth on Exhibit I hereto.

"Person" shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture or other entity of any kind whatsoever.

"Personnel" shall mean all directors, officers and employees of the Seller.

"Petition Date" shall have the meaning set forth in Section 6.4(a) of this Agreement.

"Pre-Closing Obligations" shall have the meaning set forth in Section 3.5 of this Agreement.

"Post-Closing Obligations" shall have the meaning set forth in Section 3.5 of this Agreement.

"Purchase Price" shall have the meaning set forth in Section 2.6 of this Agreement.

4

"Representative" shall mean any attorney, accountant, lender, agent, consultant or other representative.

"Sale Approval Order" shall mean an order of the Bankruptcy Court, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel, approving this Agreement and the transactions contemplated herein, including without limitation the sale of the Acquired Assets free and clear of all Liens, Claims, Interests, and Encumbrances and the assumption and assignment of all Assumed Executory Contracts.

"Sale Motion" shall mean a motion of the Seller, filed in the Bankruptcy Court, seeking approval of this Agreement and the transactions contemplated hereby, and entry of the Sale Approval Order, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel.

"Sales Procedures Motion" shall mean a motion of the Seller, filed in the Bankruptcy Court, seeking approval of the Bidding Procedures, the Stalking Horse Provisions, and entry of the Bidding Procedures Order, reasonably satisfactory in form and substance to the Buyer, the Seller, and their respective counsel.

"Seller Claims" means any and all rights of the Seller to payment, whether affirmative or through set-off, credit, allowance, or recoupment, that arose prior to, and that exist as of, the Closing.

"Stalking Horse Provisions" shall mean, collectively, the Overbid Amount, the Break-Up Fee, and the Expense Reimbursement.

"Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any governmental entity or political subdivision thereof, including, but not limited to, income, excise, property, sales, use, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, ad valorem, stamp, value added or gains taxes, registration and documentation fees, custom duties, tariffs and similar charges, withholding, social security or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties or additions attributable thereto.

"Termination Threshold Cure Amount" shall mean One Million Dollars ($1,000,000.00).

"Transferred Books and Records" shall mean the books and records regarding the Business that are transferred from the Seller to the Buyer at the Closing, as the same may be maintained following the Closing in the ordinary course of the Business as operated by the Buyer following the Closing.

5

## ARTICLE II

## PURCHASE AND SALE AGREEMENT

2.1    **Transfer of Assets**.    Upon the terms and subject to the conditions and provisions contained herein, at the Closing, the Seller shall sell, convey, transfer, assign, and deliver to the Buyer, and the Buyer shall acquire and accept from the Seller, the Acquired Assets, free and clear of all Liens, Claims, Interests, and Encumbrances, including all Excluded Liabilities (subject only to Section 2.3 below).

2.2    **Excluded Assets.**    Notwithstanding anything to the contrary contained herein, the Acquired Assets shall not include, and the Seller shall retain all of its rights, title, and interest in and to, and shall not sell, convey, transfer, assign, and deliver to the Buyer, any of the Excluded Assets, provided, however, that the inclusion of any accounts receivable from a counterparty within the Excluded Assets shall in no way impair, diminish, or otherwise affect any other rights of the Buyer with respect to such counterparty or under any Assumed Executory Contract to which such counterparty is a party.

2.3    **Assumed Liabilities and Permitted Encumbrances**.    At the Closing, the Buyer shall assume and have sole responsibility for the Assumed Liabilities.    In addition, the Buyer shall take assignment of the Acquired Assets subject to, and only to, the Permitted Encumbrances.

2.4    **Excluded Liabilities**.    For the avoidance of doubt, notwithstanding any other terms, provisions and conditions of this Agreement, the Buyer shall not assume, or otherwise be responsible or liable for or obligated with respect to, any Liens, Claims, Interests, Encumbrances, or Liabilities of the Seller or related to the Acquired Assets or any other assets of the Seller, whether actual or contingent, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, or known or unknown, except for Assumed Liabilities and Permitted Encumbrances (such Liens, Claims, Interests, Encumbrances and Liabilities described in the foregoing sentence, as qualified by the following sentence, the "Excluded Liabilities"). Specifically, and without limiting the generality of the foregoing, the Buyer shall have no liability or obligation in respect of any accounts receivable that are included within the Excluded Assets, including, without limitation, any liability or obligation to assist the Seller with the collection of any such accounts receivable or to perform under any Assumed Executory Contract in order to enable the Seller or any successor, assign, agent, or representative of the Seller to collect any accounts receivable.

2.5    **Assumed Executory Contracts and Unexpired Leases**.

(a)    The Seller shall file with the Bankruptcy Court and serve on all non-debtor parties to all Assumed Executory Contracts, in accordance with the Bidding Procedures, a notice listing all Assumed Executory Contracts and the Seller's good-faith estimate of cure costs and adequate assurance of future performance, if any, required to be paid or provided in connection with assumption and assignment with respect to each such Assumed Executory Contract (such cure costs and costs of adequate assurance being referred to herein in the aggregate as the "Estimated Cure Costs").

6

(b)      In accordance with the Bidding Procedures, if any non-debtor party to an Assumed Executory Contract objects to the applicable portion of the Estimated Cure Costs, then either (i) such non-debtor party, the Seller, and the Buyer shall agree in writing on the proper amount of such costs, or (ii) in the absence of such agreement, the Bankruptcy Court shall determine the amount of such costs (a "Cure Costs Determination").

(c)      The aggregate amount of all cure costs and costs of adequate assurance of future performance, based on the Estimated Cure Costs and as modified through Cure Costs Determinations, if any, shall be referred to as the "Aggregate Cure Amount," and components of the Aggregate Cure Amount shall be referred to as "Allowed Cure Costs." The Buyer shall pay the Aggregate Cure Amount, provided that (i) any portion of the Aggregate Cure Amount paid by the Buyer (the "Buyer-Paid Cure Amount") may be deducted from the Purchase Price as set forth in Section 2.6 of this Agreement, (ii) the Buyer may, at any time and for any reason, or for no reason, in its sole discretion, elect not to take assignment of any Assumed Executory Contract, in which case such contract shall not be an Assumed Executory Contract and no portion of the Aggregate Cure Amount shall be payable in respect of such contract, and (iii) the Buyer may elect not to purchase any of the Acquired Assets, and may terminate this Agreement pursuant to Section 9.1(vi) of this Agreement, if the Aggregate Cure Amount exceeds the Termination Threshold Cure Amount.

2.6      **Purchase Price**. Upon the terms and subject to the conditions set forth herein, the Buyer shall pay to the Seller at the Closing, for the sale, transfer, assignment, conveyance and delivery of the Acquired Assets, cash in the amount of (x) Four Million Five Hundred Thousand Dollars ($4,500,000.00), less (y) any Buyer-Paid Cure Amount (such difference, the "Purchase Price"), and (z) plus or minus any net prorations known at the Closing to be due to the Buyer or the Seller, as the case may be, pursuant to Section 3.5.

2.7      **Deposit**. Buyer shall, as soon as practicable, but in any event on or before the date the Bankruptcy Court enters the Bidding Procedures Order, deposit, in an escrow account held in trust by a third-party escrow agent, a good-faith deposit in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "Deposit"). The Deposit shall be (a) paid to the Seller and applied against the Purchase Price at the Closing, or (b) if the Closing has not occurred, then (i) returned to the Buyer, if this Agreement has terminated (except for any termination by the Seller pursuant to Section 9.1(iv) of this Agreement), (ii) returned to the Buyer, if the Outside Date has occurred, and (iii) paid as any court of competent jurisdiction may direct, if neither of the preceding clauses (i) or (ii) applies or if there is any dispute between the Buyer and the Seller in respect of the Deposit. The Buyer and the Seller shall cooperate to provide the third-party escrow agent with instructions to implement the provisions of this Section 2.7.

2.8      **Allocation of the Purchase Price**. Within ninety (90) days after the Closing, the Buyer shall deliver to the Seller an allocation of the Purchase Price among the Acquired Assets (the "Allocation"). Such Allocation shall become part of this Agreement for all purposes. The Seller and the Buyer agree to report, pursuant to Section 1060 of the Code and the regulations promulgated thereunder, if and when required, the Allocation of the Purchase Price, as adjusted, in a manner entirely consistent with such Allocation in the preparation and filing of

7

all Tax Returns (including IRS form 8594). Neither the Seller nor the Buyer shall take any action that would call into question the bona fide nature of such Allocation; and neither party shall take any position for Tax purposes which is inconsistent with such Allocation, unless required to do so under applicable law. Notwithstanding the foregoing, the Allocation shall not be binding upon any person or entity that is not a party to this Agreement.

## ARTICLE III

## CLOSING

3.1     **Closing**. Provided that the conditions to closing set forth herein have been satisfied or, if waiveable, have been waived in accordance herewith, the closing of the transactions contemplated herein (the "Closing") shall be held via e-mail or such other place as agreed to between Buyer and Seller, within five (5) Business Days following the first date that all such conditions have been satisfied or, if waiveable, waived, on a Business Day mutually agreeable to the Buyer and the Seller, but in all events prior to the Outside Date. The date on which the Closing occurs in accordance with the previous sentence is referred to as the "Closing Date."

3.2     **Conveyances at Closing**. At the Closing, the Seller and the Buyer shall take the following actions:

(a)     the Buyer shall pay to the Seller, by wire transfer to an account designated by the Seller, the Purchase Price, less the Deposit and any net amount owing by the Seller pursuant to Section 3.5, in immediately available funds;

(b)     the Buyer and the Seller shall deliver to the escrow agent a written instruction, and otherwise cooperate in good faith, to effect a wire transfer of the Deposit to an account designated by the Seller;

(c)     the Seller shall deliver to the Buyer possession of all Acquired Assets;

(d)     the Seller shall execute all such instruments as the Buyer may reasonably require to effectuate the transfer, assignment, and conveyance of the Acquired Assets, including one or more bills of sale, contract assignments, intellectual property assignments, and other instruments of conveyance; and

(e)     the Buyer shall execute and deliver to the Seller an instrument of assumption of liabilities with respect to the Assumed Liabilities in the form attached hereto as Exhibit K.

3.3     **Additional Deliveries**. After the Closing Date, the Seller shall deliver to the Buyer such other instruments and documents, and shall take such other actions, as shall be reasonably requested by the Buyer to vest in the Buyer all of the Seller's right, title, and interest in and to the Acquired Assets and otherwise to effectuate the transactions described herein.

8

3.4 **Transaction Expenses**. Except as expressly provided herein in respect of the Expense Reimbursement, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

3.5 **Prorations**. To the extent that there are obligations in respect of the Acquired Assets that relate both to the period up to and including the Closing Date ("Pre-Closing Obligations") and to the period following the Closing Date ("Post-Closing Obligations"), the Buyer and the Seller shall allocate such obligations between themselves on a ratable basis that fairly reflects the portions of such obligations that are Pre-Closing Obligations and that shall be paid by the Seller, and the portions of such obligations that are Post-Closing Obligations and that shall be paid by the Buyer. To the extent that any net amount is owing to the Buyer or the Seller, as the case may be under this Section 3.5 as of the Closing, the Purchase Price shall be decreased or increased, as the case may be, to the extent such prorations are identified as of the Closing, and to the extent such pro rations cannot or are not identified until after the Closing, then any net amount owing to the Seller or the Buyer shall be paid by the party owing such amount. Any net amount owing to the Buyer under this Section 3.5, shall be an administrative expense of the Seller's bankruptcy estate under Section 503(b) and Section 507(a)(2) of the Bankruptcy Code. For the avoidance of doubt, any prorations under this Section 3.5 that are known at Closing shall be embodied within, and shall not be in addition to, the amounts described in clause (z) of Section 2.6 of this Agreement.

3.6 **Other Closing Matters**. Each of the parties shall use their reasonable efforts to take such other actions required hereby to be performed by it prior to or on the Closing Date.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller represents and warrants to the Buyer that the statements contained in this Article IV are correct and complete in all material respects as of the date of this Agreement.

4.1 **Organization of Seller**. The Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2 **Authorization, Execution, and Delivery of Seller**. Subject only to the entry of the Sale Approval Order, the Seller has all necessary corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. Subject only to the entry of the Sale Approval Order, this Agreement has been duly executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)). Subject only to the entry of the Sale Approval Order, each agreement, instrument, and document which has been or shall be entered into or executed and delivered by the Seller in

9

connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by the Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

4.3    **No Violation**.  The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate any provision of the Articles or Certificate of Incorporation or Bylaws of the Seller or (b) subject only to the entry of the Sale Approval Order, conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to the Seller or by which the Acquired Assets or the Business are bound or affected.

4.4    **Governmental Consents and Approvals**.  Except for the Sale Approval Order, no consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state, local or foreign governmental or regulatory authority is required to be made or obtained by the Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or thereby.

4.5    **Financial Statements**.    The financial statements and other financial information provided by the Seller to the Buyer on or before the Closing Date (including without limitation the unaudited balance sheets of the Seller for the years ended December 31, 2008, December 31, 2009, and December 31, 2010, and for the quarters ended March 31, 2011 and June 30, 2011, and the related unaudited statements of operations, changes in stockholders' equity, and cash flows, as well as information regarding pipeline and backlog of customer contracts, projects, and revenues) (a) to the extent applicable to the Business, fairly present in all material respects the financial position of the Seller as of their respective dates, and (b) except for information therein regarding pipeline and backlog of customer contracts, projects, and revenues, each statement has been prepared in accordance with general accounting principles and rules.

4.6    **Acquired Assets**.  The Seller has (or will have as of the Closing, subject only to the entry of the Sale Approval Order, pursuant to Section 363 of the Bankruptcy Code) good title to, or (if applicable) a valid leasehold interest in, each and all of the Acquired Assets, free and clear of all Liens, Claims, Interests, and Encumbrances.  The Acquired Assets constitute all of the assets necessary for the Buyer to operate the Business in the manner that the Business has been conducted by the Seller prior to the date hereof.  Other than the Acquired Assets, the Seller does not have any right, title, or interest in any assets used or useful in connection with the Business.

4.7    **Specific Representations and Warranties**. All of the specific statements with respect to the Acquired Assets, the Business, and the Seller contained on Exhibit J hereto

10

are correct and complete, and are incorporated in this Section 4.7 and in this Article IV by reference.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

The Buyer represents and warrants to the Seller that the statements contained in this Article V are correct and complete in all material respects as of the date of this Agreement.

5.1    **Organization of Buyer**. The Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware.

5.2    **Authorization, Execution, and Delivery of Buyer**. The Buyer has all necessary corporate or limited liability company power and authority, and has taken all corporate or limited liability company action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. This Agreement has been duly executed and delivered by the Buyer and is a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)). Each agreement or instrument which has been or shall be entered into or executed and delivered by the Buyer in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by the Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

5.3    **No Violation**. The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate any provision of any organizational documents of the Buyer or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to the Buyer or by which the property or assets of the Buyer are bound or affected.

5.4    **Financial Capacity**. The Buyer has sufficient financial resources to pay the Purchase Price when due and otherwise consummate the transaction described herein and perform the obligations arising under this Agreement.

5.5    **Adequate Assurances**. To the Buyer's best knowledge, the Buyer is and will be capable of satisfying the conditions contained in Sections 365(b) and (f) of the Bankruptcy Code with respect to the Assumed Executory Contracts.

11

# ARTICLE VI

## ADDITIONAL COVENANTS

The Seller and the Buyer covenant and agree with each other that from the date hereof through the Closing:

6.1     **Maintenance of Acquired Assets Prior to Closing**.  The Seller, at its own expense, (a) shall maintain and operate the Acquired Assets and the Business in their current state of repair, excepting normal wear and tear, (b) shall not enter into any transactions or take any other actions outside the ordinary course of business of the Seller, consistent with past practices, in respect of or having any effect on the Acquired Assets or the Business, (c) shall maintain the employment of, and shall pay all wages, salaries, benefits, commissions, expenses, and other amounts in respect of, all employees, contractors, agents, and representatives related to the Acquired Assets and the Business, (d) shall pay all taxes, charges, and other amounts in respect of the Acquired Assets and the Business, (e) shall keep the Acquired Assets free of all Liens, Claims, Interests, and Encumbrances, other than Permitted Encumbrances, (f) shall pay all utilities all amounts that are due and owing or that may accrue up to the Closing, and shall provide all utilities any adequate assurance of payment as may be required by the Bankruptcy Code or the Bankruptcy Court, (g) shall service all customers and contracts related to the Acquired Assets and the Business, and shall perform all obligations thereto and thereunder, (h) shall maintain its existing accounting practices, and (i) shall maintain casualty and liability insurance covering the Acquired Assets and the Business in reasonable amounts and consistent with past practices and industry customs.  The Seller shall bear all risk of loss in respect of the Acquired Assets and the Business until the delivery of the Acquired Assets to the Buyer at the Closing, and, in the event that the Closing does not occur, the Buyer shall have no liability to the Seller in respect of the Acquired Assets or in relation to the Seller's taking, or having failed to take, any action required in this Section 6.1 or otherwise.

6.2     **Investigation by Buyer**.  The Seller shall allow the Buyer and its Representatives to inspect and make copies, at the Buyer's expense, of contracts, books and records, and all other documents and information reasonably requested by the Buyer and related to the Acquired Assets and the operation of the Business, up and until the Closing.  The Seller shall make available to the Buyer promptly upon reasonable request all additional documents and information with respect to the Acquired Assets and the operation of the Business.  The Buyer's rights to access, inspect and make copies as contained in this Section 6.2 will be governed by and subject to the Confidentiality Agreement.  Nothing in this Section 6.2 shall limit the Seller's obligations at closing under Section 3.2.

6.3     **Consents and Reasonable Efforts**.  Each of the parties hereto covenants and agrees, upon the terms and subject to the conditions contained herein, to pursue diligently and in good faith and use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby.

12

6.4    **Bankruptcy Actions**.

(a)    The Seller shall (i) commence the Bankruptcy Case as soon as reasonably practicable after executing this Agreement, and in any event no later than five (5) Business Days following the date of this Agreement (the commencement date being referred to as the "Petition Date"); (ii) as soon as reasonably practicable, and in any event within two (2) Business Days following the Petition Date, file with the Bankruptcy Court the Sale Procedures Motion; and (iii) as soon as reasonably practicable, and in any event in compliance with the Bidding Procedures Order, file with the Bankruptcy Court the Sale Motion and serve notice of the transactions contemplated hereby upon all parties entitled to notice, including, without limitation, all Persons known to possess or assert a Lien, Claim, Interest, or Encumbrance against the Acquired Assets or the Business, counterparties to all contracts or agreements with the Seller, all relevant government agencies, departments, authorities, and divisions thereof, and any other parties required to be served by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Bankruptcy Court, and upon any other parties requested to be served by the Buyer. The Buyer acknowledges that the Acquired Assets may be subject to competitive bidding and that the Bidding Procedures may be supplemented by other customary procedures consistent with the terms of this Agreement, provided that the Bidding Procedures may not be amended, modified, or supplemented in any respect except as agreed to by the Buyer in writing in its sole discretion.

(b)    The Buyer shall provide such information and assistance as are reasonably requested by the Seller to assist the Seller in obtaining a finding by the Bankruptcy Court that the Buyer is deemed to have purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Assumed Executory Contracts as required by Section 365 of the Bankruptcy Code.

(c)    In the event the Sale Approval Order is appealed, the parties hereto shall cooperate in taking such steps to prosecute diligently such appeal and use their commercially reasonable efforts to defend such appeal, provided that nothing herein shall limit or impair the right of the Buyer to terminate this Agreement under Section 9.1 (iv), (x), or (xii) hereof.

6.5    **Overbid Protections**. As set forth in the Bidding Procedures, any competing offer to purchase all or a portion of the Acquired Assets or Business will not be considered by the Seller as qualified unless, in the Seller's reasonable judgment, after consulting with the Seller's financial and legal advisors, such competing offer has been made on substantially the same terms and conditions as those set forth in this Agreement, and the competing purchase price equals or exceeds the aggregate of (i) the Purchase Price as set forth in Section 2.6(x) of this Agreement, (ii) the Break-Up Fee, (iii) the maximum amount of the Expense Reimbursement, plus (iv) $100,000 (such aggregate amount arrived at by adding the amounts in the foregoing clauses (i) through (iv) being referred to herein as the "Overbid Amount").

13

6.6    **Alternative Transaction.**

(a)    If the Seller enters into an agreement to consummate or consummates an Alternative Transaction, then the Seller shall pay the Buyer by wire transfer to an account designated by the Buyer, in immediately available funds, on the closing date of such Alternative Transaction: (i) an amount equal to Two Hundred Twenty Five Thousand Dollars ($225,000.00) (the "Break-Up Fee"), and (ii) all reasonable out-of-pocket expenses of the Buyer in connection with the transactions contemplated by this Agreement (including, without limitation, the fees and expenses of counsel) up to a maximum of Five Hundred Thousand Dollars ($500,000.00) (the "Expense Reimbursement").

(b)    The Break-Up Fee and Expense Reimbursement shall be paid from any proceeds of an Alternative Transaction otherwise payable to the Seller, provided that if such amounts are not paid from such proceeds, the Seller shall remain liable for such amounts. Except as otherwise provided in Section 9.2, in no event shall the Seller or any Affiliate have any liability with respect to the Buyer or any other person for an amount exceeding the Break-Up Fee and Expense Reimbursement in the event that this Agreement terminates pursuant to Section 9.1(ii).

(c)    The Break-Up Fee and Expense Reimbursement, to the extent the same become due and owing, shall be first-priority administrative expenses of the Seller's bankruptcy estate under Section 503(b) and Section 507(a)(2) of the Bankruptcy Code.

(d)    The obligation of the Seller to pay, and the payment by the Seller of, the Break-Up Fee and Expense Reimbursement shall in no way limit or otherwise affect the rights of the Buyer to a return of the Deposit, including without limitation the rights of the Buyer under Sections 2.7 and 9.2(iii) of this Agreement and under any applicable escrow agreement.

(c)    The Seller acknowledges and agrees that the Buyer would not have entered into this Agreement but for the provisions of this Section 6.6, and that the provisions of this Section 6.6 are integral to, and shall survive any termination of, this Agreement.

6.7    **No Shop Provision**. The Seller shall not solicit, negotiate, or enter into any other offers to purchase all or any portion of the Acquired Assets or the Business except through the process set forth in the Bidding Procedures and as otherwise required by the Bankruptcy Code, provided, however, that the foregoing shall not prohibit the Seller or its advisors from taking any action in response to any unsolicited proposal that its board of directors concludes, after consultation with counsel, and through resolution in accordance with applicable corporate requirements, is necessary in the exercise of their fiduciary duties as directors.

6.8    **Avoidance Actions**. The Seller shall not commence or pursue any action or claim under Chapter 5 of the Bankruptcy Code against the Buyer or against any vendor or customer of the Business. This Section 6.8 shall survive the Closing and any termination of this Agreement following the Closing.

## ARTICLE VII

## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of the Seller to sell the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by the Seller in writing in accordance with Section 9.8:

7.1     **Entry of Orders**.  Each of the Bidding Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall be final and non-appealable, and shall not have been stayed, withdrawn, or modified.

7.2     **Litigation**.  There shall not be any judgment, decree, injunction, order or ruling in effect preventing the consummation of the transactions contemplated by this Agreement.

7.3     **Covenants and Representations**.  The Buyer shall have performed in all material respects all agreements and covenants required hereby to be performed by the Buyer prior to or at the Closing Date, and the representations and warranties of the Buyer made in Article V shall be correct and complete in all material respects as of the Closing Date as if made on such date.

7.4     **Deliveries**.   On or prior to the Closing Date, the Buyer shall have delivered to the Seller the Purchase Price as required in Section 3.2(a).

## ARTICLE VIII

## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of the Buyer to purchase the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by the Buyer in writing in accordance with Section 9.8:

8.1     **Entry of Orders**.  The Bidding Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall be final and non-appealable, and shall not have been stayed, appealed, withdrawn, or modified.

8.2     **Litigation**.  There shall not be any judgment, decree, injunction, order or ruling in effect preventing the consummation of the transactions contemplated by this Agreement.

8.3     **Covenants and Representations**.  The Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by the Seller prior to or at the Closing Date, and the representations and warranties of the Seller in Article IV

15

shall be correct and complete in all material respects as of the Closing Date as if made on such date.

8.4 **Required Approvals**. All customary regulatory approvals that may be required, if any, shall have been obtained, or any applicable waiting periods shall have expired without comment or response from the applicable regulatory entity or agency.

8.5 **No Material Adverse Change**. There shall not have been any material adverse change to the Business, to the Acquired Assets, or to the value thereof, or to the finances or operations of the Seller, other than the Seller's filing of its Bankruptcy Case, that (a) becomes known to the Buyer from the date of this Agreement through the Closing Date, (b) was not disclosed by the Seller, and (c) was not reasonably discoverable by the Buyer prior to the date of this Agreement.

8.6 **Key Employees**. All of the Designated Key Employees and at least eighty percent (80%) of the Non-Designated Key Employees: (a) shall continue to be employed by the Seller at the Closing; (b) shall not have given any notice or other indication that such employee is not willing or does not intend to be employed by the Buyer following the Closing; and (c) shall have accepted employment with the Buyer on terms and conditions satisfactory to the Buyer and executed and delivered to the Buyer the Buyer's standard forms of confidentiality and invention assignment agreement and associated schedules and statements without amendment or modification thereto in any substantive respect.

8.7 **Key Contracts**. No party to any Key Contract shall have objected to or otherwise opposed the assumption and assignment of its contract, shall have demanded any adequate assurance of future performance under its contract, or shall have objected to the Estimated Cure Costs for its contract, unless such objection or demand has been resolved to the reasonable satisfaction of the Buyer.

8.8 **Mechanics' Liens**. Notwithstanding Section 2.3 of this Agreement, the Seller shall have obtained releases of any Permitted Encumbrances described in paragraph 2 of Exhibit I hereto, unless, and solely to the extent that, the obligations secured by such Permitted Encumbrances are Assumed Liabilities.

8.9 **Instruments of Conveyance, Certificates**. The Seller shall have executed and delivered to the Buyer all of the documents provided for in Section 3.2 of this Agreement.

8.10 **Deliveries**. On or prior to the Closing Date, the Seller shall have delivered to the Buyer all of the following:

(i) a copy of the each of the Bidding Procedures Order and the Sale Approval Order as entered by the Bankruptcy Court, certified by the clerk of the Bankruptcy Court;

(ii) a certificate from the Seller, dated as of the Closing Date, stating that the conditions specified in Sections 8.1 through 8.9 have been satisfied; and

16

(iii)    such other documents or instruments as the Buyer or its counsel may reasonably request to effect the transactions contemplated hereby.

## ARTICLE IX

## MISCELLANEOUS

9.1    **Termination.**  This Agreement may be terminated prior to the Closing:

(i)    by mutual written consent executed by both the Buyer and the Seller at any time;

(ii)    by the Seller, upon the consummation of any Alternative Transaction as a result of any Auction (as defined in the Bidding Procedures), but only if the Seller performs its obligations under Sections 6.6 and 9.2(ii) and (iii) hereof prior to or simultaneously with such termination;

(iii)    by the Buyer, if the Seller is in breach of any of its material obligations hereunder, and, to the extent such breach is reasonably capable of cure within such period, such breach has not been cured by the Seller within five (5) Business Days after written notification by the Buyer;

(iv)    by the Seller, if the Buyer fails to satisfy any of its material obligations at the Closing;

(v)    by either the Buyer or the Seller, if all Cure Cost Determinations have not been made, or if the Aggregate Cure Amount has not been established within forty-five (45) Business Days following the Petition Date;

(vi)    by the Buyer, if the Aggregate Cure Amount exceeds the Termination Threshold Cure Amount;

(vii)    by the Buyer, if the Seller fails to comply with any of its obligations contained in Section 6.4 of this Agreement;

(viii)    by the Buyer, if the Cash Collateral Order is not entered by the Bankruptcy Court within five (5) Business Days following the Petition Date, or if any approval of the Seller's use of Cash Collateral is denied, or if any consent to the Seller's use of Cash Collateral by any Cash Collateral Parties is revoked, withdrawn, or terminated, or if the Cash Collateral Order or any other approval of the Seller's use of Cash Collateral is appealed, revoked, or withdrawn, or expires or terminates without renewal on terms reasonably satisfactory to the Buyer;

(ix)    by either the Buyer or the Seller, if (a) the Bidding Procedures Order has not been entered by the Bankruptcy Court, or if the Stalking Horse Provisions have not been approved by the Bankruptcy Court, in each case within twenty (20) Business Days following the Petition Date, (b) the Bidding Procedures Order has been appealed,

17

withdrawn, revoked, rescinded, or modified, or (c) the Bidding Procedures Order has not become a final, non-appealable order within fourteen (14) calendar days following the date on which it is entered;

(x)    by either the Buyer or the Seller, if (a) the Sale Approval Order has not been entered by the Bankruptcy Court, or if the sale of the Acquired Assets to the Buyer has not been approved by the Bankruptcy Court, in each case within forty-five (45) Business Days following the Petition Date, (b) the Sale Approval Order has been appealed, withdrawn, revoked, rescinded, or modified, or (c) the Sale Approval Order has not become a final, non-appealable order within fourteen (14) calendar days following the date on which it is entered;

(xi)    by the Buyer, if the Bankruptcy Case is converted from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code; or

(xii)    by either the Buyer or the Seller, if the Closing has not occurred on or prior to the Outside Date, provided that neither the Buyer nor the Seller may terminate pursuant to this clause (xi) if the failure of the Closing to occur on or prior to the Closing Date is primarily attributable to a breach by such party of its obligations hereunder.

9.2    **In the Event of Termination; Remedies**.  In the event of termination of this Agreement pursuant to Section 9.1:

(i)    except as otherwise set forth in this Section 9.2, all obligations of the parties hereto under this Agreement shall terminate and there shall be no liability of any party hereto to any other party and each party hereto shall bear its own expenses incurred in connection with the negotiation, preparation, execution and performance of this Agreement; provided that the foregoing shall not relieve any party of liability for damages actually incurred by any other party as a result of any breach of this Agreement resulting from the willful misconduct or grossly negligent act or omission of the party permitting, causing or committing such breach;

(ii)    in the case of a termination pursuant to Section 9.1(ii), the Buyer shall be entitled to the Break-Up Fee and the Expense Reimbursement on the terms and subject to the conditions of Section 6.6, notwithstanding such termination, and the provisions of Section 6.6 shall survive any termination of this Agreement; and

(iii)    the Buyer and the Seller shall cause the Deposit to be released to the Buyer or the Seller, as the case may be, pursuant to the terms of Section 2.7, and the provisions of Section 2.7 shall survive any termination of this Agreement.

The provisions of this Section 9.2 shall survive any termination of this Agreement.  Nothing in this Section 9.2 shall require a termination of this Agreement by the Seller as a condition to the payment of the Break-Up Fee and Expense Reimbursement to the extent such amounts otherwise are or become owing under Section 6.6 of this Agreement.

18

9.3    **Seller's Liquidated Damages**.  Notwithstanding any other provision of this Agreement, in the event of any termination by the Seller under Section 9.1(iv), or in the event of any breach or default by the Buyer, whether or not this Agreement terminated, the sole remedy of the Seller shall be recourse to the Deposit. The provisions of this Section 9.3 shall survive any termination of this Agreement.

9.4    **Assignment; Successors**.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of all other parties to this Agreement.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, legatees, successors and permitted assigns, and no other person shall have any right, benefit or obligation hereunder.  Notwithstanding the foregoing, ISPE Services, LLC may assign its rights and obligations under this Agreement to any wholly-owned direct or indirect subsidiary of ISPE Services, LLC by sending written notice to, but without the consent of, the Seller, provided that any such assignment shall not relieve ISPE Services, LLC of its obligation to pay the Purchase Price at the Closing, if required under the terms and subject to the conditions of this Agreement. In the event of any such assignment by ISPE Services, LLC, all references to the Buyer herein shall be deemed references to the assignee, and the Seller shall cooperate to ensure that the Sale Approval Order and any other document or instrument reflecting the name of the Buyer is modified to reflect the name of the assignee.

9.5    **Access to Books and Records**.  From and after the Closing, and for so long as the Bankruptcy Case is pending or twelve (12) months after Closing, whichever is longer, the Buyer agrees to provide the Seller with reasonable access to the Transferred Books and Records (and allow the Seller to make extracts and copies of such Transferred Books and Records during such access) in connection with the Bankruptcy Case or any other proceeding or action related thereto, including any avoidance action (except for any avoidance actions described in the proviso to clause 8 of Exhibit F hereto) that may be brought by the Seller, in each case at the Seller's sole cost and expense. Any such access shall be during regular business hours upon reasonable advance notice and in a manner that minimizes disruption to the business, operations and activities of the Buyer. In connection with the Seller's access to the Transferred Books and Records, the Seller shall be accompanied at all times by a representative of the Buyer unless the Buyer otherwise agrees, shall not materially interfere with the use and operation of the offices and other facilities of the Buyer, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities. Notwithstanding the foregoing, the Seller shall keep the Transferred Books and Records confidential, and may not use or disclose any Transferred Books and Records, or any information contained therein, following the Closing unless (a) such use or disclosure is permitted in writing by the Buyer or under the terms of the Confidentiality Agreement, or (b) such use or disclosure is necessary for the Seller's satisfaction of its obligations as a debtor under the Bankruptcy Code, in connection with any tax or regulatory filing or proceeding, or as a part of the Seller's winding up its affairs.

9.6    **Notices**.  All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by facsimile upon written confirmation (including the automatic confirmation that is received from

19

the recipient's fax machine or computer) of receipt by the recipient of such notice if such confirmation is received on a Business Day before 6:00 p.m. (ET), or otherwise on the next Business Day; the date after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case notice shall be:

If to the Seller, addressed to:                  Energy and Power Solutions, Inc.
                                            150 Paularino Avenue, Suite A 120
                                            Costa Mesa, California  92626
                                            Attention: Jay Zoellner, President & CEO
                                            Facsimile:    (714) 957-0167

With a copy to:

        Attorney for the Seller:          Winthrop Couchot Professional Corporation
                                            660 Newport Center Dr., 4th Floor
                                            Newport Beach, CA 92660
                                            Attention: Marc Winthrop, Esq.
                                            Facsimile: (949) 720-4111

If to the Buyer, addressed to:                ISPE Services, LLC
                                            111 Speen Street, Suite 410
                                            Framingham, Massachusetts  01701
                                            Attention: General Counsel
                                            Facsimile: (508) 661-2203

With a copy to:

        Attorneys for the Buyer:        Wilmer Cutler Pickering Hale and Dorr LLP
                                            60 State Street
                                            Boston, Massachusetts  02109
                                            Attention: George W. Shuster, Jr., Esq.
                                            Facsimile:  (617) 526-5000

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

        9.7    **Choice of Law**. This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the state of California. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 9.6. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of

20

the transactions contemplated hereby or thereby and any such dispute shall be deemed to have arisen in the state of California. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

9.8    **Entire Agreement; Amendments and Waivers**.  The Confidentiality Agreement shall be considered a part of this Agreement and shall be deemed integrated herewith. This Agreement, together with all Exhibits, Schedules, and Annexes attached or to be attached hereto and together with the Confidentiality Agreement (which Confidentiality Agreement shall survive the entry into this Agreement and any termination hereof), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties; provided that the forms of agreements attached hereto as Exhibits shall be superseded by the copies of such agreements executed by the parties thereto and shall be conclusive evidence of such parties' approval of any change or modification or waiver thereof or of this Agreement, as applicable. No amendment or modification of any term or provision hereof shall be binding unless executed in writing by or on behalf of the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

9.9    **Construction**.  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits, Schedules, and Annexes shall be to the specified Exhibits, Schedules, and Annexes attached hereto. All Exhibits, Schedules, and Annexes attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits, Schedules, and Annexes, except as otherwise provided therein. All references in this Agreement to "this Agreement" shall be deemed to include the Exhibits, Schedules, and Annexes attached hereto. The terms "hereby", "hereto", "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "including" when used herein shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

21

9.10    **Third Party Beneficiaries**. No Person other than the parties hereto (and any permitted assignee under Section 9.4 hereof), shall have any rights or claims under this Agreement.

9.11    **Brokerage Obligations**. The Buyer and the Seller shall not be liable for any brokerage obligations incurred by the other, and in no event shall any broker engaged by the Seller have any recourse against the Buyer, the Acquired Assets, or the Business.

9.12    **No Waiver**. The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform, nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

9.13    **Multiple Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.14    **Invalidity**. In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument; provided, however, that Section 6.6 of this Agreement shall be deemed an integral part hereof and not severable from the other provisions of this Agreement.

9.15    **Publicity**. The Seller shall not issue any press release or make any public statement regarding the transactions contemplated hereby, without the prior approval of the Buyer.

9.16    **Further Assurances**. Without limiting any other rights or obligations of the parties contained in this Agreement, following the Closing, the Seller agrees to execute such documents, instruments or conveyances and take such actions as may be reasonably requested by the Buyer or the Buyer's counsel and otherwise reasonably cooperate with the Buyer, its Affiliates and their respective Representatives in connection with any action that may be necessary or advisable in connection with the transactions contemplated hereby.

9.17    **Cumulative Remedies**. All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

9.18    **Warranties Exclusive**. The representations and warranties contained herein are the only representations or warranties given by the Seller and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Buyer acknowledges that the Acquired Assets are conveyed "AS IS," WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed.

22

9.19    **Termination of Covenants, Representations, and Warranties at Closing**. The covenants to be performed hereunder by the Seller and the Buyer before the Closing, and the representations and warranties made by the Seller and the Buyer herein, shall terminate as of the Closing, subject only to those provisions of this Agreement that expressly survive the Closing or any termination of this Agreement. The Buyer shall have no right to seek indemnification from the Seller subsequent to the Closing based on a breach by the Seller of a representation or warranty made by the Seller herein, or based on a breach by the Seller of any covenant to be performed hereunder by the Seller before the Closing, except with respect to the Excluded Liabilities and except as set forth in Section 9.2(i). The Seller shall have no right to seek indemnification subsequent to the Closing based on a breach of a representation or warranty made by the Buyer herein, or based on a breach by the Buyer of any covenant to be performed hereunder by the Buyer before the Closing, except with respect to the Assumed Liabilities. For the avoidance of doubt, and notwithstanding the foregoing, covenants to be performed by the Seller and the Buyer on and following the Closing, or that expressly survive the closing pursuant to the terms of this Agreement, shall not terminate pursuant to this Section 9.19, and shall survive, and remain enforceable following, the Closing. This Section 9.19 shall survive following the Closing and notwithstanding any termination of this Agreement.

9.20    **Representation by Counsel; Mutual Negotiation**. Each party has been represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction and construction of the parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

9.21    **Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration and other such taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement shall be paid by the Buyer when due, and the Buyer shall, at its own expense, file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law.

[The next page is the execution page]

23

**IN WITNESS WHEREOF,** the parties hereto have caused this Asset Purchase Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

**SELLER**

**Energy and Power Solutions, Inc.**

By: _____
    Name: Peter Ludlum
    Title: CFO

**BUYER**

**ISPE Services, LLC**

By: _____
    Name: _____
    Title: _____

24

**IN WITNESS WHEREOF,** the parties hereto have caused this Asset Purchase Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

**SELLER**

**Energy and Power Solutions, Inc.**

By: _____
      Name: _____
      Title: _____

**BUYER**

**ISPE Services, LLC**

By: _____
      Name: George P. Sakellaris
      Title: President

24

**List of Exhibits**

Exhibit A:     Acquired Assets

Exhibit B:     Assumed Executory Contracts

Exhibit C:     Assumed Liabilities

Exhibit D:     Bidding Procedures

Exhibit E:     Description of the Business

Exhibit F:     Excluded Assets

Exhibit G:     Key Contracts

Exhibit H:     Key Employees

Exhibit I:     Permitted Encumbrances

Exhibit J:     Specific Representations and Warranties

Exhibit K:     Instrument of Assumption of Liabilities

## EXHIBIT A

## Acquired Assets

The term "Acquired Assets" means, collectively, all of the following:

1.      All tangible assets, including, without limitation, (a) all fixtures, furniture, office supplies, and office equipment, (b) all computers, printers, servers, and other information technology equipment, (c) all machinery, tools and tooling, supplies, spare parts, packaging materials, and other operational and manufacturing equipment, (d) all fixtures, (e) all inventory, raw materials, and work-in-progress, (f) all motor vehicles, (g) all signage, advertising materials, marketing materials, literature and manuals, and samples, (g) all tangible books, records, files, ledgers, accounts, correspondence, and communications necessary or useful to operate the Business, and (h) all other tangible personal property.

2.      All intangible assets, including, without limitation, (a) all claims, prepayments, deposits (including security deposits and equipment deposits), refunds, causes of action, choses in action, rights of recovery, rights of setoff, rights of recoupment, and prepaid items, (b) all warranties and similar rights, (c) all certificates, licenses, permits, franchises, rights, approvals, clearances, orders, exemptions, registrations, authorizations, and similar rights issued by any governmental entity or agency, (d) all intangible books, records, files, accounts, ledgers, correspondence, and communications, (e) all rights under contracts, agreements, and instruments that are not Executory Contracts, including, without limitation, all rights under non-disclosure and confidentiality agreements that are not Executory Contracts and all rights under insurance contracts and to insurance proceeds for claims under such insurance contracts and to such insurance proceeds arising after the Closing Date to the extent that the insurance proceeds are related to other Acquired Assets, (f) all good will, and (g) all other intangible personal property.

3.      To the extent not included in the foregoing, all intellectual property and related rights, including, without limitation, (a) all patents, patent applications, patent disclosures and all related continuation, continuation-in-part, divisional, reissue, reexamination, utility model, certificate of invention and design patents, patent applications, registrations and applications for registrations, (b) all trademarks, service marks, trade dress, internet domain names, logos, trade names and corporate names and registrations and applications for registration thereof, (c) all copyrights, designs, data and database rights and registrations and applications for registration thereof, (d) all mask works and registrations and applications for registration thereof, (e) all computer software, data and documentation, (f) inventions, trade secrets and confidential business information, whether patentable or nonpatentable and whether or not reduced to practice, know-how, manufacturing and product processes and techniques, research and development information, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (g) other proprietary rights relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions), and (h) all copies and tangible embodiments of the foregoing and all good will associated with the foregoing, in each case whether the Seller's right, title, or interest therein is owned, licensed, or of any other nature or character.

4.      Without limiting the generality of the foregoing, all of the assets specifically listed in Annex A-1 hereto.

For the avoidance of doubt, notwithstanding the foregoing, (1) none of the Excluded Assets are included within the Acquired Assets, and (2) all of the Assumed Executory Contracts are Acquired Assets.

Annex A-1

## Specific Acquired Assets

1) Tangible - Inventory / Equipment for Projects / Tools located at:
   a) 150 Paularino Suites A120 and C110
   b) Listing per accounting system:

Inventory Report                          07/26/2011

Warehouse:   1                            EPS Warehouse

| Item # | Description | Category | Qty |
|---|---|---|---|
| 00022 | UL489 MINIATURE CIRC(1492-SPU1B150) | MISC | 3.00 |
| 00024 | MODULE | MISC | 4.00 |
| 00026 | J4 END ANCHOR (REPL 1492-EA35) | MISC | 20.00 |
| 00028 | J4 END BARRIER | MISC | 12.00 |
| 00031 | FEED THROUGH SCREW TERM | MISC | 24.00 |
| 00032 | FEED THROUGH GRD BLK | MISC | 4.00 |
| 00034 | MCB/SUPPLEMENTARY P | MISC | 1.00 |
| 00041 | INPUT 8 CHANNEL | MISC | 4.00 |
| 00042 | RIGHT END CAP | MISC | 2.00 |
| 00044 | CMX L23E 16DI 16D ANG/GKK | MISC | 2.00 |
| 00045 | 750K/ETHERNET PROCESSOR | NETW | 2.00 |
| 00048 | DIN MOUNTING RAIL | MISC | 6.00 |
| 00068 | SINGLE SENSOR IO | METR | 8.00 |
| 00069 | 900MHZ WHIP ANTNN 1M RG174/SMA | METR | 16.00 |
| 00090 | 3" WHITE COVER | MISC | 36.00 |
| 00091 | 3 X 3 NARROW FINGER WHITE | MISC | 36.00 |
| 00103 | AB 15E POWER SUPPLY | POWR | 3.00 |
| 00105 | LOOP PWRD ISOLATOR 1 CH | MISC | 17.00 |
| 00106 | LOOP PWRD ISOLATOR 2 CH | MISC | 5.00 |
| 00107 | LOOP PWRD ISOLATOR 4 CH | MISC | 7.00 |
| 00110 | 900 MHZ WLESS OUTDOOR PTP ENET BRDG | MISC | 1.00 |
| 00115 | SOLOR PANEL KIT w/BATTERY BU | MISC | 1.00 |
| 00119 | SIE ECGB10 GROUNDBAR KIT #10-4 | MISC | 6.00 |
| 00121 | K FACTOR SCALER CONFG KIT FLO-TECH | MISC | 3.00 |
| 00122 | SIGNAL CONDITIONRS 4-20 LOOP ISOLTD | MISC | 1.00 |
| 00125 | HUMIDITY & TEMPERATURE METER | METR | 5.00 |
| 00126 | KEPWARE A-B OEM SITE LICENSE | SFTW | 6.00 |
| 00127 | ANTENEX DL BND CELLULAR/PCS ANT KIT | MISC | 2.00 |
| 00133 | VORTEX FLOW GAS MTR 316SS 24" STEM | METR | 15.00 |
| 00139 | FT218ISSSTE1DDB FOX THERML FLOW 18" | METR | 4.00 |
| 00140 | DYNASONIC ULTRASONIC FLOWMETER 11/2 | METR | 2.00 |
| 00153 | SPLIT-CORE CURRENT TRANSDUCER, HIGH | MISC | 1.00 |
| 00154 | REPEATER/POWER SUPPLY 2 CHANNELS | MISC | 2.00 |
| 00156 | PROX SWITCH, 18MM,10-30VDC,2WIRE,NO | MISC | 2.00 |
| 00158 | 115 VAC/7.5-13 VDC POWERED W/ ANALO | MISC | 1.00 |

| 00161 | MODIFIED SGL DOOR WALL MT ENC (DRAW | ITEQ | 22.00 |
|---|---|---|---|
| 00164 | FT2-I8ISSSTE1DDMBG3 INSERTION METER | LAB | 2.00 |
| 00165 | MINIATURE CB BREAKER | MISC | 5.00 |
| 00166 | 24VDC PWR SUPPLY | MISC | 6.00 |
| 00169 | PRESSURE TRANSDUCER | MISC | 1.00 |
| 00171 | PRESSURE TRANSDUCER | MISC | 1.00 |
| 00173 | MODBUS 8-Ch AI Module | MISC | 4.00 |
| 00174 | MODBUS 15-Ch DI/O Module | MISC | 10.00 |
| 00176 | ACROMAG:CH ANALOG INPUT ETHERNET IP | MISC | 2.00 |
| 00178 | RTD TEMP SENSOR w/ TRANSMITTER | MISC | 7.00 |
| 00179 | FT218ISSSTE1D0B0-FOX THRML NO DISP | METR | 3 00- |
| 00181 | J TYPE THERMOCOUPLE 6" LENGTH | MISC | 4.00 |
| 00182 | THERMOCOUPLE CONVERTER 4-20mA 32-12 | MISC | 2.00 |
| 00187 | DYNASONIC ULTRASONIC FLOWMETER 1" | METR | 6.00 |
| 00188 | ENERCEPT H8040 SERIES | MISC | 2.00 |
| 00192 | ENERCEPT H8040 SERIES | MISC | 1.00 |
| 00195 | USB to Isolated 2 Port 422/485 Conv | METR | 1.00 |
| 00196 | USB TO SERIAL 1 PORT, 2WIRE TB | METR | 2.00 |
| 00197 | Power-IO Interface Module | MISC | 14.00 |
| 00200 | AB Flex I/O Terminal Base Unit | MISC | 2.00 |
| 00201 | AB Flex I/O T/C RTD Input 8 Channel | MISC | 1.00 |
| 00202 | Rosemount RTD with 1" Thermal Well | MISC | 6.00 |
| 00203 | Rosemount Pressure Transmitter, 0-1 | MISC | 2.00 |
| 00204 | VFD PowerFlex 400 AB 23C-D045H103NN | MISC | 1.00 |
| 00207 | Din Mount Filter | MISC | 2.00 |
| 00208 | LEV 3801-DIN TVSS Single | MISC | 2.00 |
| 00209 | 20 AMP UL489 Mini Circuit Brake | MISC | 2.00 |
| 00210 | 5 AMP Mini Circuit Braker UL489 | MISC | 4.00 |
| 00213 | Hoff C-WHNL NON Locking Handle | MISC | 2.00 |
| 00214 | AB 1492-ACAB025EA69 Analog Cable W | MISC | 2.00 |
| 00215 | Assembly Cable | MISC | 2.00 |
| 00217 | Mobule with Multiple commons cable | MISC | 2.00 |
| 00218 | AB 1492-IFM20D-120A2 Module | MISC | 2.00 |
| 00219 | AB1769-1A16 Input MOD 16PT 120VAC | MISC | 2.00 |
| 00220 | AB179-OA16 Compact Logix 16 Point | MISC | 2.00 |
| 00221 | AB 1769-OF8C 8 Channel Log | MISC | 2.00 |
| 00222 | AB1769PA2 Ecpansion Power Supply | MISC | 2.00 |
| 00223 | AB 1783-US08T Stra Tix Unmanage | MISC | 2.00 |
| 00225 | AB-1492-J4 W Feed Through | MISC | 30.00 |
| 00226 | AB1492ACAB025D69 Asemble | MISC | 2.00 |
| 00227 | 3DB Fiberglass Omni Station Antenna | MISC | 1.00 |
| 00228 | HD Mounting Bracket for Antenna | MISC | 1.00 |
| 00229 | LMR195Cable RPSMA Plug toN-Male 3FT | MISC | 1.00 |
| 00300 | Vision Module Limited | MISC | 9.00 |
| 00301 | Swagelock Compression Fitting | MISC | 1.00 |
| 00302 | XPress Ethernet Bridge 900MHZ | MISC | 2.00 |
| 302 | Advantech Fanless Industrail PC | MISC | 7.00 |
| MDMKIT-A | AIRLINK MODEM KIT (AT&T) | KIT | 2.00 |

A-1-2